UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

—————————————————————————

FOX TELEVISION STATIONS, INC., et al.                Civil No. 1:13-cv-00758 (RMC)
                                                     Hon. Rosemary M. Collyer

     *Plaintiffs/Counter-Defendants*,

                  v.

FILMON X, LLC, et al.

     *Defendants/Counter-Plaintiffs*.

—————————————————————————

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS/COUNTER-PLAINTIFFS' OPPOSITION TO PLAINTIFFS/COUNTER-DEFENDANTS' JOINT MOTION FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 4

ARGUMENT ...................................................................................................................... 7

    I.      Plaintiffs Do Not, And Cannot, Establish The Elements Required For Issuance Of A Preliminary Injunction ........................................................................................ 7

   II.     Plaintiff's Do Not, And Cannot, Establish A Likelihood Of Success On The Merits ....... 8

     A.    FilmOn X Enables "Private Transmissions" Under The Transmit Clause Of The Copyright Act ........................................................................................................ 8

        1.   Congress intended to exempt private performances from liability ................................... 8

        2.   Case law protects private transmissions ........................................................................ 10

     B.    FilmOn X's Technology Enables Consumers To Lawfully Exercise Their Right To Remotely Time-Shift And Play-Back Over The Air Broadcast Programming ............... 21

  III.     Plaintiffs Will Not Suffer Irreparable Harm .................................................................. 21

     A.    Plaintiffs' Showing is Speculative and Unsupported by Any Evidence .......................... 21

     B.    The Risk of Wrongful Enjoinment Justifies a Substantial Bond .................................... 24

  IV.     The Balance Of Hardships Favors FilmOn X ................................................................ 24

   V.     An Injunction Does Not Serve The Public Interest ........................................................ 25

  VI.     If A Preliminary Injunction Is Issued, It Should Be Limited To The D.C. Circuit ......... 27

CONCLUSION .................................................................................................................. 29

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Aamer v. Obama,*
    2013 WL 3651393 (D.D.C. July 16, 2013) ..........................................................................7

*Am. Broad. Companies, Inc. v. Aereo, Inc.,*
    874 F. Supp. 2d 373 (S.D.N.Y. 2012), ........................................................................passim

*Belushi v. Woodward,*
    598 F. Supp. 36 (D.D.C.1984)................................................................................24, 25

*Cablevision. Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
    536 F. 3d 121 (2d Cir. 2008), .....................................................................................passim

*Cablevision Systems Development Co. v. Motion Picture Association of America, Inc.,*
    836 F.2d 599 (D.C. Cir. 1988).........................................................................................16

*Califano v. Yamasaki,*
    442 U.S. 682 (1979).........................................................................................................28

*David v. Showtime/The Movie Channel, Inc.,*
    697 F. Supp. 752 (S.D.N.Y. 1988) ..................................................................................17

*Davis v. Pension Ben. Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009)..........................................................................................7

*eBay, Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006).....................................................................................................3, 22

*Fortnightly Corp. v. United Artists Television, Inc.,*
    392 U.S. 390 (1968)....................................................................................................19, 20

*Fox Broadcasting Co, Inc., et al. v. Dish Network L.L.C., et al.,*
    2013 WL 3814917 (C.D. Cal. July 24, 2013)..........................................................15, 16, 21

*Fox Television Stations, Inc. v. BarryDriller Content Sys. PLC.,*
    915 F. Supp. 2d 1138 (C.D. Cal. 2012) ........................................................................passim

*GEO Specialty Chemicals, Inc. v. Husisian,*
    2013 WL 500560 (D.D.C. Feb. 11, 2013) .........................................................3, 21, 22, 23

*Health Ins. Ass'n of Am. v. Novelli,*
    211 F. Supp. 2d 23 (D.D.C. 2002)..................................................................................24

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
    683 F.3d 664 (9th Cir. 2011) ..........................................................................................29

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)...........................................................................................................7

*Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*,
545 U.S. 913 (2005)..........................................................................................................26

*Mylan Pharm., Inc. v. Shalala*,
81 F.Supp.2d 30 (D.D.C.2000)........................................................................................23

*National Cable Television Association, Inc. v. Broadcast Music, Inc.*,
772 F. Supp. 614 (D.D.C. 1991).......................................................................................17

*Nat'l Kidney Patients Ass'n v. Sullivan*,
958 F.2d 1127 (D.C. Cir. 1992)........................................................................................24

*Nikas v. Vietnam Veterans of America, Inc.*,
1992 WL 336495 (D.D.C. Nov.6, 1992) ..........................................................................25

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
16 F.3d 1032 (9th Cir. 1994) ............................................................................................24

*On Command Video Corp. v. Columbia Pictures Indus.*,
777 F. Supp. 787 (N.D. Cal. 1991) ......................................................................12,13, 18

*Random House v. Rosetta Books LLC*,
283 F. 3d 490 (2d Cir. 2002) ............................................................................................25

*Scott-Blanton v. Universal City Studios Prods. LLLP*,
495 F. Supp. 2d 74 (D.D.C. 2007).....................................................................................25

*Softman Prods. Co., LLC v. Adobe Systems, Inc.*,
171 F. Supp. 2d 1075 (C.D. Cal. 2001) ............................................................................26

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)..............................................................................................15,19, 21

*Turner Broadcasting System, Inc. v. FCC*,
520 U.S. 180 (1997)............................................................................................................5

*Twentieth Century Fox Film Corp. v. iCraveTV*,
2000 WL 255989 (W.D. Pa. Feb. 8, 2000).......................................................................19

*United Artists Television, Inc. v. Fortnightly Corp.*,
255 F. Supp. 177 (S.D.N.Y. 1966), *aff'd*, 377 F.2d 872 (2d Cir. 1967), *rev'd*, 392 U.S.
390 (1968)..........................................................................................................................20

*United States v. AMC Entm't, Inc.*,
549 F.3d 760 (9th Cir. 2008) ......................................................................................27, 28

*Virginia Soc'y for Human Life v. Federal Election Comm'n,*
  263 F.3d 379 (4th Cir.2001) ...................................................................28

*Warner Bros Entertainment. Inc. v. WTV Systems, Inc.,*
  824 F. Supp. 2d 1003 (C.D. Cal. 2011) ........................................17, 18

*Winter v. NRDC,*
  555 U.S. 7 (2008)..................................................................................2, 7

*Wisc. Gas Co. v. FERC,*
  758 F.2d 669 (D.C.Cir.1985)..................................................................22

*WNET, Thirteen v. Aereo, Inc.,*
  712 F.3d 680 (2d Cir. 2013) ...........................................................1, 4, 13

**FEDERAL STATUTES**

17 U.S.C. § 101.............................................................................................11

17 U.S.C. § 106(4).....................................................................................8, 10

47 U.S.C. § 303...............................................................................................5

**OTHER AUTHORITIES**

4-19E *Nimmer on Copyright* § 19E.02 (2012) ..............................................5

89th Cong., 1st Sess. 186-187 (House Comm. Print May 1965)..................19

89th Cong., 1st Sess. (Comm. Print 1965) ..................................................10

H.R. 2512 (1967) .........................................................................................19

H.R. 4347 (1966) .........................................................................................19

H.R. Rep. 94-1476 (1976), reprinted in 1976 U.S.C.C.A.N. 5659...............9

H.R. Rep. No. 2222, 89th Cong., 2d Sess. 80 (1966)..................................20

H.R. Rep. No. 83 (1967)...............................................................................19

H.R. Rep. No. 94-1476 (1976), reprinted in 1976 U.S.C.C.A.N. 5659.....9, 11

Josh Lerner, *The Impact of Copyright Policy Changes on Venture Capital Investment in Cloud Computing Companies* at 9 (2011) .................................................13, 27

Michael A. Carrier, *SOPA, PIPA, ACTA, TPP: An Alphabet Soup of Innovation-Stifling Copyright Legislation and Agreements,*
  11 Nw. J. Tech. & Intell. Prop. 21 (2013) ..................................13, 27

Paul Goldstein, *Goldstein on Copyright*
 §7.7.2.2b (3d. ed. 2013) ........................................................................................13

William Patry, *4 Patry on Copyright,*
 §14.13, §14.51, §14.53 (West 2012 Supp.) ...........................................................19

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Having recently failed to enjoin a service similar to defendants' in the Second Circuit, plaintiffs take another bite at the apple in this Court.  In the instant motion for preliminary injunction, plaintiffs make the exact same arguments that the Second Circuit considered and wisely rejected.  Try as they might, plaintiffs cannot recast those arguments to render them consistent with the plain language of the Copyright Act – the language that guided the Second Circuit, which should also guide this Court.

Plaintiffs have not shown and cannot show they are likely to succeed on the merits of this case.  Congress and the courts have always protected the right of "private performance."  In *WNET, Thirteen v. Aereo, Inc.*,712 F.3d 680 (2d Cir. 2013) (*"Aereo"),* which was recently decided on April 1, 2013, the Second Circuit rejected virtually all of the same arguments plaintiffs make here.  It found that a service which is similar to FilmOn X in every relevant way did not permit public performance of copyright work.  Its decision in *Aereo* was based predominantly on its plain reading of the Transmit Clause as explained in *Cartoon Network LP, LLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir. 2008) (*"Cablevision"*).  *Cablevision* had correctly interpreted the plain language of the Transmit Clause to protect the right of private performance.  Thus, the *Aereo* court applied the law in *Cablevision* to facts similar in all relevant ways to those here.  The court stated the relevant inquiry to determine if a performance was to the public is: (1) What is the specific transmission that constitutes performance; and (2) Who is capable of receiving that performance.  Finding that Aereo's technology only enabled transmissions to individual users at their direction, the court found those performances private.

In plaintiffs' attempt to support their argument to this Court, they cite to primarily one case—a district court case between the same parties that is currently on appeal in the Ninth Circuit.

1

However, there is already appellate case law directly on point. *Cablevision* and *Aereo*, both Second Circuit cases, hold that transmissions such as those made by users of FilmOn X (formerly known as Aereokiller LLC) are decidedly private and not actionable under the Copyright Act's Transmit Clause. There is no relevant distinction between this case and those decisions, despite plaintiffs' considerable effort to find one.

As with the similar technology at issue in *Aereo,* FilmOn X's technology only enables transmission to individual users at their direction, which constitutes private (not public) performance. Through FilmOn X's technology, a user may remotely record and privately view television programming the user indisputably has the right to record and view. This is accomplished legally through the use of two essential components. First, FilmOn X's system features thousands of mini-antennas, each of which is assigned to a unique user. No mini-antenna is simultaneously shared by users. Second, FilmOn X provides each user with a dedicated hard drive, on which the user's selected programming is recorded by the user for subsequent viewing. FilmOn X remotely hosts the same type of technology that already exists in millions of homes across the United States. That technology, the television, antenna and DVR, has always been declared legal by Congress and the courts. Because the consumer can use FilmOn X's mini-antenna technology to make private performances not prohibited by the Transmit Clause of the Copyright Act, plaintiffs cannot establish a likelihood of success on the merits.

Setting aside the plaintiffs' dispositive failure to sufficiently establish a likelihood of success on the merits, plaintiffs' motion should also be denied because they cannot establish likely irreparable harm, that the balance of hardships tips in their favor, or that the injunction serves the public interest. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008).

While plaintiffs make a spirited and lengthy argument regarding irreparable injury, they cannot surmount the reality that their alleged harms are entirely speculative and based upon a

presumption that FilmOn X's service is illegal due to its infringement.  But to say there is harm

because there is infringement is circular when, as here, FilmOn X's technology and service do not

infringe plaintiffs' copyrights.  The purported harms, should they ever come to fruition, are simply

the practical result of Congress' considered policy choices as reflected in the 1976 Copyright Act

and more specifically the Transmit Clause.

Further, plaintiffs have offered no proof that these purported harms are going to occur or

have occurred in the past.  *GEO Specialty Chemicals, Inc. v. Husisian*, 2013 WL 500560, *3

(D.D.C. Feb. 11, 2013) (the movant must provide proof that the harm has occurred in the past and

is likely to occur again, or proof indicating that the harm is certain to occur in the near future).

Speculative losses are insufficient to establish actual harm for purposes of the irreparable harm

analysis.  *GEO Specialty Chemicals, Inc. v. Husisian*, 2013 WL 500560, at *2-3 (finding

inadequate showing of irreparable harm because the plaintiff failed to "demonstrate that the

competitive harm that it will suffer without a preliminary injunction amounts to anything but pure

economic loss").  Further, a court may not presume irreparable injury in the copyright context, but

rather the plaintiff must <u>demonstrate actual harm</u> that cannot be remedied later by damages should

the plaintiff prevail on the merits.  *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93

(2006) (emphasis added).  Plaintiffs are not entitled to a presumption of irreparable harm and have

not asserted, let alone provided evidence of anything more than their speculative fears of possible

revenue consequences that new innovators like Filmon X might cause.

The balance of hardships and the public interest also favor FilmOn X.  FilmOn X has

expended significant capital and labor to develop and launch its system.  Since FilmOn X's

creation though, it has been embroiled in legal battles with plaintiffs.  Should this Court grant

plaintiffs a preliminary injunction, it will force FilmOn X, a small but profitable business, to

effectively shut down within the geographic scope of the injunction.  *Am. Broad. Companies, Inc.*

*v. Aereo, Inc.*, 874 F. Supp. 2d 373, 402 (S.D.N.Y. 2012), affirmed WNET*, Thirteen v. Aereo, Inc.*,

712 F.3d 676 (2d Cir. 2013), *en banc* rehearing denied, *WNET, Thirteen v. Aereo, Inc.*, 12-2807,

2013 WL 3657978 (2d Cir. July 16, 2013).  This will result in the loss of the labor, capital and

innovation of the FilmOn X system.  *Am. Broad. Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d at

402.  Finally, more than lost profits are at stake.  Denying plaintiffs' motion for preliminary

injunction advances the long-standing public interest in fostering innovation, as well as the interest

in allowing consumers to freely view the content of free, over-the-air broadcast networks, which

were granted broad, exclusive rights to certain over-the-air spectrums.  An injunction in this case

would not only undermine the innovation specific to FilmOn X's technology, but also Internet

storage and access of copyrighted material contained on remote services, such as cloud computing

services which has become an extremely large, successful and growing industry.

For all of these reasons, plaintiffs' motion for preliminary injunction should be denied.

Plaintiffs' request that this Court enter a nationwide injunction should also be rejected.  In light of

the Second Circuit's ruling, which plaintiffs attempt to – but cannot – avoid, and the pending

litigations in the First Circuit and Ninth Circuit, this Court should not issue any nationwide ruling.

Initially, this Court cannot issue any ruling to alter the law of the Second Circuit, which has been

clearly annunciated.  With similar cases pending in the First and Ninth Circuits, this Court should

not deprive those other courts of the opportunity to issue rulings based on the law of those

jurisdictions.

## STATEMENT OF FACTS

FilmOn X[1] enables its users to do exactly what they are otherwise able to do in their own

homes – watch free-to-air network television broadcasts using an antenna and digital video

---

[1] The defendants in the action are Aereokiller LLC, FilmOn.TV Networks, Inc., FilmOn.TV, Inc. and FilmOn.com, Inc.  Aereokiller LLC is now called FilmOn X, LLC pursuant to the State of Delaware Certificate of Amendment filed on May 31, 2013.  All defendants in this action shall be referred to collectively as "FilmOn X."

recorder ("DVR").  FilmOn X provides its users with mini antennas and hard drives, which enable users to receive and record the same network television broadcasts those users have always had the right to receive, record and view.  FilmOn X technology provides its users with mini-antennas and a DVR device, which then permits those users to receive and view network programming on computers and mobile devices.  (*See* Declaration of Alkiviades David ("David Decl.") ¶ 18; Declaration of Mykola Kutovyy ("Kutovyy Decl.") ¶ 5,7.)  Plaintiffs do not dispute that FilmOn X's users have a right to privately record and view network programming – the same programming they view using FilmOn X technology.  Indeed, Congress has mandated that the networks must make that programming freely available.  4-19E *Nimmer on Copyright* § 19E.02 (2012); *see also* 47 U.S.C. § 303 (directing the Federal Radio Commission to grant licenses to the public airwaves in the "public convenience, interest, or necessity"); *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997) (there is an important governmental interest in "preserving the benefits of free, over-the-air local broadcast television").

A user of FilmOn X starts a viewing session by opening an authorized  "client application," including software like the HDi Player, a website like filmonx.com (which is reserved for use by FilmOn X), or a proprietary mobile phone application like the FilmonTVPlus application for Apple's iOS or LiveTV application for Android.  (David Decl. ¶ 10; Kutovyy Decl. ¶ 33.)  The client application displays a variety of programming options, including (in the past) local broadcast channels.  When the customer clicks on any local channel, it requests a unique, dedicated video stream from Filmon.com.  (Kutovyy Decl. ¶ 34.)  The client application then shows a message such as "Connecting antenna" while FilmOn X's web service issues a unique antenna stream and tunes the channel frequency.  (*Id*.)  While this process takes place, the customer sees the message "We are connecting your antenna."  (*Id*. ¶ 35.)  After the connection is established, the user is able to select programming he or she wishes to view.

The technology underlying the user experience is complicated, and required a substantial investment of time and resources to design and test.  (David Decl. ¶¶ 11, 13, 18-27, 32.)  At the core of the design are mini antennas, each no larger than the size of a dime and spaced inches apart.  (Kutovyy Decl. ¶ 8.)  These antennas are either privately owned by individual users (the "static option") or dynamically allocated (assigned to specific individual users for a period of time, ensuring only one user is assigned to a given antenna at a time).  (*Id*. ¶¶ 9-10.)  Next, the tuner server connects the mini antennas to ATSC ("Advanced Television Systems Committee") adapters to transfer off-air data.  (*Id*. ¶ 11.)  The encoder server transcodes video/audio data into a format suitable for Internet delivery and/or a format supported by endpoint devices such as iPhone, iPad, Android, and STB devices.  (*Id*. ¶ 12.)  The distribution endpoint is a server or group of servers for end user data delivery, and the encoder server publishes data to the distribution endpoint.  (*Id*. ¶¶ 13-14.)

The technological process of converting television broadcasts to a format that can be distributed via internet begins when a user initiates a request to a web server by clicking on a channel using a "client application" such as the filmonx.com website or applications for mobile devices.  (Kutovyy Decl. ¶ 15.)  The web server sends the request for a specific channel to the antenna router, while a designated antenna is selected and tuned to the selected channel's frequency band.  (*Id*. ¶¶ 16-17.)  The antenna router processes the request, finds the first free antenna adapter and then schedules a request to tune the selected channel.  (*Id*. ¶ 18.)  The system is designed so that no two users can select the same antenna at the same time.  (*Id*.)  Next, the antenna router finds a free encoder slot and sets up a tuner server to send the data to the free encoder where the unique directory is created and assigned to the user.  (*Id*. ¶ 19.)  The system is designed so that each user has their own unique directory not shared with any other user.  (*Id*.)

Once the user's unique directory is created, data from the antenna is processed through the

tuner server and then the encoder server.  (Kutovyy Decl. ¶ 20.)  In this process, the data is

encoded for an internet delivery format, saved to the user's unique directory (for possible later

seek request) and transmitted to the user through the distribution endpoint.  (*Id*.)  All saved data is

removed when the user disconnects from the system.  (*Id*. ¶ 21.)

When the user finishes viewing the channel – with user options to stop, pause, close

application and/or switch channels – the web user interface generates a "stop" request to the

antenna router to stop fetching data and free up the antenna device and encoder slot.  (Kutovyy

Decl.  ¶ 29.)  The unique directory and files are then removed.  (*Id*.)  FilmOn X does not make any

quality control copy or any other copy not specifically requested by a particular user.  (*Id*. ¶30)

Similarly, FilmOn X does not allow any user to view any content requested by anyone but that

particular user.  (*Id*.)

## ARGUMENT

### I.   Plaintiffs Do Not, And Cannot, Establish The Elements Required For Issuance Of A Preliminary Injunction

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be

granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v.

Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original).  A plaintiff seeking a preliminary

injunction bears the burden of showing "that he is likely to succeed on the merits, that he is likely

to suffer irreparable harm, that the balance of equities tips in his favor, and that an injunction is in

the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Aamer v. Obama*, 2013 WL

3651393, at *3 (D.D.C. July 16, 2013).  Injunctive relief should be denied where the plaintiff fails

to carry this burden with respect to any of these factors. *Winter, 555 U.S. at 20; Davis v. Pension

Ben. Guar. Corp.,* 571 F.3d 1288, 1296 (D.C. Cir. 2009) ("a party moving for a preliminary

injunction must meet four independent requirements").

Here, plaintiffs do not and cannot establish any of the elements necessary for a preliminary injunction to issue, let alone all four:

- Plaintiffs are not likely to succeed on the merits because FilmOn X's service permits only private performances, which do not infringe plaintiff's copyrights;

- Plaintiff's irreparable injury arguments are all just speculative, unproven fears of potential revenue consequences FilmOn X *might* cause;

- The balance of hardships tilts decidedly in favor of FilmOn X, as wrongful enjoinment would irreparably injure its nascent business; and

- Injunctive relief is decidedly *not* in the public interest as plaintiffs' position threatens all cloud computing innovation and reduced access to material that Congress has decided ought to be freely available to the public.

Unable to establish any of the required elements, plaintiffs' motion should be denied.

II. **Plaintiffs Do Not, And Cannot, Establish A Likelihood Of Success On The Merits**

Plaintiffs are unlikely to succeed on the merits of their claim for copyright infringement, despite their claims to the contrary, because:  (1) FilmOn X's technology does not enable infringement but simply assists consumers in their lawful exercise of the right to remotely time-shift over-the-air broadcasts; and (2) FilmOn X only enables its users to privately perform plaintiffs' copyrighted works.

A. **FilmOn X Enables "Private Transmissions" Under The Transmit Clause Of The Copyright Act**

1. **Congress intended to exempt private performances from liability**

The Transmit Clause of the Copyright Act gives content owners the exclusive right to "perform the copyrighted works *publicly*."  17 U.S.C. § 106(4) (emphasis added).  In relevant part, the statute states:

> To perform or display a work 'publicly' means . . . to transmit or otherwise communicate a performance or display of the work . . . *to*

> *the public*, by means of any device or process, whether the members
> of the public capable of receiving the performance or display receive
> it in the same place or in separate places and at the same time or
> different times.

*Id.* § 101 (emphasis added).  The phrase "to the public" reflects Congress' intent that private performances do not violate copyright holders' rights.  Only public performance transmissions generate liability for infringement.  Of course, an individual is not liable for watching a previously recorded network broadcast program in his or her own home, office or elsewhere (for instance, via Slingbox).  Conversely, one would be liable for a public showing of that same, recorded broadcast.

In crafting the Transmit Clause and distinguishing between public and private transmissions, Congress balanced potentially competing policy aims.  The Transmit Clause both encourages the widespread public access to broadcast programming (by allowing private transmissions) and protects the expression of content owners (by prohibiting public transmissions). *See* H.R. Rep. 94-1476, at 65 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5678.  The Transmit Clause expresses in precise language the Congressional intent that private performances do not infringe copyright.  Congress summarized its intent in a way that leaves no doubt that only *public* performances are actionable under the Transmit Clause:

> [a]lthough any act by which the initial performance or display is
> transmitted, repeated, or made to recur would itself be a 'performance' or
> 'display' under the bill, it would not be actionable as an infringement
> unless it were done 'publicly,' as defined in section 101.  Certain other
> performances and displays, *in addition to those that are 'private'* are
> exempted or given qualified copyright control under sections 107 and 108.

H.R. Rep. No. 94-1476, at 63 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5678 (emphasis added).  Thus, copyright holders cannot prohibit private transmissions.  The legislative record shows that Congress understood that its definition of transmission would limit the ability to prevent private transmissions:

> The definition of 'publicly'…would, in general, exempt private performances and exhibitions from the copyright owner's control, and the limitations in the remaining sections of the chapter…would further narrow the scope of his rights.

Register of Copyrights, Copyright Law Revision, Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill 89th Cong., 1st Sess., at 22 (Comm. Print 1965).

Were private transmissions not excluded from liability, the rights individuals have enjoyed since the advent of the television would be curtailed, if not eliminated. Plaintiffs cannot dispute that pursuant to the Transmit Clause an individual may, for example, install a private antenna on a roof and use it to transmit a television signal to a television inside the house. Further, that individual may unquestionably then also transmit that same signal to other televisions in the home, whether by running separate wires from rooftop antenna directly to other televisions or by running separate wires from one television to another, or by using wireless technology. Were there no right to privately transmit copyright material, anyone with an antenna would be forced to obtain licenses to watch television throughout their home. That simply is not the law.

### 2. Case law protects private transmissions

Legal decisions in the Second and Ninth Circuits made well after the Copyright Act confirm FilmOn X's technology is not infringing. The Second Circuit analyzed transmissions similar to those enabled by FilmOn X in *Cablevision*. *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F. 3d 121 (2d Cir. 2008) ("*Cablevision*"). *Cablevision* involved a "Remote Storage DVR" ("RS-DVR") system designed to allow customers who did not have a stand-alone DVR in their homes to record cable programming on central hard drives housed and maintained by Cablevision at a remote location. 536 F.3d at 125. The Second Circuit explicitly rejected the district court's conclusion that the RS-DVR technology violated the Section 106(4) right of public performance, finding that defendant-appellant's "embodiments of copyrighted programs" were not

fixed copies and also were not public performances under the transmit clause.

The Court's decision depended on the RS-DVR's particular technological architecture and emphasis on individual viewer use and control:  "And because the RS-DVR system, as designed, only makes transmissions to one subscriber using a copy made by that subscriber we believe that the universe of people capable of receiving an RS-DVR transmission is the single subscriber whose self-made copy is used to create that transmission."  *Id.* at 137.  Such a technological system enables the private transmission of content, not the public performance of a work under the Copyright Act:

> [T]he transmit clause directs us to identify the potential audience of a given transmission, i.e. the persons 'capable of receiving' it, to determine whether that transmission is made 'to the public.'  Because each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber, we conclude that such transmissions are not public performances 'to the public,' and therefore do not infringe any exclusive right of public performance.

*Id* at 139.

To confirm the meaning of the Transmit Clause's language, the *Cablevision* court looked to legislative history, which provides:

> *Although any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a 'performance' or 'display' under the bill, it would not be actionable as an infringement unless it were done 'publicly,' as defined in section 101.* Certain other performances and displays, in addition to those that are 'private,' are exempted or given qualified copyright control under sections 107 through 118.

H.R. Rep. No. 94-1476, at 63 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5677 (emphasis added).  A transmission is a performance, but that transmission is not actionable unless it is done "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered."  17 U.S.C. § 101.  As *Cablevision's* analysis shows, plaintiffs' strained interpretation of the Transmit Clause must be rejected based on the plain language of the statute, as further clarified by its legislative history.

Plaintiffs err in arguing that the Second Circuit wrongly equated performance with transmission. (Plaintiffs' Memorandum of Points and Authorities in support of Motion for Preliminary Injunction ("Plaintiffs' Motion"), p. 20.)  It did no such thing.  As the Copyright Act's plain language and the legislative history make clear, a transmission is a performance.  Of course, a performance is not necessarily a transmission.  Accordingly, plaintiffs' hasty generalization – that Congress could not have meant performance to include a transmission because a transmission cannot be "received" at different times – must be rejected.  (Plaintiffs' Motion, p. 21.)  The time-shifting language in the Transmit Clause is still valid, and it applies to performances that are not transmissions.

Plaintiffs cite several academic authorities in their far reaching attempt to find support for this argument.  (*See* Plaintiffs' Motion, pp. 20-21.)  But these scholars do not help their cause, and do no damage to the sound reasoning in *Cablevision* and *Aereo*.  In fact, one of the scholars cited by plaintiffs explains exactly why FilmOn X's technology is not making a public performance, through its reconciling *Cablevision* with other cases finding public performances through transmissions, such as *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787 (N.D. Cal. 1991).  Although plaintiffs cite Professor Goldstein as an authority criticizing the Second Circuit, Plaintiffs omit part of a discussion from *Goldstein on Copyright*, which states the following:

> *Cablevision*'s redefinition of the transmission branch of the public performance right may in fact be no more than dicta, and the decision's holding can at least arguably be limited to situations in which the transmission is made from a copy that is exclusively dedicated to the user receiving the transmission. This narrower holding would be consistent with the court's understanding that "because the RS-DVR system, as designed, only makes transmissions to one subscriber using a copy made by that subscriber, we believe that the universe of people capable of receiving an RS-DVR transmission is the single subscriber whose self-made copy is used to create that transmission." *The narrower holding may also reflect the court's concern that functionally, if not technologically, the dedicated recording was akin to one made on a user's home DVR.*

> *Decisions inside and outside the Second Circuit approximate this*
> *narrower interpretation of Cablevision, an interpretation that not only*
> *reconciles Cablevision with cases like On Command, in which the*
> *transmission copy was not perpetually dedicated to a single user, but that*
> *also presents less of a threat to the market for the on-demand*
> *performances that Congress contemplated when it introduced the same*
> *time-different times language in the 1976 Act.*

Paul Goldstein, *Goldstein on Copyright* § 7.7.2.2b (3d. ed. 2013) (emphasis added).  Plaintiffs

simply misrepresent (or misunderstand) the opinion of the scholar they cite.[2]  (*See, e.g.*, Plaintiffs'

Motion, p. 21.)

    *Cablevision's* continued vitality was reaffirmed in *Aereo*, and this time specifically with

respect to remote mini antenna and remote DVR technology like that at issue here.  *WNET,*

*Thirteen v. Aereo, Inc.*, 712 F.3d 680, 682 (2d Cir. 2013) ("*Aereo*") ("Aereo's system thus

provides the functionality of three devices: a standard TV antenna, a DVR, and a Slingbox-like

device"), affirming *Am. Broad. Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y.

2012), *en banc* rehearing denied, *WNET, Thirteen v. Aereo, Inc.*, 12-2807, 2013 WL 3657978 (2d

Cir. July 16, 2013).  In *Aereo*, the Second Circuit applied *Cablevision* to facts analogous to the

facts here in every relevant way.  The Second Circuit explained the relevant aspects of that

technology as follows:

> When an Aereo customer elects to watch or record a program . . . Aereo's
> system creates a unique copy of that program on a portion of a hard drive
> assigned only to that Aereo user. And when an Aereo user chooses to watch

---

[2] Further, many respected scholars support *Cablevision*, which encourages investment and
innovation. *See, e.g.*, Josh Lerner, *The Impact of Copyright Policy Changes on Venture Capital
Investment in Cloud Computing Companies* at 9 (2011) ("VC investment in cloud computing firms
increased significantly in the U.S. relative to the EU after the *Cablevision* decision. Our results
suggest that the *Cablevision* decision led to additional incremental investment in U.S. cloud
computing firms that ranged from $728 million to approximately $1.3 billion over the two-and-a-
half years after the decision.") (available at http://www.analysisgroup.com/uploadedFiles/
Publishing/Articles/Lerner_Fall2011_Copyright_Policy_VC_Investments.pdf); Michael A.
Carrier, *SOPA, PIPA, ACTA, TPP: An Alphabet Soup of Innovation-Stifling Copyright Legislation
and Agreements*, 11 Nw. J. Tech. & Intell. Prop. 21 (2013) (*Cablevision* has encouraged
innovation and investment in cloud computing) (available at
http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1179&context=njtip).

the recorded program . . . the transmission sent by Aereo and received by that user is generated from that unique copy. No other Aereo user can ever receive a transmission from that copy. Thus, just as in *Cablevision*, the potential audience of each Aereo transmission is the single user who requested that a program be recorded.

*Aereo*, 712 F.3d at 682-83.

*Cablevision*, the *Aereo* court stated, "establishes four guideposts that determine the outcome of [the] appeal." 712 F.3d at 689.  Those guideposts are:

The transmit clause directs courts to consider the potential audience of the individual transmission …

private transmissions—that is those not capable of being received by the public—should not be aggregated …

there is an exception to this no-aggregation rule when private transmissions are generated from the same copy of the work …

any factor that limits the *potential* audience of a transmission is relevant to the Transmit Clause analysis.

*Id*. (quotations omitted; emphasis in original).

Considering Aereo's technology in light of those factors, the Second Circuit found the express language of the Copyright Act "and its legislative history, as interpreted by this Court in *Cablevision*, compels the conclusion that Aereo's transmissions are not public performances."  *Id*. at 695.

FilmOn X's technology is functionally similar to Aereo's technology,[3] as set forth in detail by Mykola Kutovyy (the Chief Technical Officer for licensor FilmOn) in his Declaration in support of FilmOn X's Opposition.  (*See* Kutovyy Decl. ¶¶ 7-36.)  Of most importance to this Court in its analysis are the following facts: (1) FilmOn X's technology is initiated by the user and based on the use of mini antennas; (2) whether the user connects statically or dynamically, each

---

[3] The district court's ruling in *Fox Television Stations, Inc. v. BarryDriller Content Sys. PLC.*, 915 F. Supp. 2d 1138 (C.D. Cal. 2012) (the "California Case") which Plaintiffs rely so heavily on for support in their motion (*see, e.g.,* Plaintiffs' Motion, pp. 14, 17, 25, 29) was based on the assumption that FilmOn X's technology is the same as Aereo's for all relevant purposes.)

user has their own unique antenna and their own unique directory containing the data that they selected, *e.g.* television programming converted to viewing over the internet via computer or mobile device; and (3) each user has the ability to control that data, including to stop, pause, close the application or switch channels.  (*Id*. ¶¶ 7-10, 15, 19-20, 29, 31-36.)  The unique and dedicated nature of this technology directly parallels the technology offered by Aereo and endorsed in the earlier *Sony*[4] and *Cablevision* decisions.

Plaintiffs spend considerable time attempting (unsuccessfully) to distance the present case from *Cablevision*.  (Plaintiffs' Motion, pp. 17-25.)  Ultimately, however, in response to that Second Circuit jurisprudence (as applied in *Aereo*), plaintiffs are left with the argument that the *Cablevision* court got it wrong and the *Aereo* court could not correct Cablevision's error because of stare decisis (i.e., the Second Circuit could not have ruled any other way based on its prior *Cablevision* ruling).  Following the *Cablevision* ruling, the networks unsuccessfully petitioned the Second Circuit for *en banc* review.  That petition was denied.  The Supreme Court also denied the network's requests to review *Cablevision*.  Again, after the networks lost the *Aereo* appeal in the Second Circuit they petitioned for *en banc* rehearing.  This petition was also denied.   The Second Circuit has now had numerous opportunities to either distinguish or overturn *Cablevision*, but has chosen not to.  Even the dissenting opinion in *Aereo* distinguished *Aereo* from *Cablevision* based on allegedly "critical differences," stating that *Aereo*'s reliance on *Cablevision* was "misplaced."[5] *Aereo*, 712 F.3d at 697.  But had the majority in *Aereo* been concerned with *Cablevision*'s interpretation of the Transmit Clause's plain language, based on "critical differences," they could have ruled differently; instead, the *Aereo* court applied the sound reasoning set forth in *Cablevision*

---

[4] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*") (Supreme Court held Sony was not liable for secondary infringement for sales of a video recorder, the Betamax, because consumer recording and play-back of television programs was a form of "fair use" and, therefore, did not violate the Copyright Act).
[5] Plaintiffs do not attempt to explain how Judge Chin was not bound by stare decisis, but the majority was.

to facts analogous to the facts in this case.  *Id*. at 694.

Plaintiffs' reliance on a district court in the California Case, which FilmOn X is appealing, as support for their arguments, is unpersuasive.  That district court quite simply got it wrong when it rejected *Cablevision* (without the benefit of the more recent *Aereo* decision).  The Ninth Circuit's recent *Dish* ruling evidences the fact that the district court should have relied on *Cablevision*.  The recent *Dish* opinion is just another case to hold that private, user controlled time shifting of otherwise copyrighted work does not violate the Copyright Act.  *Fox Broadcasting Co, Inc., et al. v. Dish Network L.L.C., et al.*, 2013 WL 3814917 (C.D. Cal. July 24, 2013) ("*Dish*").  In *Dish*, the Ninth Circuit concluded that a district court did not abuse its discretion in concluding that Fox Broadcasting Company, Inc. and related entities were unlikely to succeed on the merits of their direct and secondary copyright infringement claims against Dish Network L.L.C. and Dish Network Corporation.  *Dish*, 2013 WL 3814917, at *4.  In reaching that conclusion, the Ninth Circuit relied directly on *Cablevision*'s infringement analysis.  *Id.*  For this reasons, among others, FilmOn X expects the Ninth Circuit to reverse that decision and this Court should not rely on it.[6]

The D.C. Circuit authorities Plaintiffs cite are an unpersuasive and obvious stretch to find any relevant authority in support of their position.  The cases are factually distinct, and when examined closely, lend no support to Plaintiffs' arguments.

*Cablevision Systems Development Co. v. Motion Picture Association of America, Inc.*, 836 F.2d 599, 602 (D.C. Cir. 1988) dealt specifically with <u>cable systems</u>.  FilmOn X, however, is <u>not</u> a cable system.  Plaintiffs' attempt to analogize FilmOn X to cable systems, arguing that "FilmOnX provides the same type of broadcast retransmission service as cable systems and satellite carriers – retransmitting broadcasts of copyrighted television programs to unlimited numbers of subscribers."  But Plaintiffs also cite to *WPIX, Inc. v. ivi, inc.*, 691 F. 3d 275 (2d Cir. 2012) which expressly held

---

[6] Oral argument is set for August 27, 2013.

that Internet rebroadcasters are <u>not</u> cable systems (and therefore do not qualify for the same treatment under the compulsory licensing statute).

*National Cable Television Association, Inc. v. Broadcast Music, Inc*., 772 F. Supp. 614 (D.D.C. 1991)("*NCT*") is inapplicable as well.  *NCT* is outdated and irrelevant to the analysis of the facts at hand.  *NTC* and the Southern District of New York case it relied heavily on, *David v. Showtime/The Movie Channel, Inc.*, 697 F. Supp. 752 (S.D.N.Y. 1988), could have been very influential to the *Cablevision* decision had the proposition asserted by Plaintiffs actually been its holding.  However, *Cablevision* does not cite to it once.  Nor does the *Cablevision* cite to *David v. Showtime*, which would seem surprising if plaintiffs' interpretation of the case was correct, given it comes from the same district.  This is obvious support for the fact *NCT* does <u>not</u> stand for the proposition that plaintiffs cite it for (that cable networks publicly perform a program when they retransmit that program to subscribers).  (Plaintiffs' Motion, p. 15.)  *NCT* only states that cable networks publicly perform copyrighted musical material used by cable companies when they transmit their signal to <u>cable providers</u>.  *NCT*, 772 F. Supp. at 651.

Plaintiffs also assert that *Aereo* stands alone in its statement of the law.  (Plaintiff's Motion, p. 24.)  That is simply not true and misleading.  The cases plaintiffs cite as evidence other courts disagree with *Aereo* are easily distinguishable.  One such decision is *Warner Bros Entertainment. Inc. v. WTV Systems, Inc*., 824 F. Supp. 2d 1003 (C.D. Cal. 2011), in which plaintiff owners and producers of copyrighted motion pictures brought suit against a DVD "rental" service company.  WTV's service, "Zediva," utilized hundreds of DVD players installed in cabinets at a data center which played purchased copies of plaintiffs' copyrighted works that were offered to consumers by digital service (from the DVDs located in the data center) via internet for 14 day-rentals.  *Warner Bros Entertainment. Inc. v. WTV Systems, Inc*., 824 F. Supp. 2d at 1007-08.  The DVD players were designated to particular movies or copyrighted works which were transmitted to consumers

one after another every four hours.  In this business model, the consumer had little control over the movies they received digitally and could not pause, rewind or fast forward while viewing.

The *WTV Systems* court found that defendants transmitted the copyrighted works even though consumers initiated the process.  824 F. Supp. 2d at 1010 ("As in *On Command*, the fact that Zediva's customers initiate the transmission by turning on their computers and choosing which of Plaintiffs' Copyrighted Works they wish to view is immaterial.").  The court took care, however, to distinguish the facts and its ruling from those in *Cablevision* because of the unique copy made by consumers in *Cablevision* as well as the consumer's ability to control their own unique copy.  *Id* at 1011.  The clear implication of the court's noting the different facts in *Cablevision* is that the *WTV Systems* Court would have been guided by the *Cablevision* Court's reasoning if presented with those facts, as are presented here.[7]

Another decision plaintiffs rely on to bolster their argument that *Aereo* is an outlier is the Second Circuit's decision in *WPIX, Inc. v. ivi, inc.*, 691 F. 3d 275 (2d Cir. 2012).  The entire first half of the *ivi* Court's analysis as to likelihood of success was devoted to a "cable system" affirmative defense that is not being asserted by FilmOn X in this case and, therefore, is wholly inapplicable.  691 F.3d at 278-84.  The irreparable harm arguments accepted by the *ivi* Court are

---

[7]  The technology in the distinguishable *WTV* decision is comparable to that in *On Command Video Corp v. Columbia Pictures Industries*, 777 F. Supp. 787 (N.D. Cal. 1991), in which the court granted summary judgment for copyright infringement due to electronic delivery of movie videotape signals in hotel rooms that amounted to a "public performance" under the transmit clause.  The defendants' system in that case was based on "a computer program, a sophisticated electronic switch, and a bank of video cassette players ('VCP's'), all of which are centrally located in a hotel equipment room."  777 F. Supp 787 at 788.  The program directed electronic switches to turn on a particular VCP for any given hotel room that then played the selected movie to the hotel guest based on their selection via remote control.  Although the video was viewable only by the guest who ordered it, the *On Command* Court observed that ***"[t]he viewer cannot pause, rewind or fast-forward the video***.  When the movie ends, it is automatically rewound and then immediately available for viewing by another hotel guest."  *Id*. (emphasis added).  These shared video systems, in *WTV Systems* and *On Command Video*, differ dramatically from the unique copies made by consumers of FilmOn X's service which are accessible only to the individual consumer and controlled through actions of the consumer.

basically reiterated here by plaintiffs.  Yet the key distinction is that the *ivi* irreparable harm facts

buttressed a strong showing of likelihood of success based on the unsuccessful assertion of an

affirmative defense that has no relevance to this action.  FilmOn X in this action bases its defense

on the law in *Sony, Cablevision*, *Aereo*, and other cases which simply are not addressed by

Plaintiffs.

Plaintiffs' other authorities all are non-D.C. Circuit lower court rulings based on similarly

disparate and distinguishable facts.  For example, the early decision of *Twentieth Century Fox

Film Corp. v. iCraveTV*, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000)  was based on technology that

involved entry of any Canadian area code and "clicking to other buttons."  *Id* at *2.  There were no

factual allegations of individual copies made by consumers and solely accessible to consumers

through personally allocated antennas.

Plaintiffs argue that the Transmit Clause was adopted in response to the Supreme Court's

1968 decision in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968).

(Plaintiffs' Motion, pp. 17-19.)  In *Fortnightly*, the Supreme Court held that a cable system did not

perform the television programming at issue and hence was not an infringer.  *Id*. at 399-400.

Plaintiffs claim that the enactment of the Transmit Clause was a direct repudiation of *Fortnightly*;

however the relevant language of the Transmit Clause was written before *Fortnightly* and could

not have been a response to it.[8]

---

[8] The current statutory language of the Copyright Act in the Transmit Clause was virtually settled
in 1964 and finalized in 1966, two years *before* the Supreme Court's *Fortnightly* opinion. The
language was proposed by the Copyright Office in 1964 and included in the bills introduced in
1964 and 1966.  *See* William Patry, 4 Patry on Copyright §14.13, §14.51, §14.53 (West, 2012
Supp., available on Westlaw as Patrycopy); Copyright Law Revision Part 6: Supplementary Report
of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 1965 Revision
Bill, 89th Cong., 1st Sess. 186-187 (House Comm. Print May 1965).  Congress completed drafting
the core text of the Transmit Clause by October 1966. The text of the Transmit Clause in H.R.
4347 (1966) provided: "(B) to transmit or otherwise communicate a performance or exhibition of
the work to the public by means of any device or process." H.R. Rep. No. 83, at 157 (1967) (the
"1967 House Report"). By March 1967, the text was virtually finalized in its present form. The

Congress ultimately *did* respond to *Fortnightly* by enacting a new statutory section applicable only to cable systems: the cable compulsory license and royalty payment obligation, Section 117 of the 1976 Act.  The compulsory license, and the House Report language quoted and relied upon by plaintiffs that described cable systems (which retransmit a single source to many thousands of households) as "commercial enterprises" have nothing to do with the Transmit Clause and its distinction between private and public performances.  Congress, therefore, did not have the facts of *Fortnightly* in mind when it drafted the Transmit Clause.[9]

Plaintiffs also invoke *Fortnightly*, and the Congressional "reaction" to it, as somehow establishing that a service provider may not "stand in the shoes" of its customer when defending an infringement action.  Yet the language in *Fortnightly* that Plaintiffs cite actually undermines their position: It confirms that a purely private performance—such as an individual setting up a remote hilltop antenna to transmit a signal to herself—was not infringing under the 1909 Act.  *Fortnightly*, 392 U.S. at 400 ("If an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set.").  Nothing in the 1976 Copyright Act changed that statement of the law—setting up your own antenna on your rooftop or on a nearby hill would still be a private

---

drafters changed the word "exhibition" in the 1966 text to "display"; and added clarifications of its application as to place and time of performance which, as the legislative history confirms, also were true under the 1909 Act.  *See* H.R. 2512 (1967); 1967 House Report, at 156-57; *see also* 1976 House Report, at 64-65. The only difference is the addition of the phrase "to a place specified by clause (1)," which has no impact on the decision before this Court.

[9] To the extent that the *Fortnightly* litigation had any impact at all on the drafting of the 1976 Copyright Act, it was actually to diminish, not expand, the public performance right.  On May 23, 1966, the Honorable Judge William B. Herlands of the Southern District of New York issued his ruling in the *Fortnightly* litigation, finding the cable company fully liable.  *United Artists Television, Inc. v. Fortnightly Corp.*, 255 F. Supp. 177 (S.D.N.Y. 1966), *aff'd*, 377 F.2d 872 (2d Cir. 1967), *rev'd*, 392 U.S. 390 (1968).  The effect of this decision was swift and momentous: The House Judiciary Committee, in reporting out the revision bill, amended the bill by including what is now the Section 111 compulsory license for cable and satellite broadcasters. See H.R. Rep. No. 2222, 89th Cong., 2d Sess. 80 (1966).

performance today.  In any event, the question of whether a service provider may "stand in the shoes" of its customer is entirely irrelevant to resolution of this case.  The users of FilmOn X, like users of Aereo and Cablevision, make only private performances when those users transmit performances from unique copies they have made.  With respect to the claim of direct infringement by public performance, whether it would be legal for the user herself to engage in the activity directly is beside the point.

> ### B.  FilmOn X's Technology Enables Consumers To Lawfully Exercise Their Right To Remotely Time-Shift And Play-Back Over The Air Broadcast Programming

The right of individuals to use a technology to record over-the-air broadcasts as a matter of personal convenience is a long-standing and fundamental principle of modern copyright jurisprudence.  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (*Sony*); *see also Dish*, 2013 WL 3814917, at *1 (denying the network's motion to enjoin Dish's technology that included set-top box with digital video recorder (DVR) and commercial-skipping capabilities). In *Sony*, the Supreme Court held that Sony was <u>not</u> liable for secondary infringement for sales of a video recorder, the Betamax, because consumer recording and play-back of television programs was a form of "fair use" and, therefore, did not violate the Copyright Act.  *Sony*, 464 U.S. at 455. Here, FilmOn X's technology performs exactly the same function: it allows the consumer to record and play-back broadcast programming through the convenient medium of the Internet, and is therefore functionally (and legally) analogous to the *Sony* Betamax video recorders and the more recent *Dish* case.

### III.  <u>Plaintiffs Will Not Suffer Irreparable Harm</u>

> ### A.  Plaintiffs' Showing is Speculative and Unsupported by Any Evidence

Speculative losses are insufficient to establish actual harm for purposes of irreparable harm analysis.  "In [the D.C.] Circuit, there is a high standard to establish irreparable harm sufficient to

justify injunctive relief." *GEO Specialty Chemicals, Inc. v. Husisian*, 2013 WL 500560, at *2-3 (D.D.C. Feb. 11, 2013) (finding inadequate showing of irreparable harm because the plaintiff failed to "demonstrate that the competitive harm that it will suffer without a preliminary injunction amounts to anything but pure economic loss").  "Indeed, proving irreparable injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm."  *Id.*, at *2-3 (internal citations omitted); *see also, e.g., eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006) (a court may not presume irreparable injury in the copyright context, but rather the plaintiff must demonstrate actual harm that cannot be remedied later by damages should the plaintiff prevail on the merits).

The D.C. Circuit's standard is so high in this regard, that a plaintiff "must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985) (per curiam).

Here, despite offering numerous declarations, plaintiffs "fail to articulate a tangible injury that is either 'certain and great' or irreparable." *Id.*  There is no specific evidence of imminent harm, aside from pure speculation as to how FilmOn X's service may hypothetically impact plaintiffs' future ad revenue.  Since users transmit the copyrighted works through FilmOn X's technology in their original form, there is little basis for arguments regarding inauthenticity or reputational harm.

Furthermore, it is "well-settled that economic loss does not, in and of itself, constitute irreparable harm because it is merely economic in character and not sufficiently grave enough to warrant emergency injunctive relief." *Wis. Gas Co.,* 758 F.2d at 674; *see also GEO Specialty Chemicals, Inc*, 2013 WL 500560, at *2-3.  Here, money damages would be sufficient to redress

any harm proven at trial.  Lost advertising revenue, if any, should be quantifiable by the time of trial.  Also, this District recognizes that "the possibility that adequate compensatory or other corrective relief will be <u>available at a later date</u>, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."  *Chaplaincy,* 454 F.3d 290, 297–98 (D.D.C. 2006) (citation omitted) (emphasis added).  If FilmOn X is not preliminary enjoined and allowed to continue pursuing its business, their revenue stream will continue to grow.

Additionally, "Courts within the [D.C.] Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share."  *Mylan Pharm., Inc. v. Shalala,* 81 F. Supp. 2d 30, 42 (D.D.C. 2000).  In *GEO Specialty Chemicals, Inc.,* the court found the plaintiff "failed to demonstrate that there is no adequate remedy at law for the potential sales loss that it claims would result, nor shown that GEO's would-be financial shortfalls are incalculable or threaten the very survival of its business.  Indeed, aside from speculative allegations of loss of revenue and other market advantages, all of which are merely economic, [the plaintiff] has completely failed to demonstrate the certainty or imminence of its financial deficits."  2013 WL 500560 at *5.  Plaintiffs' asserted irreparable harm all relate to their fear of lost revenues and market positions.  (Plaintiffs' Motion, pp. 25-27.)  These are recognized as economic losses in the District of Columbia Circuit.  *GEO Specialty Chemicals, Inc.,* 2013 WL 500560 at *5.

Also the networks asserted substantially similar claims of irreparable harm in the *Aereo* case, where a preliminary injunction was not entered and also in the California Case, where a limited injunction was entered, and importantly, plaintiffs are still thriving, successful and profitable corporations.  *See Am. Broad. Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 397 (S.D.N.Y. 2012); *Fox Television Stations, Inc. v. BarryDriller Content Sys, PLC*, 915 F. Supp. 2d at 1147.  If plaintiffs' claims bear out over time, plaintiffs' current assertions as to reputational

harm or lost goodwill (if any) likewise would have some factual support or basis by the time of trial.  At present, those assertions are conjecture, not evidence of irreparable harm.

### B.    The Risk of Wrongful Enjoinment Justifies a Substantial Bond

The D.C. Circuit recognizes that the bond posted for preliminary injunctions may be forfeited if a party is wrongfully enjoined.  *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992) (a defendant injured by wrongfully issued preliminary injunction is presumptively entitled to recovery on injunction bond).  Here, wrongful enjoinment would deprive FilmOn X of legitimate subscription and advertising revenue at a crucial stage of its growth. FilmOn X also risks losing its substantial technology investment as well as some of its partnerships, and it may also lose key personnel if the injunction issues and the service is put on hold pending the litigation.  All of this supports the requirement of a substantial bond to protect FilmOn X in the event they are wrongfully enjoined in this action.  *See, e.g., Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d at 1134 (defendant wrongfully enjoined granted damages to be paid from bond plaintiff posted); *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1039 (9th Cir. 1994) (the defendant proved with reasonable certainty it was damaged by the wrongful injunction and received damages from bond posted by the plaintiff).

## IV.    The Balance Of Hardships Favors FilmOn X

Plaintiffs' alleged harm must be balanced against the harm to FilmOn X, as FilmOn X is not infringing plaintiffs' copyrights and cannot establish a likelihood of success.  Further, it is the plaintiff's burden to show that, should a preliminary injunction be granted, it "would not harm the other parties to the case."  *Health Ins. Ass'n of Am. v. Novelli*, 211 F. Supp. 2d 23, 33 (D.D.C. 2002) (denying plaintiff's request for preliminary injunction for copyright infringement because defendant and other parties would likely suffer harm); *see also Belushi v. Woodward,* 598 F. Supp.

36, 37 (D.D.C.1984) (when seeking a preliminary injunction, "plaintiff must establish that defendants will not be unduly harmed by the issuance of relief").

FilmOn X has devoted significant time and resources to developing the remote antenna-based technology and marketing it to consumers.  (Alki Decl., ¶¶ 13, 32)  Moreover, FilmOn X is not a huge multinational entertainment conglomerate like plaintiffs, so it has fewer resources to fall back on, comparative to plaintiffs, if an injunction is issued.  Granting of an injunction now could very well cripple FilmOn X's business.  Moreover, an injunction would send a strong negative message to other technology innovators that creativity and novel approaches to facilitate public access to media may be quashed or killed early on while legal battles ensue against larger players.  These facts tip the scales decidedly in favor of FilmOn X.  *See, e.g., Nikas v. Vietnam Veterans of America, Inc.,*, 1992 WL 336495, at *5 (D.D.C. Nov.6, 1992) (declining to issue preliminary injunction where it appeared plaintiff was unlikely to prevail on their copyright and trademark infringement claims and where an injunction against the sale of defendants' products and distribution of their literature would "greatly disrupt the promotional and fundraising plans of defendants… and clearly could substantially harm [their] national reputation." ); *Belushi,* 598 F. Supp. at 37 (denying to grant plaintiff a preliminary injunction in a copyright infringement case because, although plaintiff demonstrated a likelihood of success on the merits of her claim, defendants would have lost a substantial amount in sales and legal remedies were available to plaintiff to adequately address her injuries.); *Random House v. Rosetta Books LLC*, 283 F.3d 490, 491-2 (2d Cir. 2002) (affirming denial of preliminary injunction due to serious concerns that Rosetta would go out of business balanced against Random House's alleged loss of goodwill).

## V.     An Injunction Does Not Serve The Public Interest

Plaintiffs bear the burden of proof to show that public interest favors issuance of injunctive relief.  *See, e.g., Scott-Blanton v. Universal City Studios Prods. LLLP*, 495 F. Supp. 2d 74, 77

(D.D.C. 2007) (denying preliminary injunction for copyright infringement where plaintiff failed to meet its burden).

While plaintiffs' own anticompetitive interest in restricting competition may be well served by the injunction, the ordinary consumer who merely wants access to broadcast programming in as many convenient forums as possible is harmed. The consumer will suffer if an injunction is issued because it would restrict consumer choice and convenience when viewing free-to-air broadcast television. Commentators and media advocacy groups have shown a strong interest in protecting broad and convenient consumer access to media, as reflected in amicus briefing submitted in *Aereo* and the appeal of the California Case. (*See, e.g.,* Defendants' Request for Judicial Notice filed concurrently herewith.)

Further, there are no allegations that FilmOn X has altered or manipulated copyrighted works, which is the type of conduct that may weigh against it in the public interest. FilmOn X merely provides the public with a service it increasingly desires and demands: internet access to media through a remote DVR.

One consequence of plaintiffs' position would be to enforce a monopoly of licensing or control over their broadcast programming that is otherwise available to the public under the Copyright Act. Those precise facts have caused federal courts to weight this factor in favor of the technology innovator over the copyright holder. *See, e.g., Softman Prods. Co., LLC v. Adobe Systems, Inc*., 171 F. Supp. 2d 1075, 1091 (C.D. Cal. 2001) ("A system of 'licensing' which grants software publishers this degree of unchecked power to control the market deserves to be the object of careful scrutiny.").

Another consequence of plaintiffs' position is in direct contravention to their own argument that FilmOn X undermines the aim of copyright law. The underlying aim of copyright law is technological innovation. Should plaintiffs' position prevail, this will be severely undermined.

*See, e.g., Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*, 545 U.S. 913, 928 (2005) ("The more artistic protection favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise of managing the tradeoff."). This significant undermining effect extends well beyond FilmOn X's specific type of service and technology and touches Internet storage and access of copyrighted material contained on remote servers, such as cloud computing services. These businesses, like FilmOn X and Aereo, relied on *Cablevision*'s guidance concerning what constitutes a private performance in developing services and technologies for the public. Should Plaintiffs' position prevail, these will all be in jeopardy. After all, there is considerable evidence of the public benefit these technologies have had.[10]

## VI.    If A Preliminary Injunction Is Issued, It Should Be Limited To The D.C. Circuit

Plaintiffs have now filed four separate cases attempting to enjoin the technology at issue in this case. Plaintiffs lost in *Aereo* and should lose on the appeal in the California Case. In the California Case, the district court correctly limited its injunction given the Southern District of New York's ruling (since the Second Circuit had not yet affirmed the district court's ruling in *Aereo*). It did so in light of the very possible circuit split and recognized that "[c]ourts should not issue nationwide injunctions where the injunction would not issue under the law of another circuit." *Fox Television Stations, Inc. v. BarryDriller Content Systems, PLC*, 915 F. Supp. at 1142-43 (quoting *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 773 (9th Cir. 2008) (reversing

---

[10] As discussed *supra*, *See, e.g.*, Josh Lerner, *The Impact of Copyright Policy Changes on Venture Capital Investment in Cloud Computing Companies* at 9 (2011) ("VC investment in cloud computing firms increased significantly in the U.S. relative to the EU after the *Cablevision* decision. Our results suggest that the *Cablevision* decision led to additional incremental investment in U.S. cloud computing firms that ranged from $728 million to approximately $1.3 billion over the two-and-a-half years after the decision.") (available at http://www.analysisgroup.com/uploadedFiles/ Publishing/Articles/Lerner_Fall2011_Copyright_Policy_VC_Investments.pdf); Michael A. Carrier, *SOPA, PIPA, ACTA, TPP: An Alphabet Soup of Innovation-Stifling Copyright Legislation and Agreements*, 11 Nw. J. Tech. & Intell. Prop. 21 (2013) (*Cablevision* has encouraged innovation and investment in cloud computing) (available at http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1179&context=njtip)

grant of nationwide injunction).

      FilmOn X expects to prevail in its Ninth Circuit appeal, but in the event it does not, a circuit split between the Ninth and Second Circuits will exist.  Whether FilmOn X prevails in the Ninth Circuit or not does not impact the fact that principles of comity prevent this Court from issuing a nationwide injunction.  Assuming FilmOn X prevails, then if this Court decides to side with plaintiffs it would be issuing an injunction against two other Circuits that have ruled this technology legal.  Even if FilmOn X does not prevail, then the injunction will be in the face of the Second Circuit's ruling of legality and the circuit split the Ninth Circuit created.  *See United States v. AMC Entm't, Inc.*, 549 F.3d at 773.  Plaintiffs' arguments in this respect have already been rejected by the one district court that granted them an injunction.  Plaintiffs have cited no new or additional authorities in their motion that would better support their claim for a nationwide injunction here in the District of Columbia.

      If this Court grants a nationwide injunction, it will preclude other courts from considering the issue.  In light of the fact there are already two divergent opinions on the legality of this technology, the other varying circuits should have the opportunity to decide for themselves whether it is legal or not.  *See Virginia Soc'y for Human Life v. Federal Election Comm'n*, 263 F.3d 379, 393 (4th Cir.2001) (A nationwide injunction "has the effect of precluding other circuits from ruling on the constitutionality" of an agency's regulation.); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (nationwide injunctions "have a detrimental effect by foreclosing adjudication by a number of different courts and judges.").  The district court in the California Case correctly explained that "[i]f other circuits do not have law that conflicts with this decision, they <u>might</u> adopt such law when presented with the choice." *Fox Television Stations, Inc. v. BarryDriller Content Systems, PLC*, 915 F. Supp. at 1148.

      Plaintiffs attempt to offer a generalized assertion that the Copyright Act requires a

28

nationwide injunction by cherry-picking several words from the language of Section 502(b).  Yet, tellingly, plaintiffs cite to not a single case to support this remarkable assertion, which stands in stark contrast to the normal principle of comity, discussed above.  *See, e.g., Virginia Soc'y for Human Life, Inc.*, 263 F.3d at 393 (district court abused its discretion by granting a nationwide injunction and that it "encroaches on the ability of other circuits to consider" the issue); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 683 F.3d 664, 665 (9th Cir. 2011) (limiting nationwide injunction granted by the district court to only the Ninth Circuit).  Therefore, if the Court grants plaintiffs' request for a preliminary injunction, it should properly be limited to the District of Columbia.

## <u>CONCLUSION</u>

Based on the foregoing, FilmOn X respectfully requests that the Court deny plaintiffs' motion for a preliminary injunction.

Dated:  August 15, 2013                          BAKER MARQUART LLP

By:_ /s/   Ryan G. Baker_____ _____
Ryan G. Baker
BAKER MARQUART LLP
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
(424) 652-7811 (telephone)
(424) 652-7850 (facsimile)
Bar No.: 200344

*Attorneys for Defendants and Counterclaim Plaintiffs FilmOn X, LLC, FilmOn.TV, Inc., FilmOn.TV Networks, Inc., and FilmOn.com, Inc*