UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| FOX TELEVISION STATIONS, INC., et al. | Civil Action No.  1:13-cv-00758-RMC |
| Plaintiffs, | Hon. Rosemary M. Collyer |
| v. | |
| FILMON X, LLC, et al. | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' JOINT MOTION FOR PRELIMINARY INJUNCTION**

2225266.3

## **TABLE OF AUTHORITIES**

INTRODUCTION ....................................................................................................... 1

**I.**   Plaintiffs Have Established That They Will Succeed On The Merits. ..................................... 4

    **A.**   FilmOnX Is A Broadcast Retransmission Service, Not A Technology Provider. ............ 5

    **B.**   It Is Not A Defense To Say That FilmOnX Merely Allows Individuals To Do What They Could Do With Standalone Equipment. .................................................................. 7

    **C.**   The "Technological Exemption" To The Transmit Clause Created By *Cablevision* And *Aereo* Is Contrary To The Statutory Language. .................................................................. 9

    **D.**   FilmOnX's Proposed Interpretation Of The Transmit Clause Is Foreclosed By The Legislative History. ............................................................................................................. 15

**II.**  Plaintiffs Have Demonstrated Irreparable Harm. .................................................................. 17

**III.** The Balance Of Harms Tips Decidedly In Favor Of An Injunction. ...................................... 19

**IV.** Public Policy Favors An Injunction. ....................................................................................... 20

**V.**  The Preliminary Injunction Should Prohibit FilmOnX's Infringement Nationwide. ............. 21

CONCLUSION ......................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Broad. Cos., Inc. v. Aereo*,
   874 F. Supp. 2d 373 (S.D.N.Y. 2012)..................................................................18

*Apple, Inc. v. Psystar Corp.*,
   658 F.3d 1150 (9th Cir. 2011) .............................................................................22

*Armour & Co. v. Freeman*,
   304 F.2d 404 (D.C. Cir. 1962) ............................................................................19

*\*Bayer HealthCare, LLC v. U.S. F.D.A.*,
   --- F. Supp. 2d ---, 2013 WL 1777481 (D.D.C. Apr. 17, 2013) (Collyer, J.) ..........19

*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987) .............................................................................23

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)............................................................................................22

*Capital Cities Cable, Inc. v. Crisp*,
   467 U.S. 691 (1984)..................................................................................8, 9, 16

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
   536 F.3d 121 (2d Cir. 2008)...........................................................................2, 21

*\*CBS Broad. Inc. v. FilmOn.com*,
   No. 10-07532 (S.D.N.Y. Nov. 22, 2010) ............................................................18

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ............................................................................17

*CytoSport, Inc. v. Vital Pharms, Inc.*,
   617 F. Supp. 2d 1051 (E.D. Cal. 2009)...............................................................17

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
   654 F.3d 989 (9th Cir. 2011) .............................................................................17

*Fortnightly Corp. v. United Artists Television, Inc.*,
   392 U.S. 390, 392 (1968)......................................................................................8

*Fox Broadcasting Co., Inc. v. Dish Network LLC*,
   --- F.3d ---, 2013 WL 3814917 (9th Cir. 2013) ....................................................3

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
    915 F. Supp. 2d 1138 (C.D. Cal. 2012) ........................................................ passim

*GEO Specialty Chems. Inc. v. Husisian*,
    --- F. Supp. 2d ---, 2013 WL 500560 (D.D.C. Feb. 11, 2013)................................17

*Hanley-Wood LLC v. Hanley Wood LLC*,
    783 F. Supp. 2d 147 (D.D.C. 2011)...................................................................20

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
    829 F.2d 1171 (D.C. Cir. 1987).........................................................................4

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998)..............................................................................8

*L.A. Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ............................................................................22

*Malarkey-Taylor Assocs., Inc. v. Cellular Telecomm. Indus. Ass'n*,
    929 F. Supp. 473 (D.D.C. 1996) ......................................................................19

*Morgan Stanley DW Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001) ...................................................................19

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) .....................................................................17

*Nalco Co. v. U.S. E.P.A.*,
    786 F. Supp. 2d 177 (D.D.C. 2011) (Collyer, J.)..............................................19

*Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*,
    772 F. Supp. 614 (D.D.C. 1991) ......................................................................15

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) .......................................................................23

*On Command Video Corp. v. Columbia Pictures Indus.*,
    777 F. Supp. 787 (N.D. Cal. 1991) ....................................................................7

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)...............................................................................17

*Sony Corp. of America v. Universal Studios, Inc.*,
    464 U.S. 417 (1984)...........................................................................................8

*Triad Sys. Corp. v. Se. Express Co.*,
    64 F.3d 1330 (9th Cir. 1995) ...........................................................................19

*Twentieth Century Fox Film Corp. v. iCraveTV,*
    Nos. 00-120, 00-121, 2000 WL 25989 (W.D. Pa. Feb. 8, 2000)............................18

*United States v. AMC Entm't, Inc.,*
    549 F.3d 760 (9th Cir. 2008) ..............................................................................22

*Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n,*
    263 F.3d 379 (4th Cir. 2001) .............................................................................22

*Walt Disney Co. v. Powell,*
    897 F.2d 565 (D.C. Cir. 1990).............................................................................22

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.,*
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ...................................................6, 7, 18, 20

*Wis. Gas Co. v. F.E.R.C.,*
    758 F.2d 669 (D.C. Cir. 1985) .............................................................................17

*WNET, Thirteen v. Aereo, Inc.,*
    712 F.3d 676 (2d Cir. 2013)..................................................................2, 9, 10, 20

*WPIX, Inc. v. ivi, Inc.,*
     765 F. Supp. 2d 594, 617-20 (S.D.N.Y. 2011) ........................................18, 19, 21

STATUTES

*17 U.S.C. § 101........................................................................................... passim

17 U.S.C. § 502.....................................................................................................21, 23

OTHER AUTHORITIES

2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright (2007).....................................14

*H.R. Rep. No. 94-1476 ............................................................................................4

Jane C. Ginsburg, Recent Developments in US Copyright Law – Part II, Caselaw:
    Exclusive Rights on the Ebb?, Columbia Pub. L. Res. Paper No. 08-192 (2008).....................3

Jeffrey Malkan, *The Public Performance Problem in Cartoon Network LP v. CSC Holdings, Inc.,*
    89 Or. L. Rev. 505 (2011).........................................................................................3

Mario Lucero, The Second Circuit's En Banc Crisis, 2013 Cardozo L. Rev. De Novo 32 ...........3

Paul Goldstein, Goldstein on Copyright (3d ed. 2012 Supp.) ........................................................3

Richard L. Marcus, Conflicts Among Circuits and Transfers Within the Federal Judicial System,
    93 Yale L.J. 677 (1984) ...........................................................................................4

H. Comm. on the Judiciary, 89th Congress, 1st Sess., *Supplementary Register's Report on the General Revision of the U.S. Copyright Law: 1965 Revision Bill*, 22, 40-42 (Comm. Print 1965) ...................................................................................................................9, 15,

H. Comm. on the Judiciary, 94th Congress, 1st Sess., *Second Supplementary Register's Report on the General Revision of the U.S. Copyright Law*, 116-35 (Comm. Print 1975) ........................9

Plaintiffs submit the following reply to FilmOnX's Memorandum of Law in Support of Defendants'/Counter-Plaintiffs' Opposition to Plaintiffs'/Counter-Defendants' Joint Motion for Preliminary Injunction ("Opp.").

## INTRODUCTION

Despite its efforts, FilmOnX cannot obscure the uncontroverted fact that it allows thousands, and potentially millions, of viewers to watch the same broadcasts of some of the most valuable copyrighted programming in the world – such as *Glee*, *The Good Wife*, *Saturday Night Live*, *Grey's Anatomy*, and thousands of other television programs, including award-winning local broadcasts. Under the clear and unambiguous language of the Transmit Clause, that conduct constitutes public performance. Because FilmOnX has no license to publicly perform any broadcast programs, FilmOnX engages in copyright infringement. This is precisely why one court has already enjoined the FilmOnX service from operating within the geographic boundaries of the Ninth Circuit. *See Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138 (C.D. Cal. 2012) ("*BarryDriller*"), *appeal docketed sub nom. Fox Television Stations, Inc. v. Aereokiller, LLC*, Nos. 13-55156, 13-55157 (9th Cir. Jan. 25, 2013). FilmOnX provides no valid reason why the same result should not be reached here.

FilmOnX argues that it simply provides equipment that allows viewers "to do what they are otherwise able to do in their own homes — watch free-to-air network television broadcasts[.]" Opp. at 4. But that does not mean that FilmOnX falls outside the Transmit Clause. Indeed, television providers like Comcast, Cox, DISH, DirecTV, Verizon, and AT&T also offer broadcast services by providing equipment that allows their subscribers "to do what they are otherwise able to do in their own homes — watch free-to-air network television broadcasts[.]" *Id.* They are all subject to the Transmit Clause. The simple fact is that, under the Transmit Clause, if a party transmits a performance of a copyrighted work to the public by any

1

device or process — via a big antenna or mini-antennas, via cable, via the insertion of an intermediate copy or without such a copy, or via any combination of such devices or processes — they are liable for copyright infringement where, as here, they are unlicensed.

FilmOnX claims it is exempt from copyright liability because it has copied the technology used by the Aereo retransmission service, which a divided panel of the Second Circuit ruled does not infringe the public performance right under the Copyright Act. *See WNET, Thirteen v. Aereo, Inc*., 712 F.3d 676 (2d Cir. 2013) ("*Aereo*").  But the Second Circuit's holding in *Aereo* was not based on the statute's plain language.  It was based on the Second Circuit's "interpretation" of the Transmit Clause in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), which is not binding in this Circuit and which, as various copyright scholars, judges in the Second Circuit, and the court in *BarryDriller* have correctly recognized, is contrary to the express language of the Transmit Clause.

The Transmit Clause clearly states that transmitting a performance of a work to the public by means of *any device or process now known or later developed* is a public performance.  Yet the *Aereo* court read *Cablevision* as creating a technological exemption to that provision. According to the *Aereo* court, if a retransmission service uses a particular device or process (mini-antennas and digital copies) to send each viewer an individualized stream, the service's performance of the work is "private," notwithstanding that thousands or millions of people use the service to view the same live broadcast.  As the court in *BarryDriller* correctly recognized, the text of the statute and the legislative history are abundantly clear — the public performance right is not subject to technological erosion; the statutory language covers all possible technologies that are used to retransmit, including technologies that were not invented when the

statute was enacted.  *See BarryDriller*, 915 F. Supp. 2d at 1140-43.  It is no wonder, then, that leading scholars have criticized the Second Circuit's interpretation of the Transmit Clause in *Cablevision* and *Aereo* as "error"[1] "derived from . . . a misreading of the statute,"[2] "peculiar if not perverse,"[3] and "inconsistent with the statutory text and policy."[4]

      FilmOnX offers no coherent rebuttal to the multiple reasons Plaintiffs have presented for rejecting *Cablevision*'s interpretation of the Transmit Clause.  Instead, FilmOnX simply urges this Court to blindly follow *Aereo* and *Cablevision* because they exist and have not yet been overturned by the Supreme Court.[5]  Rather than adopt *Cablevision*'s heavily criticized interpretation of the Transmit Clause, this Court must look at the language of the Transmit Clause independently and reach its own conclusion since it is not bound by *Cablevision* (unlike the court in *Aereo*).  As then-Judge Ruth Bader Ginsberg explained:  "The federal courts have not only the power but the duty to decide issues of federal law correctly.  There is no room in the federal system of review for rote acceptance of the decision of a court outside the chain of direct review."  *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987)

---

[1] Paul Goldstein, *Goldstein on Copyright* § 7.7.2, at 7:168 (3d ed. 2012 Supp.).

[2] Jeffrey Malkan, *The Public Performance Problem in Cartoon Network LP v. CSC Holdings, Inc.*, 89 Or. L. Rev. 505, 536 (2011).

[3] Jane C. Ginsburg, *Recent Developments in US Copyright Law – Part II, Caselaw: Exclusive Rights on the Ebb?*, Columbia Pub. L. Res.  Paper No. 08-192 (2008).

[4] Jane C. Ginsburg, WNET v. Aereo:  *The Second Circuit Persists In Poor (Cable) Vision* (The Media Institute, April 23, 2013).

[5] FilmOnX argues that the Second Circuit's denial of Plaintiffs' petition for rehearing en banc in *Aereo* indicates that the reasoning in that case was sound.  But the Second Circuit grants less than one en banc petition per year out of thousands.  Mario Lucero, *The Second Circuit's En Banc Crisis*, 2013 Cardozo L. Rev. De Novo 32, 41.  Likewise, *Fox Broadcasting Co., Inc. v. Dish Network LLC*, --- F.3d ---, 2013 WL 3814917 (9th Cir. 2013) sheds no light on whether the Ninth Circuit would adopt *Cablevision*'s interpretation of the Transmit Clause, since that case dealt exclusively with the reproduction right, had nothing to do with the public performance right, and did not even mention *Cablevision*'s Transmit Clause analysis.

3

(quoting Richard L. Marcus, *Conflicts Among Circuits and Transfers Within the Federal Judicial System*, 93 Yale L.J. 677, 702 (1984)) (brackets omitted).

FilmOnX's arguments regarding irreparable harm, the balance of hardships, the public interest, and the scope of the injunction fare no better.  Plaintiffs submitted detailed declarations describing the types of harms that would befall them if FilmOnX is not enjoined.  These harms have been recognized as irreparable by numerous courts, and FilmOnX cites no authority that would compel a contrary conclusion here.  On the balance of hardships, FilmOnX has submitted no evidence substantiating any purported harm to FilmOnX that should be balanced against the clear irreparable harm to Plaintiffs absent an injunction.  Nor does FilmOnX provide any support for its claim that the public's ability to freely view broadcast programming over the Internet will be harmed if its unlawful service is enjoined.  On the contrary, the record is clear that there are multiple, licensed Internet services that the public may utilize.  Finally, a nationwide injunction is mandated by the Copyright Act and necessary to end the irreparable harm caused by FilmOnX's unlawful acts, which are occurring throughout the country.

## ARGUMENT

### I.     Plaintiffs Have Established That They Will Succeed On The Merits.

FilmOnX (1) "transmits" (communicates beyond the place from which it sends); (2) "to the public" (users of the FilmOnX service); (3) by means of "any device or process" "now known or later developed" (mini-antennas along with routers, servers, transcoders and other equipment; (4) a "performance . . . of [a] work" (a particular broadcast by a television station of a program).  *See* 17 U.S.C. § 101; H.R. Rep. No. 94-1476, at 63, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5676-78 (1976) (the "1976 Report").  Thus, under the plain language of the Transmit Clause, FilmOnX engages in public performance of copyrighted broadcast television programming.  That conclusion is consistent with Congressional intent to require commercial

4

broadcast retransmission services, regardless of their technology, to obtain copyright licenses. Accordingly, Plaintiffs are likely to succeed on the merits of their copyright infringement claim against FilmOnX.  Nothing in FilmOnX's Opposition supports a contrary result.

**A.     FilmOnX Is A Broadcast Retransmission Service, Not A Technology Provider.**

FilmOnX attempts to evade its violation of the Copyright Act by mischaracterizing its service as merely allowing subscribers to use remote technology provided by FilmOnX — *i.e.*, antennas and computer equipment — to transmit programming to themselves.  This characterization is a sham.  A simple visit to www.filmonx.com reveals that FilmOnX does not merely "provide" mini-antennas and DVRs that viewers can use to transmit programming to themselves.  To the contrary, FilmOnX offers live broadcast television over the Internet.  *See* Declaration of Julie Shepard ("Shepard Decl.") ¶¶ 13-18, Exs. E-K.  After navigating to FilmOnX's website, the viewer simply selects a channel from the on-screen list.  *Id*. ¶ 13,  Ex. E. Once the channel is selected, FilmOnX continuously streams that channel's live signal over the Internet to the viewer's computer or mobile device.  *Id*.  Any member of the public willing to sit through the "pre-roll" commercials that FilmOnX inserts into the retransmission stream before it begins can watch television on FilmOnX.  *See id*. ¶¶ 13-18.  And, as FilmOnX's website makes clear, members of the public who buy FilmOnX subscriptions are buying monthly or annual high-definition television service, *not* renting or buying antennas.  *Id.* ¶ 14, Ex. F (listing available subscription packages).[6]

---

[6]  FilmOnX's assertion that its subscribers purchase or rent antennas is belied by FilmOnX's own documents as there is no option to "purchase" or "rent" antennas from FilmOnX.  *See* Shepard Decl. ¶ 13, Ex. E.  In any event, FilmOnX's assertion is irrelevant as the statute expressly includes any device or process.  17 U.S.C. § 101.

FilmOnX's own admissions confirm that it is a retransmission service. *E.g.*, Declaration of Akiviades David ("David Decl.") ¶ 2 (describing FilmOn as a subscription-based Internet television service); Declaration of Mykola Kutovyy ¶ 5 (same); David Decl. ¶ 8 (describing the FilmOn/FilmOnX technology as "a platform or delivery system for transmitting and receiving video over the Internet using IP."), ¶ 9 (admitting that FilmOnX retransmits over-the-air broadcast programming), ¶¶ 28-31 (admitting that FilmOn has retransmission licenses with certain content providers and has attempted to negotiate retransmission agreements with others), Ex. B (letter from David attempting to unilaterally impose a retransmission consent agreement). Moreover, FilmOnX offers many channels of non-broadcast programming, which further underscores the fact that FilmOnX is a retransmission service, not a technology provider. FilmOnX "technology" is a "device or process" used to retransmit broadcast television signals, just like a cable company's antenna and network of wires, or a satellite company's system of satellite equipment and wires. No court would seriously entertain an argument by a cable or satellite provider that it does not need a license to retransmit live broadcast signals because it merely allows its subscribers to use remote technology — *i.e.*, antennas and cable wires, or a satellite dish — to receive and transmit those broadcast signals themselves. FilmOnX is no different.

FilmOnX is hardly the first service provider to attempt to skirt liability for transmitting copyrighted works by pretending its customers are merely controlling the transmission technology remotely. Such attempts have been routinely rejected by the courts. *See, e.g.*, *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1009-10 (C.D. Cal. 2011) (rejecting characterization of Internet movie streaming service as "remote DVD rentals," and holding that the defendant "transmits performances of Plaintiffs' Copyrighted Works directly

under the language of the statute[.]  [T]he fact that [defendants'] customers initiate the

transmission by turning on their computers and choosing which of Plaintiffs' Copyrighted Works

they wish to view is immaterial."); *On Command Video Corp. v. Columbia Pictures Indus.*, 777

F. Supp. 787, 789-90 (N.D. Cal. 1991) (rejecting defendant's attempt to characterize its system

for transmitting movies to hotel room televisions as merely allowing guests to transmit movies to

themselves using a remotely-located VCR).[7]

> **B.     It Is Not A Defense To Say That FilmOnX Merely Allows Individuals To Do What They Could Do With Standalone Equipment.**

FilmOnX repeatedly argues that it merely allows viewers to do what they could otherwise

do using off-the-shelf equipment — to receive and to record broadcast television programming

in their homes.  Opp. at 2, 4-5, 10, 21.  Cable systems, satellite carriers, and other broadcast

retransmission services could, of course, make the same argument.  But, as explained in

Plaintiffs' opening brief, Congress rejected precisely this mode of reasoning when it overruled

the *Fortnightly* and *Teleprompter* decisions and determined that commercial broadcast

retransmission services are engaged in public performances that require licenses.  *See* Mot. at 17-

19; *BarryDriller*, 915 F. Supp. 2d at 1146.  And of course this makes sense.  The Copyright Act

---

[7] FilmOnX argues that *On Command* and *WTV* are distinguishable because the viewers in those cases could not pause, rewind, or fast-forward while viewing the movies. Opp. at 18 & n.7. Preliminarily, this is not even factually accurate with respect to *WTV*, since the opinion in that case notes that the movies could be paused (and therefore presumably rewound or fast-forwarded as well, since that is how online video players work). 824 F. Supp. 2d at 1007. More importantly, the consumer's ability to pause, fast-forward, or rewind the movies had nothing to do with the courts' holdings that WTV and On Command were transmitting copyrighted movies to the public. Whether the recipient of the transmission has the ability to pause, fast-forward, and rewind is irrelevant to whether the transmitter is transmitting the movie to the public. Cable and satellite subscribers also may pause, fast-forward, and rewind. That does not mean that cable systems and satellite carriers do not need broadcast retransmission licenses. FilmOnX also notes that *WTV* distinguished *Cablevision* on the ground that WTV's system did not use subscriber-associated copies like Cablevision. That does not mean the *WTV* court would have found no liability if WTV had made a unique digital copy of each movie for the viewer prior to streaming it.

distinguishes between what consumers can lawfully do on their own with respect to broadcast signals and what businesses can do for large numbers of consumers for a profit. This is why a consumer can use an antenna to receive broadcast programming, but a middleman retransmission service needs a license to use an antenna to capture over-the-air broadcast programming and retransmit it to subscribers. *E.g.*, *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 709-10 (1984); *BarryDriller*, 915 F. Supp. 2d at 1146; *see also* 1976 Report at 88-89 ("[C]able systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and . . . copyright royalties should be paid by cable operators to the creators of such programs").[8]

FilmOnX's only response is that Congress could not have enacted the Transmit Clause to overrule *Fortnightly* because it drafted that provision in 1965, prior to the Supreme Court issuing the *Fortnightly* decision in 1968. Congress, however, expressly stated that it had been dealing with the "difficult problem" of determining copyright liability of broadcast retransmission services such as cable systems "since 1965." 1976 Report at 89. The *Fortnightly* litigation itself began in 1960. *See Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 392

---

[8] In another twist on its argument that it should be allowed to stand in the shoes of its customers, FilmOnX contends that its service is legal under *Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417 (1984), because it allows viewers to record the programs FilmOnX illegally retransmits. Opp. at 21. Contrary to FilmOnX's assertion, its "technology" does *not* "perform[] exactly the same function" as a Sony Betamax. *See id*. A Betamax VCR performs the function of allowing people to record programming they receive on their televisions from authorized providers. FilmOnX's "technology" performs the function of allowing FilmOnX to offer an Internet retransmission service while claiming it somehow does not need to pay for a license. A FilmOnX viewer cannot even record the programming streamed by FilmOnX unless she pays for a subscription. *See* Shepard Decl. ¶ 14, Ex. F. This case has nothing to do with the time-shifting found to be fair use in *Sony* — namely, recording a single program, watching it one time, then erasing it. *See* 464 U.S. at 423 (defining time-shifting as "the practice of recording a program to view it once at a later time, and thereafter erasing it"). No court has ever recognized a fair use defense for a commercial retransmitter that retransmits entire live broadcasts to the public, and *Sony* certainly does not support a fair use defense in this case. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 112 (2d Cir. 1998) (rejecting fair-use defense asserted by radio retransmission service and holding that "courts have rejected attempts by for-profit users to stand in the shoes of their customers").

(1968).  The 1965 draft of the copyright revision legislation contained the same Transmit Clause language ultimately enacted, reflecting that Congress determined early on that broadcast retransmission services should incur copyright liability.  *See* H. Comm. on the Judiciary, 89th Congress, 1st Sess., *Supplementary Register's Report on the General Revision of the U.S. Copyright Law: 1965 Revision Bill*, 22, 40-42 (Comm. Print 1965) (explaining that the 1965 bill subjected community antenna television retransmission services to copyright liability); H. Comm. on the Judiciary, 94th Congress, 1st Sess., *Second Supplementary Register's Report on the General Revision of the U.S. Copyright Law*, 116-35 (Comm. Print 1975) (discussing history of Congress's efforts beginning in 1965, and the Copyright Office's efforts in 1963, to address the copyright liability of broadcast retransmission services).

Congress left no doubt that the basis for the *Fortnightly* decision was "completely overturned" in the 1976 Act.  *See* 1976 Report at 86-87; *Capital Cities*, 467 U.S. at 709-10.  Indeed, even the *Aereo* majority recognized that "the Transmit Clause was intended in part to abrogate *Fortnightly* and *Teleprompter* and bring a cable television system's retransmission of broadcast television programming within the scope of the public performance right."  712 F.3d at 685.[9]

### C.   The "Technological Exemption" To The Transmit Clause Created By *Cablevision* And *Aereo* Is Contrary To The Statutory Language.

FilmOnX claims that its system is substantially similar to Aereo's.  Opp. at 1.  Thus, FilmOnX argues, this Court should conclude that FilmOnX's broadcast retransmission service

---

[9] FilmOnX argues that Congress responded to *Fortnightly* by enacting the compulsory licensing provisions of Section 111 (which FilmOnX mistakenly refers to as Section 117).  Congress's response to *Fortnightly* was twofold:  It wrote the Transmit Clause so that retransmission of broadcast programming by any device or process would constitute a public performance, and it wrote Section 111, which granted a compulsory license to cable retransmitters.  If retransmitting broadcast programming was not a public performance, no compulsory license would have been required.

does not make public performances because the Second Circuit concluded that Aereo does not make public performances. However, the *Aereo* court mechanically applied the *Cablevision* court's interpretation of the Transmit Clause. As explained in Plaintiffs' opening brief, that interpretation is simply inconsistent with the express language of the Transmit Clause. Mot. at 19-25. And it is that language that is controlling here — not *Cablevision*'s erroneous interpretation of the language.

The Transmit Clause clearly states that transmitting a performance of a work to the public by means of *any device or process* is a public performance. 17 U.S.C. § 101. Nonetheless, the *Aereo* court read *Cablevision* as fashioning a set of technological "guideposts" for analyzing whether a performance is "public" or "private." 712 F.3d at 689. These "guideposts" suggest that if a retransmission service uses a particular device or process — mini-antennas and subscriber-assigned copies — the performances are "private" because they are sent by individual transmissions even though potentially thousands or millions of consumers can view the same live programming.

The *Aereo* court's "guideposts" are not rooted in any statutory language and find no support in the legislative history. The very concept of "guideposts" for determining whether a particular device or process violates the public performance right is antithetical to the statute's express language and Congress's unambiguous intent. *Cablevision*'s and *Aereo*'s technology exemption to an expressly technology-agnostic statute turns the statutory scheme on its head, and cannot be the means by which a distinction between "public" and "private" performances is made.

Although FilmOnX's *only defense* is that this Court should adopt *Cablevision*'s interpretation of the Transmit Clause, FilmOnX has not and cannot show how *Cablevision*'s

interpretation is in fact correct.  In its attempt to demonstrate that *Cablevision*'s reading is somehow consistent with the Transmit Clause's plain language, FilmOnX only further tortures the statute while failing to address key points raised in Plaintiffs' motion.  For example, as explained in Plaintiffs' opening brief, the central flaw in *Cablevision*'s reading of the Transmit Clause is that the court conflated the terms "transmission" and "performance."  In response, FilmOnX quotes a passage from the 1976 House Report, which it claims the *Cablevision* court relied on to find that a transmission is a performance.  Opp. at 11.  But the section of the House Report FilmOnX quotes is *not* cited in, let alone relied upon by, *Cablevision*.  More importantly, it does not say that a transmission is a performance.  It simply says one can publicly perform a work by retransmitting the original performance to the public, which is exactly what FilmOnX does.  *See* 1976 Report at 63-64.

FilmOnX then attempts to reconcile *Cablevision*'s interpretation with the statutory language.  FilmOnX asserts that "[a] transmission is a performance, but that transmission is not actionable unless it is done at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered."  Opp. at 11.  That is not what the Transmit Clause says.  On the contrary, the statute makes clear that there are *two ways* to transmit a performance to the public:  It is a public performance to perform a work ***either*** at a place open to the public ***or*** to transmit it to members of the public who receive the performance in different places or at different times.  17 U.S.C. § 101.

Additionally, as Plaintiffs explained in their Motion, contrary to the Second Circuit's reading, the Transmit Clause does not say that a performance is public only if it is delivered to multiple people in a single transmission.  *See* Mot. at 21.  Rather, one can "transmit" a

"performance" of the work "to the public" *either* by transmitting the performance one time to many people (like a television broadcast) *or* by transmitting the same performance at different times to many different people (like video-on-demand). *Id.*; *BarryDriller*, 915 F. Supp. 2d at 1144 (observing that the statute "does not by its express terms require that two members of the public receive the performance from the same transmission"). FilmOnX's response is silence.

And, as explained in Plaintiffs' opening brief and cited authority, *Cablevision*'s interpretation effectively reads the "different times" language out of the Transmit Clause and, therefore, is inconsistent with the controlling statutory language. *See* 17 U.S.C. § 101 (to publicly perform is "to *transmit* . . . a performance . . . of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance receive it in the same place or in separate places and *at the same time or at different times*") (emphasis added).

While FilmOnX tries in its Opposition to respond to the fact that the Second Circuit's interpretation reads the "different times" language out of the statute, Mot. at 21-22, FilmOnX's response is confusing and illogical. FilmOnX says that the language "is still valid," but just "applies to performances that are not transmissions." Opp. at 12. In other words, FilmOnX seems to be claiming that there are some types of performances that are not delivered via transmission, and the "different times" language applies only to those non-transmission performances. FilmOnX is correct that there are types of performances that are not delivered via transmission — for example, there is no transmission involved when people go to the theater and watch a live performance of a play. However, FilmOnX is wrong that the "different times" language applies to these types of performances. There are two reasons for this. First, on the face of the statute, the "different times" language applies *only* to performances delivered via

transmission.  *See* 17 U.S.C. § 101 (to publicly perform is "to *transmit* . . . a performance . . . of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance receive it in the same place or in separate places and *at the same time or at different times*") (emphasis added).  Second, a live performance of a play in a theater cannot be "received" by members of the public at different times.  It can only be viewed by people who are physically present in the theater at the time the play is being performed.  The only types of performances that can be received by members of the public at different times are performances that are delivered by transmission.  FilmOnX's inability to reconcile *Cablevision*'s interpretation with the statute's plain language confirms that *Cablevision*'s interpretation read the "different times" language out of the Transmit Clause and therefore was incorrect.

Tellingly, in its Opposition, FilmOnX does not even attempt to defend the Second Circuit's rule that there can only be a performance to the public under the Transmit Clause if a service transmits copyrighted programming from a master copy, but not if the service retransmits the programming from separate, subscriber-associated copies.  That is because there is no support for this rule in the statute or legislative history.  The word "copy" does not appear in the Transmit Clause.  Nothing in the legislative history suggests that Congress intended that systems using master copies make public performances, but systems using thousands of separate copies to retransmit programming to the public make only "private performances."  *BarryDriller*, 915 F. Supp. 2d at 1144-45.  Drawing such a distinction between systems that use master copies and systems that use separate copies conflicts with the statute's plain language, which says that transmitting a performance to the public by means of "*any device or process*" is a public performance.  *See* 17 U.S.C. § 101.

Moreover, it makes no sense to have the question of whether a performance is public depend on whether members of the public receive the performance by means of transmissions from a master copy as opposed to thousands of separate copies of the same work. The sole source of *Cablevision*'s rule is the Nimmer copyright treatise, which cites no support for distinguishing between master copies and separate copies, and which posits, illogically, that renting a video and watching it at home would give rise to public performance liability, because other people rented and watched the same copy, while retransmitting programming over the Internet through individual streams characteristic of the Internet to millions of viewers would not be a public performance. 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 8:14[C][3], at 8-142 (2007). Under the statute, the rule is the opposite: watching a rented movie at home is a private performance, but retransmitting broadcast programming over the Internet to thousands or millions of people, as FilmOnX does, is a public performance.[10]

Finally, FilmOnX asserts that "many respected scholars support *Cablevision*." Opp. at 13 n.2. But the two articles FilmOnX cites do not even analyze — let alone defend — *Cablevision*'s interpretation of the Transmit Clause. They are economics articles that analyze the impact of developments in copyright law on certain market segments. By contrast, all of the articles cited by Plaintiffs in their opening brief are by legal scholars who deconstructed the Second Circuit's analysis of the Transmit Clause and found it to be erroneous. Mot. at 4, 14-17.

---

[10] FilmOnX seems to suggest that Professor Goldstein approved the "master copy" rule in his treatise, Opp. at 12-13, but FilmOnX has misread the Goldstein treatise. Professor Goldstein, after observing that the *Cablevision* court misread the statute, noted that reading the case narrowly to encompass only situations involving unique, user-dedicated transmissions would avoid conflicts with other courts and present less of a threat to the video-on-demand market. That is not the same as saying that the "master copy" distinction is consistent with the statute's text.

14

**D.   FilmOnX's Proposed Interpretation Of The Transmit Clause Is Foreclosed By The Legislative History.**

FilmOnX attempts to bolster its proposed interpretation of the Transmit Clause with revisionist history.  For example, FilmOnX argues that when Congress enacted the 1976 Copyright Act, it wrote the Transmit Clause "narrowly" to balance copyright owners' rights with the public's right to access copyrighted works through "private performances." *E.g.*, Opp. at 8-10.  FilmOnX has it backwards.  The legislative history is clear that Congress wrote the Transmit Clause broadly to cover all devices or processes, including technologies that did not yet exist. *See Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*, 772 F. Supp. 614, 650-51 (D.D.C. 1991) ("the term 'public performance' was meant to be read broadly" and "'it would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on the mere method by which television signals are transmitted to the public'") (internal citations omitted).

As Plaintiffs' opening brief explains, there are numerous unambiguous statements in the legislative history confirming Congress's intent that the Transmit Clause should be read broadly. For example, the House Report states:

> The definition of "transmit" . . . is broad enough to include *all conceivable forms and combinations of wires and wireless communications media,* including but by no means limited to radio and television broadcasting as we know them.  *Each and every method* by which the images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and *if the transmission reaches the public in any form*, the case comes within the scope of clauses (4) or (5) of section 106.

1976 Report at 64 (emphasis added); *see also id*. at 63 (a "performance may be accomplished 'either directly or by means of any device or process,' including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques *and systems not yet in use or even*

15

*invented*") (emphasis added); H. Comm. on the Judiciary, 89th Cong., 1st Sess., *Supplementary Register's Report on the General Revision of the U.S. Copyright Law*, 13-14 (Comm. Print 1965) ("[T]he bill should, we believe, adopt a general approach aimed at providing compensation to the author for future as well as present uses of his work that materially affect the value of his copyright[.]  A real danger to be guarded against is that of confining the scope of an author's rights on the basis of the present technology so that, as the years go by, his copyright loses much of its value because of unforeseen technical advances.").

All of the legislative history quoted by FilmOnX simply comprises statements that only public performances are actionable, which, of course, is not disputed.  FilmOnX cites nothing that suggests Congress would have considered a commercial service retransmitting live broadcast programming to thousands — or potentially millions — of people to be engaging in "private performances."  Congress intended that retransmissions of copyrighted broadcast television programs by commercial retransmission services should be considered public performances.  *See Capital Cities*, 467 U.S. at 709-10 ("In revising the Copyright Act . . . Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement."); *see also* 1976 Report at 88-89 ("cable systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and . . . copyright royalties should be paid by cable operators to the creators of such programs").

In short, as a service that retransmits copyrighted broadcast television programs to the public over the Internet, FilmOnX is precisely the type of business that Congress intended the Transmit Clause to cover.  By conducting such retransmissions without any license or

authorization, FilmOnX is subverting that nearly four-decade-old federal policy expressly codified in the Transmit Clause, and should therefore be enjoined.

## II.      Plaintiffs Have Demonstrated Irreparable Harm.

The uniform view among federal courts that have addressed the issue is that Plaintiffs suffer irreparable harm from the unauthorized retransmission of their copyrighted programming over the Internet.  *See* Mot. at 25 (collecting cases).  Unable to respond to the uninterrupted line of cases cited in the opening brief on this motion, FilmOnX purports to contest Plaintiffs' showing of irreparable harm by making three meritless arguments.

*First*, FilmOnX wrongly suggests that courts in the D.C. Circuit impose a different and more exacting test for irreparable harm than other federal courts.  This assertion is simply not true.  Here, as elsewhere, in order to obtain a preliminary injunction, courts require proof of threatened harm that is actual and not theoretical, not compensable by money damages, and supported by evidence.  *See, e.g.*, *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 672 (D.C. Cir. 1985); *Salinger v. Colting*, 607 F.3d 68, 81-82 (2d Cir. 2010); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 997-1000 (9th Cir. 2011); *CytoSport, Inc. v. Vital Pharms, Inc.*, 617 F. Supp. 2d 1051, 1080-81 (E.D. Cal. 2009).  That is exactly what Plaintiffs have presented in support of this motion.  *See* Mot. at 26-27 (citing evidence of multiple irreparable harms that Plaintiffs are likely to suffer if FilmOnX's infringing service is not enjoined).[11]

---

[11] The cases on which FilmOnX relies for the purportedly higher standard for irreparable harm are wholly inapposite.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 299 (D.C. Cir. 2006) (injunction sought in challenge under Establishment Clause to Navy's practices in promotion of chaplains); *Wis. Gas Co.*, 758 F.2d at 672 (challenge by pipeline owners to federal agency rulemaking regarding "minimum take provisions" in natural gas contracts); *GEO Specialty Chems. Inc. v. Husisian*, --- F. Supp. 2d ---, 2013 WL 500560, at *5 (D.D.C. Feb. 11, 2013) (injunction sought to bar the plaintiff's former attorney from representing allegedly adverse clients); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36, 42-43 (D.D.C. 2000) (mandatory injunction, subject to "even greater circumspection than usual," sought to require FDA approval of the plaintiff's generic drug).  None of these cases undermine the uniform

Footnote continued on next page

17

*Second*, FilmOnX argues that Plaintiffs' showing of FilmOnX's impact on their advertising revenues is speculative and can be redressed at trial by monetary damages. The argument ignores most of the categories of irreparable harm established by Plaintiffs' evidence, including the threatened impact to Plaintiffs' ability to negotiate retransmission consent agreements, undermining Plaintiffs' own websites and Internet offerings and their ability to develop a licensed system for distribution of television programming over the Internet, and destroying the local broadcasters' rights to be the exclusive providers of those programs in their own markets. *See* Mot. at 26-27. The notion that these harms are either speculative or redressable with money damages has been rejected unanimously by the courts, which have instead found them to be irreparable. *See BarryDriller*, 915 F. Supp. 2d at 1147; *Am. Broad. Cos., Inc. v. Aereo*, 874 F. Supp. 2d 373, 397-98 (S.D.N.Y. 2012); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617-20 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275, 285-87 (2d Cir. 2012); *CBS Broad. Inc. v. FilmOn.com*, No. 10-07532, Dkt. No. 8 (S.D.N.Y. Nov. 22, 2010); *Twentieth Century Fox Film Corp. v. iCraveTV*, Nos. 00-120, 00-121, 2000 WL 25989, at *8 (W.D. Pa. Feb. 8, 2000); *accord WTV Sys.,* 824 F. Supp. 2d at 1012-15. *See generally* Brennan Decl. ¶¶ 9-23.

*Finally*, FilmOnX's characterization of Plaintiffs' harms as consisting of mere economic losses that cannot support a preliminary injunction misstates both the law and the evidence. As Judge Wu recognized in the *BarryDriller* case, the harms that Plaintiffs have demonstrated here — impairment of control over copyrighted works, threats to goodwill and business reputation, and loss of business or business opportunities — "are irreparable because they are 'neither easily calculable, nor easily compensable.'" *BarryDriller*, 915 F. Supp. 2d at 1147 (quoting *WTV Sys.*,

---

Footnote continued from previous page
conclusion of courts that have found irreparable harm based on the unauthorized retransmission of copyrighted programming over the Internet.

824 F. Supp. 2d at 1013).  Moreover, these harms support preliminary injunctive relief because, FilmOnX, as a start-up company, is unlikely to be able to satisfy the large statutory damages award that may result from its extensive, infringing retransmissions.  *Id.* at 1147; *accord ivi*, 691 F.3d at 286.  Courts in this circuit have repeatedly concluded that irreparable harm exists where similar injuries are shown.  *See, e.g.*, *Bayer HealthCare, LLC v. U.S. F.D.A.*, --- F. Supp. 2d ---, 2013 WL 1777481, at *7 (D.D.C. Apr. 17, 2013) (Collyer, J.) (finding irreparable harm based on "decline in market share" and "loss of customer goodwill"); *Nalco Co. v. U.S. E.P.A.*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (Collyer, J.) ("Where a plaintiff 'cannot recover damages from the defendant . . . any loss of income suffered by plaintiff is irreparable *per se*.' . . . [E]conomic loss for which there is no corrective relief available is irreparable.") (citation omitted); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77-78 (D.D.C. 2001) (irreparable harm consists of "incalculable damages," "loss of customer trust," and loss of "goodwill"); *accord Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (the "loss of profits which could never be recaptured" constitutes irreparable harm).

### III.    The Balance Of Harms Tips Decidedly In Favor Of An Injunction.

FilmOnX cannot avoid an injunction on the ground that ceasing its infringing activities would hurt its business.  As this Court has noted, "the balance of harms cannot favor a defendant whose injury results from the knowing infringement on the plaintiff's [intellectual property rights]."  *Malarkey-Taylor Assocs., Inc. v. Cellular Telecomm. Indus. Ass'n*, 929 F. Supp. 473, 478 (D.D.C. 1996); *accord BarryDriller*, 915 F. Supp. 2d at 1147 ("'Defendants 'cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities.'") (citing *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995)).  If that were not the case, "every infringer who invested large sums of money in the unlawful activity could shield its wrongdoing."  *Malarkey-Taylor Assocs.*, 929 F. Supp. at 478;

*accord BarryDriller*, 915 F. Supp. 2d at 1147 ("To the extent that the Court finds that Plaintiffs are likely to succeed on the merits here, then Defendants have no equitable interest in continuing an infringing activity."). The cases FilmOnX cites are all decisions in which the courts found that the plaintiffs had failed to show likelihood of success on the merits or another requirement for preliminary injunctive relief. They have no relevance to this case, where Plaintiffs have proven both likelihood of success and irreparable harm.

In addition, FilmOnX has not submitted a shred of evidence to support its claims that it will suffer cognizable harm from the issuance of a preliminary injunction. That failure alone is fatal to its "balance of hardships" arguments. *See WTV Sys.*, 824 F. Supp. 2d at 1014 (rejecting defendant's balance of hardships argument, in part, because it was made "without any evidence"). The only actual evidence on this issue is FilmOnX's public statement that Plaintiffs' programming is unimportant to its business. Shepard Decl. ¶ 21, Ex. M; David Decl. ¶¶ 2, 28-29.

## IV.    Public Policy Favors An Injunction.

"[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *BarryDriller*, 915 F. Supp. 2d at 1148 (quoting *WTV Sys.*, 824 F. Supp. 2d at 1015); *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011) ("[T]he public interest favors protecting against further violation of federal copyright and trademark laws.").

FilmOnX's contention that enjoining its illegal service undermines the public interest in technological innovation should be rejected out of hand. FilmOnX's service is not innovation. It is a sham, based upon an admittedly inefficient technological scheme designed to evade copyright liability and skirt nearly four decades of federal policy against unauthorized

20

retransmission of broadcast signals. *Cf. Aereo,* 712 F.3d at 697 (Chin, J., dissenting). Enjoining FilmOnX's unauthorized retransmissions would not deprive the public of Internet access to Plaintiffs' programming or innovation in the video-on-demand market. To the contrary, the evidence before the Court demonstrates that an injunction preventing FilmOnX's unauthorized retransmissions would facilitate the further development of a lawful market for licensed distribution of Plaintiffs' programming by cable and satellite providers and Internet licensees, and over Plaintiffs' own websites and Internet services. Such an injunction would thus serve the public's interests in both assuring the "broad accessibility of creative works" and "rewarding and incentivizing [the] creative efforts" of copyright owners. *ivi*, 691 F.3d at 287.

Likewise, FilmOnX's repeated warnings that a ruling in Plaintiffs' favor would mean that individuals would be forced to obtain copyright licenses to watch television with an antenna in their home are baseless. *E.g.*, Opp. at 10. A person watching television in her home with an antenna does not need a copyright license because she is not publicly performing the programs. To the extent FilmOnX is attempting to build on the *Cablevision* court's hypothetical of a "hapless consumer" being held liable for transmitting a television program from his living room to his bedroom, 536 F.3d at 136, there is no risk of that because when an individual transmits a program to himself in his bedroom, that is not a performance to the public. See Mot. at 23. Unlike the consumers in these hypotheticals, FilmOnX is a commercial service that publicly performs the programs when it retransmits them over the Internet to its subscribers.

## V.     The Preliminary Injunction Should Prohibit FilmOnX's Infringement Nationwide.

The Copyright Act mandates that an injunction to restrain copyright infringement "shall be operative throughout the United States . . ." and "enforceable . . . by any United States court having jurisdiction" over the defendant. 17 U.S.C. § 502(b). In the face of this clear statutory directive, FilmOnX argues that this Court should limit the scope of any injunction to the

2225266.3

geographic boundaries of the D.C. Circuit in order to allow other courts to decide the copyright issues presented in this case. Such a limitation is justifiable, in FilmOnX's view, because the Central District of California and the Second Circuit have already reached contrary conclusions about how to apply the Transmit Clause and the threat of a circuit split exists. FilmOnX's argument would deprive Plaintiffs of the full protections of the Copyright Act and lead to absurd results.

A nationwide injunction against FilmOnX would not prevent other courts from deciding the Transmit Clause issues presented here in cases involving other defendants that operate similar television retransmission systems. To the contrary, that is already happening in cases challenging the Aereo service, which were brought by certain of these Plaintiffs (and others) in New York and by local broadcasters in Massachusetts. The possibility that another court might decide the Transmit Clause issues differently is not a valid ground to limit the scope of the injunction in this case, thereby depriving Plaintiffs of the complete relief to which they are entitled. *See Apple, Inc. v. Psystar Corp.*, 658 F.3d 1150, 1161 (9th Cir. 2011). The defendant in a hypothetical future case would not be bound by this Court's decision. By issuing a nationwide injunction, this Court would simply reaffirm the principle that such relief is appropriate where FilmOnX's "liability has been determined" and there is a "history of continuing infringement and a significant threat of future infringement." *Id.*; *Walt Disney Co. v. Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990).[12]

---

[12] The cases cited by FilmOnX in support of limiting the scope of the injunction involve federal regulatory challenges, in which a nationwide injunction against the government would arguably prevent further review of the meaning of a particular regulation. *See Califano v. Yamasaki*, 442 U.S. 682, 684 (1979) (HEW enforcement of Social Security regulations); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 651 (9th Cir. 2011) (HHS enforcement of Medicare regulations); *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 762 (9th Cir. 2008) (Justice Department enforcement of ADA regulations); *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 382 (4th Cir. 2001) (FEC enforcement of campaign expenditure regulations). For that

Footnote continued on next page

FilmOnX operates an infringing Internet service that unlawfully retransmits Plaintiffs'

copyrighted programming in nearly every federal judicial circuit.  Under these circumstances, in

additional to being mandatory under Section 502(b), a nationwide injunction is necessary to

provide Plaintiffs with complete relief from FilmOnX's infringement.  *See* 17 U.S.C. § 502(a);

*Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987).  An injunction that covers only the

D.C. Circuit would leave Plaintiffs in the untenable position of having to relitigate this case in

every other circuit where FilmOnX operates, in order to enjoin a service that has already been

found infringing and to prevent irreparable harm that courts have found Plaintiffs are likely to

suffer.  This Court should reject the suggestion that the law requires such an absurd result, *see*

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998), and

issue a nationwide injunction against FilmOnX, as the Copyright Act requires.

## CONCLUSION

For the reasons stated above and in their opening brief, Plaintiffs' motion for preliminary

injunction should be granted.


Dated:  August 23, 2013                                  Respectfully submitted,


                                                         /s/ Paul Smith
                                                         Paul Smith (D.C. Bar No. 358870)
                                                         psmith@jenner.com
                                                         JENNER & BLOCK LLP
                                                         1099 New York Avenue, NW, Suite 900
                                                         Washington, DC 20001-4412
                                                         Telephone: (202) 639-6000
                                                         Facsimile: (202) 639-6066

---

Footnote continued from previous page
reason, federal agencies are "not require[d] . . . to accept an adverse determination of the
agency's statutory construction by any of the Circuit Courts of Appeals as binding . . . for all
similar cases throughout the United States."  *AMC*, 549 F.3d at 771-72 (citation omitted).  That is
not the situation confronting this Court.

2225266.3

Richard L. Stone (admitted *pro hac*)
rstone@jenner.com
Julie A. Shepard (admitted *pro hac*)
jshepard@jenner.com
Amy Gallegos (admitted *pro hac*)
agallegos@jenner.com
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

*Attorneys for Plaintiffs Fox Television
Stations, Inc., Twentieth Century Fox Film
Corporation, and Fox Broadcasting Company*

Dated:  August 23, 2013

/s/ Robert Garrett
Robert Alan Garrett (D.C. Bar No. 239681)
Hadrian R. Katz (D.C. Bar No. 931162)
Christopher Scott Morrow
    (D.C. Bar No. 491925)
Murad Hussain (D.C. Bar No. 999278)
ARNOLD & PORTER LLP
555 12th St., NW
Washington, DC 20004
Telephone: (202) 942-5444
Facsimile: (202) 942-5999

James S. Blackburn (admitted *pro hac*)
james.blackburn@aporter.com
John C. Ulin (admitted *pro hac*)
john.ulin@aporter.com
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Attorneys for Plaintiffs NBC Subsidiary (WRC-
TV) LLC, NBC Studios LLC, Universal
Network Television LLC, Open 4 Business
Productions LLC, Telemundo Network Group
LLC, American Broadcasting Companies, Inc.,
Disney Enterprises, Inc., Allbritton
Communications Company, CBS Broadcasting
Inc., CBS Studios Inc., and Gannett Co., Inc.*

24