**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| | ) |
| **FOX TELEVISION STATIONS, INC.,** | ) |
| *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )   **Civil Action No. 13-758 (RMC)** |
| | ) |
| **FILMON X LLC,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

_____ )

**OPINION**

Defendants operate FilmOn X, a service that uses the Internet to give consumers the ability to watch live over-the-air television channels through their computers and on their mobile devices.  FilmOn X also has a digital video recorder, or DVR, capability, permitting users to pause live programming or record shows for later viewing.  FilmOn X assigns an individual user the content stream from one of thousands of minute antennas that it operates in major metropolitan areas, including Washington, D.C.   Plaintiffs are a group of copyright holders that includes over-the-air television broadcasters and television programmers who have not licensed any of their content to FilmOn X.  Plaintiffs complain that FilmOn X is violating their exclusive right to public performance of their copyrighted works, which include local programs and some of the country's most popular evening television shows.  Plaintiffs rely on a recent decision from the U.S. District Court for the Central District of California, *Fox Television Systems, Inc. v. BarryDriller Content Systems, PLC* (*BarryDriller*), in which that court concluded that FilmOn X violated the plaintiffs' copyrights under the Copyright Act of 1976 and barred FilmOn X from offering their content in the Ninth Circuit.

1

FilmOn X responds that it modeled its process after the system approved in a 2008 Second Circuit case, *Cartoon Network, LP v. CSC Holdings, Inc.* (*Cablevision*), 536 F.3d 121 (2d Cir. 2008). FilmOn X contends that *Cablevision* held, as a matter of law, that there is no public performance of a copyrighted work if there is a one-to-one relationship between a copy of the copyrighted work and the recipient—*i.e.*, so long as each FilmOn X user has his or her own assigned antenna, there is no copyright violation. FilmOn X notes that the Second Circuit decided in April of this year that a substantially identical Internet service, Aereo, was not committing copyright infringement. *See WNET, Thirteen v. Aereo, Inc.* (*Aereo II*), 712 F.3d 676 (2d Cir. 2013).

The Court has carefully considered the rulings in *Cablevision* and *Aereo II*, but it is not bound by them or by the California court's ruling in *BarryDriller*, although the Court finds *BarryDriller* to be more persuasive. This Court concludes that the Copyright Act forbids FilmOn X from retransmitting Plaintiffs' copyrighted programs over the Internet. Plaintiffs are thus likely to succeed on their claim that FilmOn X violates Plaintiffs' exclusive public performance rights in their copyrighted works. Because there is no dispute of fact between the parties—indeed, each has won and each has lost in a different forum on these same facts—the Court will grant Plaintiffs' motion for a preliminary injunction and will convert the scheduled preliminary injunction hearing to a status conference.

## I.  FACTS

### A.  The Parties

Plaintiffs[1] include the four major national broadcast television networks—ABC, CBS, Fox, and NBC—as well as other distributors, rights holders, and DC-area television

---

[1] Plaintiffs are: Fox Television Stations, Inc.; Twentieth Century Fox Film Corporation; Fox Broadcasting Company, Inc.; NBC Subsidiary (WRC-TV), LLC; NBC Studios LLC; Universal

broadcasters.  Am. Compl. [Dkt. 5] ¶¶ 13–26.  Defendants, referred to collectively as FilmOn X,

are: FilmOn X LLC (formerly known as Aereokiller); FilmOn.tv Networks, Inc.; FilmOn.tv,

Inc.; and FilmOn.com Inc.  FilmOn X operates a website that combines the functionality of a

television with that of a digital video recorder.  The Amended Complaint states one claim—that

FilmOn X infringes copyrights held by Plaintiffs for, *inter alia*, local news broadcasts and

nationally broadcast television programs including *Glee* (Fox), *The Office* (NBC), *Grey's

Anatomy* (ABC), and *Elementary* (CBS).  *Id.* ¶¶ 37–46; *see also id.*, Ex. B. [Dkt 5-2] (list of

illustrative copyright registrations); *see also* Mem. Supp. Pls. Mot. (Pls. Mem.) [Dkt. 27-1] at 6

(listing as examples of local programming Washington Nationals baseball telecasts and WUSA 9

News at 6 p.m.).  Plaintiffs have provided extensive documentation as to the copyrights they hold

for both local and national programming, which is not disputed by FilmOn X.  *E.g.*, Decl. Sherry

Brennan [Dkt. 27-4] (declaration of Senior Vice President of Fox Cable Network Services, LLC)

& Brennan Decl., Ex. A (copyright registration for Fox programming such as a November 20,

2012 episode of *The New Girl*, a sitcom starring Zooey Deschanel).

   FilmOn X has filed an Answer, *see* First Am. Answer, Dkt. 14, and a

Counterclaim for declaratory judgment that it is not infringing Plaintiffs' copyrights, *see* First

Am. Counterclaim, Dkt. 15, ¶¶ 44–45, which Plaintiffs have answered, Dkt. 24.  Plaintiffs filed

their Joint Motion for Preliminary Injunction on August 1, 2013.  *See* Pls. Mot. Prelim. Inj. (Pls.

Mot.) [Dkt. 27].  Because the parties agree on all material facts, the preliminary injunction

hearing scheduled for September 20, 2013 will be converted to a status conference.

---

Network Television LLC; Open 4 Business Productions LLC; Telemundo Network Group LLC;
American Broadcasting Companies, Inc.; Disney Enterprises, Inc.; Allbritton Communications
Company; Gannett Co., Inc.; CBS Broadcasting, Inc.; and CBS Studios.

### B. FilmOn X's Service

FilmOn X offers free and paid services through which consumers can watch live and recorded television over the Internet, including local channels that are affiliates of ABC, CBS, NBC, and Fox that are also broadcast over-the-air.[2]  FilmOn X began offering its services in a small number of cities in late 2012, including Los Angeles and Chicago.  It later expanded to Washington, D.C.[3]  FilmOn X readily admits that its technology is "similar . . . in every relevant way" to the technology at issue in *Aereo* and *BarryDriller*.[4]  Defs.  Opp. [Dkt. 31] at 1, 14 n.3. To describe its technology and services, FilmOn X offers the declarations of its CEO and Founder, Alkiviades David, *see* David Decl., Dkt. 31-1, and its Chief Technology Officer Mykola Kutovyy, who is responsible for "implementing and managing FilmOn's technology," Kutovyy Decl., Dkt. 31-2, ¶¶ 2–3.  There is no dispute between the parties as to the material elements of the technology employed by FilmOn X and the services a user can access.  They also agree that the *Aereo* courts and *BarryDriller* court described the technology and services accurately.  Thus, the Court will summarize FilmOn X's system briefly.

---

[2] Being broadcast "over-the-air" means that customers can receive the signals with an antenna.

[3] According to Plaintiffs, FilmOn X briefly discontinued its Washington, D.C. broadcasts around the time this case was filed, but it has since resumed.  Pls. Mem. at 5.  Plaintiffs allege that FilmOn X was, at least for a time, permitting Washington-based viewers to view New York-based stations.  *See* Shepard Decl. [Dkt. 27-3] ¶ 11, Brennan Decl. ¶ 19.  FilmOn X ascribes this to an "inadvertent spill-over of over-the-air broadcast programming due to recent database testing" that "has been addressed and is no longer occurring."  Defs. Opp. [Dkt. 31], David Decl. [Dkt. 31-1] ¶ 9.  Plaintiffs do not press the point in their reply brief, *see* Pls. Reply at 17–18, and the Court thus does not rely on any spillover transmissions in its analysis.

[4] There are some differences between FilmOn X's system and the system in *Aereo*, most notably minor distinctions in the sequence in which signals are processed.  *BarryDriller* noted this also. *See* 915 F. Supp. 2d at 1141 n.5.  Nonetheless, the systems are essentially the same, and the parties agree that there are no legally meaningful differences.

4

First, a brief peek under the figurative hood.[5]  When it expands to a city, FilmOn X installs an array of "mini antennas, each no larger than the size of a dime and spaced inches apart."  A large number of mini-antennas are aggregated on a circuit board, which also contains other electronic components essential to FilmOn X's Internet broadcast system.  An antenna may be assigned to a specific, individual user ("static").  More generally, an antenna is available for "dynamic" allocation by the tuner server—that is, a specific antenna is assigned to one specific individual user only when that user is watching television via FilmOn X and is assigned to a different user when the first user is done.  No single antenna is used by more than one user at a single time, and all dynamic antennas are shared.[6]  The antennas are networked to a tuner router and server, which in turn link to a video encoder.  The encoder converts the signals from the antennas into a video format viewable by computers and mobile devices.  The video encoder is connected to a "distribution endpoint," which is a "server or group of servers" that delivers the video and audio to FilmOn X users.  Defs. Opp. at 6.

When a FilmOn X user selects a channel to watch through FilmOn X's website or a mobile application, the user's request is sent to FilmOn X's web server.  The web server sends a command to the tuner router and server.  The tuner router and server identify an available antenna and encoder slot, and then the tuner directs the assigned antenna to tune to the requested channel.  Once the antenna begins receiving the signal, data for the requested channel flows from the antenna to the antenna router and then to the video encoder, where it is stored on a computer hard drive in a "unique directory" that is created for the specific user.  The data then goes through the distribution endpoint, over the Internet to FilmOn X's website or a mobile

---

[5] *American Broadcasting Companies, Inc. v. Aereo, Inc.* ("*Aereo I*"), 874 F. Supp. 2d 373, 379–81 (S.D.N.Y. 2012), provides additional technical detail.

[6] According to *Aereo I*, even static users sometimes share antennas.  874 F. Supp. 2d at 378.

application, for the user's consumption. Video data remains on FilmOn X's server in the user's unique directory while the user is actually watching television. When the user "finishes viewing the channel" by pressing stop or pause, closing the user application, or switching channels, a "stop" request is passed from the user to the antenna router, which immediately stops retrieving data from the antenna and frees the antenna for use by another user. The data in the user's unique directory is then deleted. Defs. Opp. at 6–7.

A FilmOn X user accesses the service by using an authorized "client application," which allows access from a desktop or laptop computer via software or the FilmOn X website, filmonx.com, as well as applications or "apps" for mobile devices, such as FilmonTVPlus for Apple's iPhone or LiveTV for Google's Android mobile operating system. The user can then select from a list of available channels within the application. Once the user selects a channel, the technological process described above begins. Defs. Opp. at 5. Below is a screenshot of the FilmOn X website accessed from the Court in Washington, D.C. on August 29, 2013, showing the different local channel viewing options on the left.



Plaintiffs describe additional characteristics of the FilmOn X service that were not

detailed by FilmOn X, although FilmOn X has not controverted them in any meaningful way.[7]

For example, Plaintiffs have provided a variety of screenshots of the FilmOn X service,

including screenshots of the different local programming available in the Los Angeles, Chicago,

Washington, and Dallas—*i.e.*, users in each city can access the channels of Plaintiffs' local

affiliates while in that metropolitan area.  *See* Shepard Decl., Ex. E.  FilmOn X offers live

standard-definition ("SD") viewing for free.  Shepard Decl. ¶ 15.  Users who pay can (1) watch

---

[7] FilmOn X objected to some of the paragraphs of the Brennan and Shepard Declarations.  *See*
Defs. Evid. Objections [Dkt. 31-3].  Those objections pertained mostly to immaterial
technological aspects of its business and did not contain any objection to the facts described here.

live television in high definition ("HD") and (2) select shows for later viewing, which FilmOn X will record by saving a copy into the user's unique directory.  *Id.* ¶ 14; *id.*, Ex F (screenshots showing that, for example, viewers can pay $0.99 per month to "watch in HD and Record" certain shows like "Travel with Rick Steves" or $99 per year to "watch in HD and Record" the CBS, NBC, Fox, and ABC local Washington channels).  In addition, Plaintiffs also assert that FilmOn X advertises both by (1) inserting brief ("10 to 30 second") video advertisements upon initiation of viewing but before the viewer can see live television and (2) displaying banner advertisements above the video viewer while a user is watching television.  *Id.* ¶¶ 16–17; *id.*, Exs. G, H, & I (screenshots of advertisements).  Finally, FilmOn X superimposes over all local programming a small "bug" containing the FilmOn or FilmOn X logo.  *Id.* ¶ 18; *id.*, Ex. J (screenshots).

Plaintiffs have not consented to FilmOn X's streaming of their programming and have not entered into any licensing agreements with FilmOn X.  Pls. Mem. at 1; Pls. Reply [Dkt. 32] at 1.

## II.  LEGAL STANDARD

A district court may grant a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  An injunction is an equitable remedy, so its issuance falls within the sound discretion of the district court.  *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  To obtain a preliminary injunction, the movant must establish that:

> (a) he is likely to succeed on the merits;
>
> (b) he is likely to suffer irreparable harm in the absence of preliminary relief;
>
> (c) the balance of equities tips in his favor; and

(d) an injunction is in the public interest.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also eBay Inc. v. MercExchange, L.L.C.*, 547

U.S. 388, 391 (2006) (in patent case, requiring as second factor a showing that "that remedies

available at law, such as monetary damages, are inadequate").  The D.C. Circuit has further

instructed that "the movant has the burden to show that all four factors . . . weigh in favor of the

injunction."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *see*

*also Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011).

### III.  ANALYSIS

To some extent, this case could just boil down to a binary choice between the

reasoning of the Second Circuit in *Aereo* or the California district court in *BarryDriller*.

*Compare* Defs. Opp. at 15 ("[P]laintiffs are left with the argument that the *Cablevision* court got

it wrong and the *Aereo* court could not correct *Cablevision*'s error because of stare decisis . . . .")

*with* Pls. Reply at 3 ("FilmOn X simply urges this Court to blindly follow *Aereo* and *Cablevision*

because they exist and have not yet been overturned by the Supreme Court.").  It does not.  This

Court is tasked with making a legal judgment.  While it has carefully considered the competing

authorities offered by the parties, the Court applies the Copyright Act and case law and finds that

Plaintiffs are likely to succeed on their claim that FilmOn X violates Plaintiffs' exclusive public

performance rights in their copyrighted works.  Because the other preliminary injunction factors

also favor Plaintiffs, their motion will be granted.

### A.  Cases Relied on by the Parties

The Court briefly reviews the cases relied on by the parties before turning to its

own analysis of the Transmit Clause.

### 1.  The Second Circuit Cases, *Cablevision* & *Aereo*

FilmOn X relies on a trio of cases: *Cartoon Network, LP v. CSC Holdings, Inc.*

(*Cablevision*), 536 F.3d 121 (2d Cir. 2008); *American Broadcasting Companies, Inc. v. Aereo,*

*Inc.* (*Aereo I*), 874 F. Supp. 2d 373 (S.D.N.Y. 2012); and *WNET, Thirteen v. Aereo, Inc.* (*Aereo*

*II*), 712 F.3d 676 (2d Cir. 2013).  *Aereo II* affirmed and adopted the analysis of *Aereo I in toto*,

and the Court follows the parties' lead in referring to those two decisions collectively as *Aereo*

when it is helpful to do so.

In 2008, the Second Circuit considered the copyright implications of a cable-

television operator's "Remote Storage DVR System" (RS-DVR).  *Cablevision*, 536 F.3d at 123.

The RS-DVR permitted customers who did not have "a stand-alone DVR," such as a Tivo, "to

record cable programming on central hard drives housed and maintained by Cablevision at a

'remote' location."  *Id.* at 124.  Customers could then "receive playback of those programs

through their home television sets, using only a remote control and a standard cable box

equipped with the RS–DVR software."  *Id.*  The plaintiffs, some of whom are plaintiffs in this

case, were copyright holders who, among other claims, asserted that the RS-DVR violated their

exclusive public performance rights.  *Id.*

The Second Circuit ruled in *Cablevision* that the district court had erred in

preliminarily enjoining the RS-DVR service.  The Second Circuit opined at length about why the

RS-DVR did not infringe the plaintiffs' public performance rights under the Transmit Clause of

the Copyright Act, 17 U.S.C. § 101, which provides: "To perform or display a work 'publicly'

means . . . to transmit or otherwise communicate a performance . . . to the public, by means of

any device or process, whether the members of the public capable of receiving the performance

or display receive it in the same place or in separate places and at the same time or at different

times."[8]  *See Cablevision*, 536 F.3d at 134–40.  The *Cablevision* court held that the Transmit

Clause required a court "to discern who is 'capable of receiving' the performance being

transmitted" when "determining whether a transmission is made to the public."  *Id.* at 134; *see*

*also id.* at 135 (rejecting district court's view that the Transmit Clause requires a court to

consider "not the potential audience of a particular transmission, but the potential audience of the

underlying work (*i.e.*, 'the program') whose content is being transmitted").  Having established

its premise, the Second Circuit then agreed with Cablevision that "because each RS–DVR

transmission is made using a single unique copy of a work, made by an individual subscriber,

one that can be decoded exclusively by that subscriber's cable box, only one subscriber is

capable of receiving any given RS–DVR transmission."  *Id.* at 135; *see also id.* at 137

("[B]ecause the RS–DVR system, as designed, only makes transmissions to one subscriber using

a copy made by that subscriber, we believe that the universe of people capable of receiving an

RS–DVR transmission is the single subscriber whose self-made copy is used to create that

transmission.").  *Cablevision* concluded:

> In sum, we find that the transmit clause directs us to identify the
> potential audience of a given transmission, *i.e.*, the persons
> "capable of receiving" it, to determine whether that transmission is
> made "to the public."  Because each RS–DVR playback
> transmission is made to a single subscriber using a single unique
> copy produced by that subscriber, we conclude that such
> transmissions are not performances "to the public," and therefore
> do not infringe any exclusive right of public performance.

*Id.* at 139.

In 2012, Judge Alison Nathan of the U.S. District Court for the Southern District

of New York issued *Aereo I*, a case involving the claim that Aereo, Inc.—a competitor to

---

[8] The Transmit Clause of the Copyright Act of 1976 (1976 Act) is discussed in additional detail
*infra*.  *Cablevision* also involved two other claims of copyright infringement, which are not
relevant here.  536 F.3d at 127–133.

FilmOn X that offers similar Internet television services—violated the public performance rights of a number of copyright holders.  The plaintiffs in *Aereo I* (again overlapping in part with Plaintiffs here) sought and were denied preliminary injunctive relief.  Judge Nathan found that *Cablevision* compelled a finding that the plaintiffs were unlikely to prevail on their copyright infringement claim in the Second Circuit, although her opinion repeatedly suggested that she would have reached the opposite conclusion if *Cablevision* were not controlling.  *See Aereo I*, 874 F. Supp. 2d at 375 ("But for *Cablevision*'s express holding regarding the meaning of the provision of the Copyright Act in issue here—the transmit clause—Plaintiffs would likely prevail on their request for a preliminary injunction.  However, in light of that decision, this Court concludes that it is bound to DENY Plaintiffs' request."); *id.* at 385 ("[T]his Court finds itself constrained to reject the approach Plaintiffs urge."); *id.* at 388 ("[T]his Court remains obligated to apply Circuit precedent with fidelity to its underlying reasoning."); *id.* at 393 ("[A]lthough the text of the transmit clause suggests that Congress intended that clause's coverage to sweep broadly . . . .").

Finding that Aereo's "system creates unique, user-requested copies that are transmitted only to the particular user that created them," giving Aereo "overall factual similarity" to the RS-DVR service in *Cablevision*, the *Aereo I* court concluded that Aereo's online streaming created only nonpublic performances.  *Id.* at 385; *see also id.* at 388 ("The facts on which the Second Circuit relied in holding that the potential audience of the transmissions in *Cablevision* was limited are the same as those present here, namely the use of unique copies, accessible only to the users who requested them, and transmitted only to those users.").

In considering the other preliminary injunction factors, Judge Nathan found that despite their likely inability to succeed on the merits, the plaintiffs had shown a "substantial," if

"not overwhelming," threat of irreparable harm. *Id.* at 400.  She concluded: "Aereo will damage Plaintiffs' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels, in which viewership is measured by Nielsen ratings" and that "Aereo's activities will damage Plaintiffs' ability to negotiate retransmission agreements [with cable or other providers], as these companies will demand concessions from Plaintiffs to make up for this decrease in viewership." *Id.* at 397–98.  The *Aereo I* court also found that Aereo's service would harm the plaintiffs by competing with the content streamed over plaintiffs' own websites and by endangering plaintiffs' relationships with other online "content providers, advertisers, [and] licensees." *Id.* at 399.  As to the balance of hardships, Judge Nathan found that "the balance of hardships certainly [did] not tip 'decidedly' in favor of Plaintiffs," given that Aereo had shown that an injunction against it would likely cause it to go out of business. *Id.* at 402–03.  Finally, Judge Nathan reasoned that "an injunction . . . would not disserve the public interest," noting that this factor partially favored both parties because the copyright system is intended both to encourage innovation (like Aereo's service) and to protect innovative content (like the programs copyrighted by the *Aereo I* plaintiffs). *Id.* at 404.

In *Aereo II*, by a two-to-one vote, the Second Circuit affirmed Judge Nathan's denial of a preliminary injunction in *Aereo I*. *Aereo II* began with a review of *Cablevision*, noting that the overall principle of that case was that "the transmit clause directs us to examine who precisely is 'capable of receiving' *a particular transmission of a performance*." 712 F.3d at 676 (quoting *Cablevision*, 536 F.3d at 135; emphasis added by *Aereo II*).  *Aereo II* then stated:

> [*Cablevision*] establishes four guideposts that determine the outcome of this appeal. First and most important, the Transmit Clause directs courts to consider *the potential audience of the individual transmission.* If that transmission is capable of being received by the public the transmission is a public performance; if the potential audience of the transmission is only one subscriber,

the transmission is not a public performance, except as discussed below. Second and following from the first, private transmissions—that is those not capable of being received by the public—should not be aggregated. It is therefore irrelevant to the Transmit Clause analysis whether the public is capable of receiving the same underlying work or original performance of the work by means of many transmissions. Third, there is an exception to this no-aggregation rule when private transmissions are generated from the same copy of the work. In such cases, these private transmissions should be aggregated, and if these aggregated transmissions from a single copy enable the public to view that copy, the transmissions are public performances. Fourth and finally, any factor that limits the potential audience of a transmission is relevant to the Transmit Clause analysis.

*Id.* at 689 (emphasis added; quotation marks and citations to *Cablevision* omitted).

Applying those four principles, *Aereo II* focused on the fact that "[w]hen an Aereo customer elects to watch or record a program using either the 'Watch' or 'Record' features, Aereo's system creates a unique copy of that program on a portion of a hard drive assigned only to that Aereo user." *Id.* at 690. Based on that fact, *Aereo II* concluded that "just as in *Cablevision*, the potential audience of each Aereo transmission is the single user" who is watching a program; therefore, Aereo's service created only private transmissions and did not infringe the plaintiffs' public performance rights. *Id.* It acknowledged that "[p]erhaps the application of the Transmit Clause should focus less on the technical details of a particular system and more on its functionality," but under Second Circuit precedent, "technical architecture matters." *Id.* at 694. *Aereo II* further stated that its decision was confirmed by the 1976 Act's legislative history, and it expressly declined to reconsider or overrule *Cablevision*. *Id.* at 695.

In dissent, Judge Denny Chin wrote that *Cablevision* was wrongly decided and that Aereo was infringing the plaintiffs' public performance rights "by transmitting (or retransmitting) copyrighted programming to the public without authorization." *Id.* at 696 (Chin,

14

J., dissenting).  Judge Chin wrote that the *Aereo II* decision "conflicts with the text of the

Copyright Act, its legislative history, and [Second Circuit] case law."  *Id.* at 697.  In essence,

Judge Chin's rationale was that "[e]ven assuming Aereo's system limits the potential audience

for each transmission, and even assuming each of its subscribers receives a unique recorded

copy, Aereo still is transmitting the programming 'to the public'" under the Transmit Clause.  *Id.*

at 698.  Thus, "[b]ecause Aereo is transmitting television signals to paying strangers, all of its

transmissions are 'to the public,' even if intervening 'device[s] or process[es]' limit the potential

audience of each separate transmission to a single 'member[ ] of the public.'"  *Id.* at 699 (quoting

17 U.S.C. § 101).

The plaintiffs' petition for rehearing *en banc* of *Aereo II* was emphatically denied,

10-2.  *WNET, Thirteen v. Aereo, Inc.*, Nos. 12-2786, 12-2807,  __ F.3d __, 2013 WL 3657978

(2d Cir. July 16, 2013).  Joined by Judge Richard C. Wesley, Judge Chin dissented from the

denial of rehearing, summarizing his dissent in *Aereo II* and arguing that "*Cablevision's* 'focus

on the uniqueness of the individual copy from which a transmission is made is not commanded

by the statute.'"  *Id.* at *5 (Chin and Wesley, JJ., dissenting) (quoting *BarryDriller*, 915 F. Supp.

2d at 1144–45); *see also id.* at *10 ("By extending *Cablevision*, the panel decision eviscerates

the Copyright Act: although it is generally unlawful to capture and retransmit public television

over the Internet without a license, entities may now do so as long as they utilize individual

antennas and unique copies, even though the antennas and copies functionally are unnecessary,

and even though the programs are retransmitted to members of the public." (citations omitted)).

## 2.  The California Case, *BarryDriller*

The case in the Central District of California before Judge George Wu, *Fox*

*Television Systems, Inc. v. BarryDriller Content System, PLC* ("*BarryDriller*"), pitted many of

15

these same Plaintiffs against these same Defendants.[9]  The California plaintiffs sought a

nationwide preliminary injunction against the FilmOn X service, and the parties presented nearly

identical arguments to those pressed here.  The plaintiffs argued that "[d]efendants' internet

retransmission service infringes their exclusive right to make public transmissions of their

copyrighted works," and the defendants responded that "due to the architecture of their systems,

their transmissions are *private*, not public," citing *Cablevision* and the then-recent *Aereo I*

decision.[10]  *BarryDriller*, 915 F. Supp. 2d at 1143.

        Judge Wu granted the plaintiffs' motion for a preliminary injunction, finding that

all four factors of the preliminary injunction analysis favored the plaintiffs.  First, the

*BarryDriller* court found that the plaintiffs were likely to succeed on the merits of their copyright

infringement claim.  Rejecting the *Cablevision* analysis as resting on a misinterpretation of the

1976 Act, Judge Wu reasoned that *Cablevision* erroneously focused on whether an individual

copy of the copyrighted work was made for each individual user, and thus whether "the

transmission itself is public," as opposed to whether the copyrighted work was being transmitted

to the public.  *BarryDriller*, 915 F. Supp. 2d at 1144; *see also id.* at 1146 ("Defendants' unique-

copy transmission argument based on *Cablevision* and *Aereo* is not binding in the Ninth

Circuit.").  *BarryDriller* further reasoned that *Cablevision* had framed its analysis in terms of

"which copy of the work the transmission is made from," which *BarryDriller* found to be "not

commanded by the [Copyright Act]" and unsupported by *Cablevision*'s citations to Supreme

Court precedent and legislative history.  *BarryDriller*, 915 F. Supp. 2d at 1144–45; *see also id.*

---

[9] FilmOn X was initially sued in the California court as BarryDriller Content Systems, PLC and
BarryDriller Inc., so the district court case bears that name as the caption.  *See* 915 F. Supp. 2d at
1140 n.1.  The California case involved the same FilmOn X service at issue here, also referred to
at times as Aereokiller.

[10] The Second Circuit had not yet affirmed the New York district court's ruling.

("Following *Cablevision*, *Aereo* [*I*] found no infringement because the defendant's service operated such that the broadcasts captured by the individual user's assigned antenna were never shared with or accessible to any other user.").

   *BarryDriller* also rejected *Cablevision* and *Aereo* to the extent that those decisions reasoned "that the defendant was providing a service equivalent to what individuals could lawfully do for themselves." *Id.* at 1145–46.  Judge Wu concluded:

> Congress has rejected that mode of reasoning in this context. The equivalency between (1) what individuals could lawfully do for themselves and (2) what a commercial provider doing the same thing for a number of individuals could lawfully do, was the basis of the Supreme Court's cable television jurisprudence before the 1976 Copyright Act.  The Supreme Court held that if an individual:
>
>> erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set. The result would be no different if several people combined to erect a cooperative antenna for the same purpose. The only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur.
>
> [*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 400 (1968)]. Acting in response to *Fortnightly*, Congress found the difference significant and legislated accordingly in the 1976 Copyright Act.

*BarryDriller*, 915 F. Supp. 2d at 1146.

   Further, *BarryDriller* found that the other three preliminary injunction factors favored the plaintiffs.  It concluded that the plaintiffs would suffer irreparable harm from the same potential injuries Plaintiffs have identified in this case, including possible damage to their revenues, to their goodwill with licensees, and to their abilities to develop their own Internet distribution avenues.  *Id.* at 1147.  As to the final two factors, the *BarryDriller* court concluded that its analysis was "inextricably bound up" in the conclusion that its plaintiffs were likely to

succeed on the merits because FilmOn X had "no equitable interest in continuing an infringing activity." *Id.* at 1148–49 (citing *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995)).

*BarryDriller* declined to enter a nationwide injunction, instead concluding that an injunction applicable in the Ninth Circuit was appropriate. *Id.* at 1148. Judge Wu reasoned that "principles of comity prevent the entry of an injunction that would apply to the Second Circuit," and extending beyond the Ninth Circuit was inappropriate because "[i]f other circuits do not have law that conflicts with this decision, they might adopt such law when presented with the choice." *Id.* The court imposed a preliminary injunction bond of $250,000. *Id.* at 1149.

The parties filed cross-appeals to the Ninth Circuit. *See Fox Television v. Aereokiller*, Nos. 13-55156, 13-55157, 13-55226, 13-55228. Oral argument was held on August 27, 2013. The Ninth Circuit has not yet issued a ruling.

FilmOn X asks that this Court take judicial notice of the Ninth Circuit court docket because "certain media and consumer advocacy groups have filed amicus briefs in support of FilmOn X in that pending appeal." Request for Judicial Notice [Dkt. 31-4] at 1. Plaintiffs oppose the request. Pls. Objections [Dkt. 32-2]. The Court grants FilmOn X's request only to the extent that the Court takes judicial notice of the fact that such documents have been filed; to the extent that FilmOn X wishes the Court to take judicial notice of the content of the amicus filings or the arguments made therein, the request is denied. *See* Fed. R. Evid. 201; *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388–89 (2d Cir. 1992) (holding that judicial notice of a document filed in another court is proper not for the truth of the matters asserted in the other litigation, but rather to establish the fact that the document was filed).

18

### B.  Likelihood of Success on the Merits

The two elements to a *prima facie* case of direct copyright infringement are straightforward: a plaintiff must show (1) ownership of the allegedly infringed material and (2) a violation of one of the exclusive rights of copyright holders set forth in 17 U.S.C. § 106.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).   There is no dispute that Plaintiffs own the allegedly infringed material, so only the second element is in contention.

### 1.  Parties' Arguments

The core of Plaintiffs' argument is that this Court should adopt the reasoning of *BarryDriller* and Judge Chin's dissenting opinion in *Aereo II*.  *E.g.*, Pls. Mem. at 17 ("The Transmit Clause's "any device or process" language is unambiguous; it cannot be read as exempting FilmOn X or any other broadcast retransmission devices and processes from public performance liability." (citing *BarryDriller*, 915 F. Supp. 2d at 1143–44 & *Aereo II*, 712 F.3d at 698–99 (Chin, J., dissenting))).

According to Plaintiffs, FilmOn X "falls squarely within the Transmit Clause" because "it retransmits the same broadcast of a television program to multiple subscribers" through "its system of miniature antennas, copies, and the Internet."  Pls. Mem. at 13–14; *see also* Pls. Reply at 6 (arguing that "FilmOn X's own admissions confirm that it is a retransmission service").  Moreover, Plaintiffs assert that, in enacting the 1976 Act, Congress intended that all commercial enterprises who retransmit copyrighted material—whether cable systems, satellite television providers, or otherwise—fall within the scope of the Transmit Clause and must first secure licenses.  Plaintiffs urge the Court to disregard FilmOn X's "one antenna per user" architecture because the text of the Copyright Act and its legislative history "underscore[ ] the fact that Congress intended the Transmit Clause to capture all possible technologies, even those not in existence when the statute was enacted."  Pls. Mem. at 15; Pls. Reply at 5; *id.* at 8

(asserting that the Copyright Act "distinguishes between what consumers can lawfully do on their own with respect to broadcast signals and what businesses can do for large numbers of consumers for a profit").

Plaintiffs suggest that the Second Circuit "misconstrued" the Transmit Clause in *Aereo* as a result of its decision in *Cablevision* "[b]y concentrating only upon the potential audience for each transmission" and "improperly replac[ing] the term 'performance' in the Transmit Clause with the term 'transmission,' thereby effectively rewriting the clause." Pls. Mem. at 20; *see also id.* at 24 (characterizing *Aereo* as "the lone exception in a line of cases, both within and outside the United States, where courts have enjoined services from retransmitting live broadcast television programming over the Internet without copyright owner consent"). In addition to the disagreement of the *BarryDriller* court and Judge Chin, Plaintiffs note that *Cablevision* has been criticized by several commentators. *See id.* at 20–22 & n.8 (collecting secondary sources casting doubt on the Second Circuit's reading of the Transmit Clause), Pls. Reply at 3 (asserting that "leading scholars have criticized the Second Circuit's interpretation of the Transmit Clause in *Cablevision* and *Aereo* as 'error' 'derived from . . . a misreading of the statute,' 'peculiar if not perverse,' and 'inconsistent with the statutory text and policy'" (citations omitted)).

In response, FilmOn X argues that the Court should eschew *BarryDriller* and follow the Second Circuit's direction in *Aereo*, which "rejected virtually all of the same arguments plaintiffs make here" and "found that a service which is similar to FilmOn X in every relevant way did not permit public performance of copyright work." Defs. Opp. at 1, 10–15. FilmOn X advances the opposing view as to the meaning of the Transmit Clause and Congress's intent in enacting it, asserting that FilmOn X enables only individual private performance of the

copyrighted works and does not infringe Plaintiffs' exclusive rights.  *Id.* at 9–10 ("The legislative record shows that Congress understood that its definition of transmission would limit the ability to prevent private transmissions . . . .").  FilmOn X argues that the Court should approach the question from the perspective of the individual consumer, whose "right . . . to use a technology to record over-the-air broadcasts as a matter of personal convenience is a long-standing and fundamental principle of modern copyright jurisprudence."  *Id.* at 21 (analogizing FilmOn X to the facts of *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), holding that Sony was not liable for secondary infringement when consumers used its Betamax video recorder to duplicate copyrighted programs because such duplication was fair use).

### 2. Analysis

The statute in contention is the Copyright Act of 1976 (1976 Act), Pub. L. 94-553, 90 Stat. 2541, *codified as amended* at 17 U.S.C. § 101 *et seq.*  The 1976 Act was enacted as a complete overhaul of its predecessor, the Copyright Act of 1909, to respond to "significant changes in technology [that] affected the operation of the copyright law."  H.R. Rep. 94-1476 (House Report) at 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5660.  One of those significant changes was the advent of cable television.  The House Report made explicit that the 1976 Act was enacted because "[p]ursuant to two Supreme Court decisions (*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. CBS, Inc.*, 415 U.S. 394 (1974)), under the 1909 copyright law, the cable television industry ha[d] not been paying copyright royalties for its retransmission of over-the-air broadcast signals."  House Report, 1976 U.S.C.C.A.N. at 5703.  The 1976 Act set forth the beginnings of an extensive licensing scheme for cable providers in § 111.

17 U.S.C. § 106(4) confers on copyright holders the right to public performance; it provides that "the owner of copyright . . . has the exclusive right . . . [,] in the case of . . . motion pictures and other audiovisual works, to *perform* the copyrighted work *publicly*." (Emphases for defined terms added.)  17 U.S.C. § 101 provides several relevant definitions. First, § 101 states: "To 'perform' a work means to recite, render, play, dance, or act it, either directly or by means of *any device or process* or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible."  (Emphases for defined terms added.)  Section 101 further clarifies that "[a] 'device,' 'machine,' or 'process' is one now known or later developed."

Central to the parties' dispute is the definition of "to perform or display a work 'publicly,'" which states:

> To perform or display a work 'publicly' means—
>
> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
>
> (2) to *transmit* or otherwise communicate *a performance* or display of the work to a place specified by clause (1) or to the public, by means of any *device or process*, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101 (emphases added).  Clause (2) of the definition of "perform or display a work 'publicly'" in 17 U.S.C. § 101, cited above, is referred to as the "Transmit Clause."  Section 101 also defines "transmit:" "To 'transmit' a performance or display is to communicate it by any *device or process* whereby images or sounds are received beyond the place from which they are sent."  *Id.*

The House Report for the 1976 Act clarified:

> Under the definitions of "perform," "display," "publicly," and
> "transmit" in section 101, the concepts of public performance and
> public display *cover not only the initial rendition or showing, but
> also any further act by which that rendition or showing is
> transmitted or communicated to the public*. Thus, for example: a
> single [singer—*sic*] is performing when he or she sings a song; a
> broadcasting network is performing when it transmits his or her
> performance (whether simultaneously or from records); a
> local broadcaster is performing when it transmits the network broadcast;
> a cable television system is performing when it retransmits the
> broadcast to its subscribers; and any individual is performing
> whenever he or she plays a phonorecord embodying the
> performance or communicates the performance by turning on a
> receiving set. *Although any act by which the initial performance
> or display is transmitted, repeated, or made to recur would itself
> be a "performance" or "display" under the bill, it would not be
> actionable as an infringement unless it were done "publicly," as
> defined in section 101.*

1976 U.S.C.C.A.N. at 5676–77 (emphases added). The House Report further emphasized the
broad reading intended for "device or process," stating that the definition of those terms is meant
to include "all kinds of equipment for reproducing or amplifying sounds or visual images, any
sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques
and systems not yet in use or even invented." *Id.* at 5677.

The House Report elaborated on the Transmit Clause as follows:

> Clause (2) of the definition of "publicly" in section 101 makes
> clear that the concepts of public performance and public display
> include not only performances and displays that occur initially in a
> public place, but also acts that transmit or otherwise communicate
> a performance or display of the work to the public by means of any
> device or process. The definition of "transmit"—to communicate a
> performance or display "by any device or process whereby images
> or sound are received beyond the place from which they are
> sent"—is broad enough to include all conceivable forms and
> combinations of wires and wireless communications media,
> including but by no means limited to radio and television
> broadcasting as we know them. Each and every method by which
> the images or sounds comprising a performance or display are
> picked up and conveyed is a "transmission," and if the

> transmission reaches the public in [an]y form, the case comes within the scope of clauses (4) or (5) of section 106.
>
> Under the bill, as under the present law, a performance made available by transmission to the public at large is "public" even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms or the subscribers of a cable television service. Clause (2) of the definition of "publicly" is applicable "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."

*Id.* at 5678.

In interpreting a statute, the general rule is that a court "must first determine whether the statutory text is plain and unambiguous." *See Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (citations omitted). "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (*quoting United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122 (1849)). Courts "should 'not resort to legislative history to cloud a statutory text that is clear,'" *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994)), but a court "may examine the statute's legislative history in order to 'shed new light on congressional intent, notwithstanding statutory language that appears superficially clear.'" *Id.* (quoting *National Rifle Ass'n v. Reno*, 216 F.3d 122, 127 (D.C. Cir. 2000); other citations omitted). The Supreme Court has made clear that a court should give broadly written statutes a broad interpretation because "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001).

The Court finds that the provisions of the 1976 Act that protect Plaintiffs' work are clear: FilmOn X's service violates Plaintiffs' "exclusive right . . . to perform the copyrighted work publicly." *See* 17 U.S.C. § 106(4).  By making available Plaintiffs' copyrighted performances to any member of the public who accesses the FilmOn X service, FilmOn X performs the copyrighted work publicly as defined by the Transmit Clause: Film On X "transmit[s] . . . a performance . . . of the work . . . to the public, by means of any device or process." *See* 17 U.S.C. § 101.  "A 'device,' 'machine,' or 'process' is one now known [*i.e.*, in 1976] *or later developed*;" "[t]o 'transmit' a performance or display is to communicate it by any *device or process*." *Id.* (emphases added).  These two definitions are facially broad and encompass FilmOn X's convoluted process for relaying television signals.  The Transmit Clause, which applies whether "members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times," also plainly captures FilmOn X's DVR-like capabilities. *Id.*  FilmOn X transmits (*i.e.*, communicates from mini-antenna through servers over the Internet to a user) the performance (*i.e.*, an original over-the-air broadcast of a work copyrighted by one of the Plaintiffs) to members of the public (*i.e.*, any person who accesses the FilmOn X service through its website or application) who receive the performance in separate places and at different times (*i.e.* at home at their computers or on their mobile devices).  FilmOn X violates §§ 101 and 106(4) of the 1976 Act, meaning that Plaintiffs are likely to succeed on the merits of their copyright infringement claim.[11]

---

[11] While the Court finds that the plain language of the Transmit Clause applies to FilmOn X's service and would so conclude if considering this case on a blank slate, the Court respectfully disagrees with *Aereo*'s interpretation of the Transmit Clause for the reasons set forth in *BarryDriller* and in Judge Chin's dissent.  *See Aereo II*, 712 F.3d at 698 (Chin, J., dissenting) ("Aereo's system of thousands of antennas and other equipment clearly is a 'device or process.' Using that 'device or process,' Aereo receives copyrighted images and sounds and 'transmit[s] or otherwise communicate[s]' them to its subscribers 'beyond the place from which they are sent,'

Even assuming *arguendo* that the 1976 Act contains any ambiguity, the legislative history confirms Congress's intent that the Transmit Clause *and* § 106(4) be applied broadly.  "Under the definitions of 'perform,' 'display,' 'publicly,' and 'transmit' in section 101, the concepts of public performance and public display cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public."  House Report, 1976 U.S.C.C.A.N. at 5676–77.  It is incongruous to suggest that FilmOn X does not "perform" "publicly" by making Plaintiffs' programs available to any person with an Internet-enabled device, as several other courts have concluded in different but analogous circumstances.  *See Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*, 772 F. Supp. 614, 650–51 (D.D.C. 1991) ("[T]he term 'public performance' was meant to be read broadly" and "it would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on the mere method by which television signals are transmitted to the public." (one set of internal quotation marks and citation omitted)); *see also Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1010 (C.D. Cal. 2011) (in a case in which the defendants operated an online DVD "rental" service, streaming a single DVD over the internet, defendants transmitted copyrighted works publicly because although "[c]ustomers watching one of Plaintiffs' Copyrighted Works on their computer . . . [were] not necessarily watching it in a 'public place,'" they were "members of 'the public'").

FilmOn X contends that it does not perform publicly because FilmOn X facilitates a one-to-one relationship between a single mini-antenna and a viewer of Plaintiffs' programs via

---

. . . .  The 'performance or display of the work' is then received by paying subscribers 'in separate places' and 'at different times.'" (citations omitted)); *BarryDriller*, 915 F. Supp. 2d at 1144 (concluding that "[t]he statute provides an exclusive right to transmit a performance publicly, but does not by its express terms require that two members of the public receive the performance from the same transmission").

an admittedly complex technological process.  First, this is a charitable description of FilmOn X's arrangement; while each user may have an assigned antenna and hard-drive directory temporarily, the mini-antennas are networked together so that a single tuner server and router, video encoder, and distribution endpoint can communicate with them all.  The television signal is captured by FilmOn X and passes through FilmOn X's single electronic transmission process of aggregating servers and electronic equipment.  This system, through which any member of the public who clicks on the link for the video feed, is hardly akin to an individual user stringing up a television antenna on the roof.  Moreover, every broadcast of a television program (whether cable, satellite, over-the-air, over the internet, or otherwise) could be described as "generated from the same copy"—the original source.

Second, the aggregation of several new kinds of technology does not avoid the Copyright Act because Congress intended "device or process" in the Transmit Clause to include "all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, *and any other techniques and systems not yet in use or even invented.*"  *Id.* at 5677 (emphasis added); *see also id.* at 5678 ("The definition of 'transmit'—to communicate a performance or display 'by any device or process whereby images or sound are received beyond the place from which they are sent'—is broad enough to include all conceivable forms and combinations of wires and wireless communications media, *including but by no means limited to radio and television broadcasting as we know them.*" (emphasis added)).  FilmOn X, which is a commercial service retransmitting Plaintiffs' television performances, is in no meaningful way different from cable television companies, whose relationship with broadcasters such as Plaintiffs was the primary motivation for the 1976 Act's enactment.  *See Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am.,*

*Inc.*, 836 F.2d 599, 602–03 (D.C. Cir. 1988).  It speaks volumes that Congress settled on a

compulsory licensing regime for cable companies that wish to carry over-the-air broadcasts.  *Id.*

("Under § 111(c) of the [1976] Act, a cable system may retransmit to its customers any primary

transmission made by a broadcast station licensed by the Federal Communications Commission.

In exchange for this privilege, however, the cable systems are required to pay a fee, to be

distributed to the copyright owners as surrogate for the royalties for which they might have

negotiated under a pure market scheme.").  Whether FilmOn X should be subject to a similar

licensing regime is not before the Court.  It suffices to say that nothing about the 1976 Act or its

legislative history suggests that Congress intended a commercial entity that rebroadcasts

copyrighted material for consumption by the public, such as FilmOn X, to avoid liability for

infringement of the copyright holders' exclusive right to public performance.[12]  *See WTV Sys.*,

824 F. Supp. 2d at 1010 ("[T]he relationship between Defendants, as the transmitter of the

performance, and the audience, which in this case consists of their customers, is a commercial,

'public' relationship regardless of where the viewing takes place.  The non-public nature of the

place of the performance has no bearing on whether or not those who enjoy the performance

constitute 'the public' under the transmit clause.").

       Plaintiffs have shown "a substantial likelihood of success on the merits" of their

copyright infringement claim.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

---

[12] The Court respectfully disagrees with *Aereo*'s conclusion to the contrary.  It agrees with Judge
Chin that "[t]he legislative history makes clear that Congress intended to reach new technologies
. . . that are designed solely to exploit someone else's work."  *Aereo II*, 712 F.3d at 699 (Chin, J.,
dissenting).  It also agrees that *Cablevision* and *Aereo* mistakenly substituted "transmission" for
"performance" in its analysis.  *BarryDriller*, 915 F. Supp. 2d at 1144–45.  When the analysis
shifts to whether FilmOn X permits multiple persons to watch a single performance, *i.e.*, the
same television show, it is immediately clear that the artifice of one-to-one is baldly wrong.

290, 297 (D.C. Cir. 2006).  The first factor thus weighs in favor of granting preliminary injunctive relief.

### C.  Irreparable Harm

Plaintiffs have also shown that they are likely to suffer irreparable harm if preliminary injunctive relief is not granted.  Plaintiffs note that "[e]very court that has considered the question of whether unauthorized Internet streaming of television and other video programming causes irreparable harm to the copyright owners has concluded unequivocally that it does," even the district court in *Aereo*, which ruled against the plaintiffs in that case.  Pls. Mem. at 25 (citing, *inter alia*, *Aereo I*, 874 F. Supp. 2d at 396–400).  Plaintiffs identify several categories of irreparable harm that they will suffer if a preliminary injunction is not issued:

> [1] *Harm to Value in Network and Local Advertising.* FilmOn X threatens to undermine Plaintiffs' positions in negotiations with advertisers by diverting viewers from distribution channels measured by Nielsen ratings, which are by far the most significant viewership measurements relied upon by advertisers in determining what to pay. Nielsen does not measure FilmOn X.
>
> . . .
>
> [2] *Damaging Plaintiffs' Ability to Negotiate Retransmission Consent Agreements.*  FilmOn X's unauthorized streaming of copyrighted television programming over the Internet, if left unabated, has the potential to impede Plaintiffs' ability to negotiate retransmission consent agreements with cable, satellite, and telecommunications providers, who legitimately retransmit the copyrighted broadcasts. . . . Moreover, the availability of Plaintiffs' content from sources other than Plaintiffs also damages Plaintiffs' goodwill with their licensees.
>
> [3] *Interference With Lawful Internet Television Distribution.* FilmOn X also threatens to interfere with Plaintiffs' ability to develop a lawful market for Internet distribution of television programming—whether through licensed entities, such as Hulu (which licenses content from the network Plaintiffs for distribution over Hulu.com) and Apple (which licenses content from the network Plaintiffs for distribution through iTunes), or over their own websites and other Internet and mobile offerings, such as Fox

> and NBCU's "Dyle.TV," ABC's "Watch" or Fox's "Fox Now"
> services. FilmOn X competes directly with these services . . . .
>
> [4] *Loss of Control Over Content and Threat of Viral Infringement.*
> Once digital copies of Plaintiffs' programs are available and
> released on the Internet, vast viral infringement routinely follows.
> . . . Plaintiffs have no ability to ensure that FilmOn X or those who
> copy network programming from FilmOn X are doing anything to
> prevent further piracy or to assure the quality of retransmissions.

Pls. Mem. at 26–27 (citations, quotations, and modifications omitted).  Plaintiffs offer the

declaration of Sherry Brennan, Senior Vice President of Distribution Strategy and Development

for Fox, to support its assertions of irreparable harm.  *E.g.*, Brennan Decl. ¶ 16 ("[B]ased on my

24 years in the industry . . . I am certain that FilmOn X's continuing ability to obtain and

retransmit the Broadcast Companies' Programs for free will be a factor in [negotiations with

retransmission providers like cable companies].  In fact, it is my understanding that cable

companies have already referenced FilmOn X-type startups when proposing a reduction of their

retransmission fees, in seeking to eliminate those fees altogether, or in seeking other valuable

contractual concessions.").  The damages Plaintiffs face are "neither easily calculable, nor easily

compensable;" FilmOn X is a startup company that would likely be unable to pay statutory

copyright damages of $150,000 *per work* if Plaintiffs prevail; and FilmOn X is likely to continue

expanding, further threatening Plaintiffs' copyrights and business model.  Pls. Mem. at 27–28

(quoting *BarryDriller*, 915 F. Supp. 2d at 1147).

      FilmOn X responds that Plaintiffs' showing of irreparable harm is insufficiently

speculative and "unsupported by any evidence."  Defs. Opp. at 21–22 ("[A] plaintiff 'must

provide proof that the harm has occurred in the past and is likely to occur again, or proof

indicating that the harm is certain to occur in the near future.'" (quoting *Wisc. Gas Co. v. FERC*,

758 F.2d 669, 674 (D.C. Cir. 1985))).  FilmOn X argues that "[t]here is no specific evidence of

imminent harm, aside from pure speculation as to how FilmOn X's service may hypothetically

impact plaintiffs' future ad revenue" and that all of the types of harm identified by Plaintiffs, even if actualized, would be non-irreparable economic losses. *Id.* at 22–23.

Plaintiffs have made a showing that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Indeed, they have shown more than the "recoverable economic losses" that courts normally find insufficient to rise to the level of irreparable harm. *See Davis*, 571 F.3d at 1295. While some of the revenue that they stand to lose might be quantifiable, Plaintiffs have identified four categories of harm that would have far-reaching consequences, including: harm to their ability to negotiate with advertisers; damage to their contractual relationships and ability to negotiate with authorized retransmitters; interference with their proprietary and licensed online distribution avenues, such as their own websites, Hulu.com, and Apple's iTunes; and the loss of control over the distribution and quality of their copyrighted programs. FilmOn X characterizes these harms as "pure speculation." Defs. Opp. at 22. But Plaintiffs have supported each category with evidence that FilmOn X has not controverted, including a sworn declaration from a senior executive at Fox who states that cable companies have *already* referenced businesses like FilmOn X in seeking to negotiate lower fees. *See* Brennan Decl. ¶ 16. *BarryDriller* and *Aereo I* both accepted that these types of harm constituted irreparable injury. *See Aereo I*, 847 F. Supp. 2d at 397–98 ("Aereo will damage Plaintiffs' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels . . . . Aereo's activities will damage Plaintiffs' ability to negotiate retransmission agreements [with cable or other providers], as these companies will demand concessions from Plaintiffs to make up for this decrease in viewership."); *BarryDriller*, 915 F. Supp. 2d at 1147 (setting forth similar analysis). This Court agrees. *See WTV Sys., Inc.*, 824 F. Supp. 2d at 1013 ("[B]ecause Defendants are exploiting Plaintiffs' Copyrighted Works without paying the normal licensing

fees, they deprive Plaintiffs of revenue, and even jeopardize the continued existence of Plaintiffs' licensees' businesses."); *see also Purdue Pharma L .P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market position are evidence of irreparable harm).

Because Plaintiffs have shown that they will likely suffer irreparable harm if the FilmOn X service is not enjoined, the second factor favors Plaintiffs.

### D.  Balance of Harms

The balance of harms tips in Plaintiffs' favor.  As set forth above, there are severe, irreparable harms that Plaintiffs face if FilmOn X is permitted to continue infringing Plaintiffs' copyrights.  While FilmOn X points out that its business could be "crippled" by an injunction and that a decision in Plaintiffs' favor will chill technological innovation, Defs. Opp. at 24–25, these concerns are overstated.  First, FilmOn X has no cognizable interest in continuing to infringe Plaintiffs' copyrights and thus cannot complain of the harm it will suffer if ordered to cease doing so.  *See BarryDriller*, 915 F. Supp. 2d at 1148–49 (finding that the third and fourth factors favored the plaintiffs because FilmOn X had "no equitable interest in continuing an infringing activity").  In addition, FilmOn X concedes that it has "other Content Partners" and has entered into licensing agreements for some over-the-air channels and "about 15" traditional cable channels.  David Decl. ¶¶ 16, 28–29 (listing as examples Inspiration Network and Real Channel).  Thus, FilmOn X will be free to continue legal retransmission.

### E.  The Public Interest

In an oft-cited passage, the Third Circuit observed: "It is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255

(3d Cir. 1983) (citation omitted); *see also Walt Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C.

Cir. 1990) ("When a copyright plaintiff has established a threat of continuing infringement, he is

entitled to an injunction." (citation omitted)).  With this record, the public interest favors an

injunction.

Because all four factors favor Plaintiffs, the Court will grant the motion for a

preliminary injunction.

### F.  Scope of Injunction

The final issue is the scope of a potential injunction.  Plaintiffs argue that, under

17 U.S.C. § 502(b), the Court should enjoin FilmOn X's service throughout the entire United

States.  Pls. Mem. at 6.  FilmOn X responds that *BarryDriller*'s injunction was properly limited

to the Ninth Circuit in light of the Second Circuit's decision in *Aereo*, and this Court should limit

any injunction to the D.C. Circuit.  Defs. Opp. at 27.

"[D]istrict courts enjoy broad discretion in awarding injunctive relief."  *Nat'l Min.

Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1408 (D.C. Cir. 1998) (citation omitted);

*see also NLRB v. Express Pub. Co.*, 312 U.S. 426, 435 (1941) ("A federal court has broad power

to restrain acts which are of the same type or class as unlawful acts which the court has found to

have been committed or whose commission in the future unless enjoined, may fairly be

anticipated from the defendant's conduct in the past.  . . . The breadth of the order, like the

injunction of a court, must depend upon the circumstances of each case . . . .").

17 U.S.C. §§ 502(a) and (b) provide, in relevant part, that any injunction granted

"to prevent or restrain infringement of a copyright" "may be served anywhere in the United

States on the person enjoined" and "shall be operative throughout the United States and shall be

enforceable, by proceedings in contempt or otherwise, by any United States court having

jurisdiction of that person."  While § 502(b) commands a nationwide injunction, the D.C. Circuit

has recognized that in some cases comity may require courts to limit the scope of injunctions.

*See Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("[W]e clarify that an

injunction issued in the D.C. Circuit can bind the Commissioner only with respect to coal

companies [that] were not already covered by the Eleventh Circuit's injunction.").  The Court's

decision conflicts with the law of the Second Circuit under *Aereo II*.  As far as the Court is

aware, its decision does not conflict with the law of any other circuit, including the Ninth Circuit,

where *BarryDriller*'s preliminary injunction remains in effect.  Accordingly, the Court will grant

Plaintiffs' request for nationwide relief except as to the Second Circuit, where *Aereo II* is the

binding precedent.

### G.  Bond Amount

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a

preliminary injunction or a temporary restraining order only if the movant gives security in an

amount that the court considers proper to pay the costs and damages sustained by any party

found to have been wrongfully enjoined or restrained."  "It is well settled that Rule 65(c) gives

the Court wide discretion in the matter of requiring security."  *Nat'l Res. Def. Council, Inc. v.*

*Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971).  "[T]he district court has power not only to set the

amount of security but to dispense with any security requirement whatsoever where the restraint

will do the defendant no material damage, where there has been no proof of likelihood of harm,

and where the applicant for equitable relief has considerable assets and is . . . able to respond in

damages if defendant does suffer damages by reason of a wrongful injunction."  *Fed.*

*Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (internal

citations, quotation marks, and alterations omitted).

FilmOn X asks the Court to impose a substantial bond because "wrongful

enjoinment would deprive FilmOn X of legitimate subscription and advertising revenue at a

crucial stage of its growth," would undermine "substantial technology investment as well as some of its partnerships," and could cause FilmOn X to lose key personnel.  Defs. Opp. at 24.  Plaintiffs' Proposed Preliminary Injunction, Dkt. 27-16, proposes a bond amount of $10,000.

Unlike FilmOn X, the copyright holders here have considerable assets to respond in damages if the injunction is overturned.  The Court finds no meaningful distinction between this case and *BarryDriller*.  It will require Plaintiffs to post $250,000 bond.

### IV.  CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' Motion for a Preliminary Injunction.  A memorializing Order accompanies this Opinion.


Date: September 5, 2013

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge
