## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————

FOX TELEVISION STATIONS, INC.,    )
*et al.*,                         )
                                  )
              Plaintiffs,         )
                                  )
       v.                         )         Civil Action No. 13-758 (RMC)
                                  )
FILMON X LLC, *et al.*,           )
                                  )
              Defendants.         )
———————————————————               )

## OPINION

This case involves a clash between two important national policies and interests. On the one hand, there is the need to protect and reward copyright owners for creating valuable intellectual property — here, original television programming. On the other hand, it is important to promote competition and ensure broad public access to diverse television programming. When enacting the Copyright Act of 1976, specifically the compulsory license regime prescribed in 17 U.S.C. § 111, Congress struck a delicate balance between these two important interests. It is up to this Court to interpret and apply that balance to determine whether a service that engages in Internet retransmission of over-the-air television programming violates the Copyright Act.

Defendant FilmOn X, LLC (formerly known as Aereokiller LLC) operates a service that captures the signals of multiple television channels that are broadcast over-the-air and streams them over the Internet to the public.[1] FilmOn X assigns an individual user the content stream from one of thousands of minute, dime-sized antennas that it operates in major metropolitan areas, including Washington, D.C. As a result, this service allows viewers to watch

———————————————

[1] Being "broadcast" over-the-air means that customers can receive the signals with an antenna.

over-the-air television programming on any computer or digital device.  Plaintiffs,[2] a group of

television broadcasters and programmers that own much of the streamed content, sued FilmOn

X, its affiliates,[3] and CEO Alkiviades David (collectively Defendants) for retransmitting their

copyrighted works without a license.  *See* Second Am. Compl. [Dkt. 66].  Plaintiffs claim that

Defendants have violated their intellectual property rights, particularly the exclusive right to

public performance of their copyrighted programming.  *See id.* ¶¶ 39–47.

On September 5, 2013, this Court held that FilmOn X's conduct likely violated

Plaintiffs' exclusive rights and preliminarily enjoined FilmOn X and its affiliates from streaming

Plaintiffs' broadcast programming without authorization.  *See Fox Television Stations, Inc. v.*

*FilmOn X LLC*, 966 F. Supp. 2d 30 (D.D.C. 2013) (2013 D.C. Prelim. Inj.), [Dkt. 34].  In a

separate case, the Supreme Court ultimately validated this Court's conclusion that the Copyright

Act forbids the unauthorized retransmissions of copyrighted programs over the Internet even

when such retransmissions rely on the use of separate antennas and data streams.  *Am. Broad.*

*Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2511 (2014) (*Aereo III*).   In doing so, the Supreme Court

drew an analogy between Internet-based retransmitters and the community antenna television

(CATV) systems that Congress brought within the scope of the Transmit Clause, 17 U.S.C.

§ 101, in the 1976 amendments to the Copyright Act.  *Id.* at 2507.  *Aereo III* described the

---

[2] Plaintiffs are: Fox Television Stations, Inc.; Twentieth Century Fox Film Corporation; Fox
Broadcasting Company, Inc.; NBC Subsidiary (WRC-TV), LLC; NBC Studios LLC; Universal
Network Television LLC; Open 4 Business Productions LLC; Telemundo Network Group LLC;
American Broadcasting Companies, Inc.; Disney Enterprises, Inc.; Allbritton Communications
Company; Gannett Co., Inc.; CBS Broadcasting, Inc.; and CBS Studios.

[3] The affiliates and co-defendants are FilmOn.tv Networks, Inc., FilmOn.tv, Inc., and
FilmOn.com Inc.  Along with FilmOn X, these were the original defendants in the instant case.
Plaintiffs later amended their Complaint to include Mr. David.  *See* Second Am. Compl. [Dkt.
66].

practices of Internet-based retransmission services as highly similar to those of CATV systems (precursors of modern cable systems). *Id.* at 2511. As a result, it held that retransmitting copyrighted programming over the Internet constitutes a public performance within the meaning of the Transmit Clause. *Id.*

Although Defendants had expressly disclaimed the argument that they are "cable systems" within the meaning of § 111, they now rely on the Supreme Court's analogy in *Aereo III* to amend their answers. *Compare* David Decl. in Supp. of Opp'n to Mot. for Prelim. Inj. [Dkt. 31-1] (Prelim. Inj. David Decl.), Ex. B at 13 (CEO David stating that FilmOn X "is not a Cable system") *with* Answers to Am. Compl. [Dkts. 69 and 70] (raising affirmative defense that Defendants are entitled to compulsory license under § 111(c)). Defendants now argue that they are entitled to a § 111 compulsory license to retransmit Plaintiffs' broadcast programming as a cable system. *Id.* at 8-9. Plaintiffs move for summary judgment, arguing that Defendants' nearly-simultaneous and time-delayed retransmission services violate the Copyright Act and that Defendants are not entitled to a § 111 license. Pls.' Mot. for Partial Summ. J. [Dkt. 81] (Pls.' Mot.). Defendants cross-move for summary judgment on their counterclaim that they are entitled to such statutory license and they also contend that it is premature to decide whether Plaintiffs' exclusive rights of public performance were actually infringed in the past. Defs.' Mot. for Summ. J. [Dkt. 97] (Defs.' Mot.).

Upon consideration of the parties' briefs and for the reasons stated in this Opinion, this Court holds that Defendants are not entitled to a § 111 license. Section 111(f)(3) defines cable systems as physical facilities that both receive and retransmit broadcast signals to paying subscribers through wires, cables, microwave, and other types of communication channels. FilmOn X is not such a facility because it relies on the Internet, which is neither a

tangible nor physical entity, to retransmit the broadcast signals to its paying subscribers.  The

Court also holds that FilmOn X infringed Plaintiffs' exclusive right of public performance in

violation of the Copyright Act.[4]  As such, this Court will grant Plaintiffs' motion for summary

judgment in part and deny Defendants' motion.

## I.  FACTS

### A.  Prior Litigation

In October 2010, a group of broadcasters and television networks, including some

of the Plaintiffs, sued Defendant FilmOn.com, Inc. for copyright infringement in the U.S.

District Court for the Southern District of New York.  *See* Pls.' Req. for Jud. Notice [Dkt. 90]

("Pls.' RJN"), Ex. A (Mot. for TRO).  Defendant FilmOn.com, Inc., which essentially streamed

over the Internet the signals of various broadcast television stations on a live basis, argued that it

was a cable system entitled to a § 111 license.  *Id.*, Ex. B (FilmOn Opp'n to Mot. for TRO) at 5.

The district court (Buchwald, J.) disagreed and granted a temporary restraining order enjoining

FilmOn.com, Inc. from streaming copyrighted programming.  *Id.*, Ex. C. (TRO).  In a companion

case, Judge Buchwald also held that an Internet-based retransmission service was not a "cable

system" and, thus, was not entitled to a § 111 license.  *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d

594, 617 (S.D.N.Y. 2011) (*ivi I*), *aff'd* 691 F.3d 275 (2d Cir. 2012) (*ivi II*), *cert. denied*, 133 S.

Ct. 1585 (2013).  Shortly before the Second Circuit's decision in *ivi II*, Judge Buchwald entered

a Stipulated Consent Judgment and Permanent Injunction ("2012 Injunction") binding

FilmOn.com, Inc. and its affiliates from streaming Plaintiffs' copyrighted programming without

authorization.  Pls.' RJN, Ex. E (2012 Injunction).

---

[4] The Court agrees with Defendants that it would be premature to determine whether any other
co-defendant, aside from FilmOn X, was involved in the Internet retransmission of copyrighted
programming.

In August 2012, Mr. David launched a new Internet-based retransmission service called FilmOn X.  David Dep. [Dkt. 93-3], Ex. 1 at 58:3-21.  Like FilmOn.com, Inc., this new service streamed broadcast television signals over the Internet without payment or authorization.  Unlike the prior system, FilmOn X relied on a mini-antenna/data video recorder technology that provided viewers with both time-delayed and nearly simultaneous retransmissions of copyrighted content.  David Decl. in Supp. of Defs.' Mot. for Summ. J. [Dkt. 111] (Summ. J. David Decl.) ¶¶ 12, 16.  Unlike FilmOn.com, Inc., FilmOn X explicitly disclaimed that it was a cable system entitled to a compulsory license.  Prelim. Inj. David Decl., Ex. B, at 13.  In fact, FilmOn X's service was specifically designed to avoid copyright liability under then-applicable Second Circuit precedent in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 137 (2d Cir. 2008) (*Cablevision*) (holding that a "Remote Storage DVR" system that makes "transmissions to one subscriber using a copy made by that subscriber" does not violate the Transmit Clause of the Copyright Act).  Summ. J. David Decl. ¶ 12.

On July 22, 2012, the Southern District of New York (Nathan, J.) applied *Cablevision* to hold that the use of a separate small antenna and separate data stream for each subscriber did not violate the Copyright Act.  *Am. Broad. Cos. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012) (*Aereo I*).  Judge Nathan found that Aereo — an established competitor to FilmOn X that offered a virtually identical service — made only nonpublic performances and, thus, avoided Transmit Clause liability.  *Id.* at 385.  Since FilmOn X's new service replicated Aereo's technology and complied with Second Circuit precedent, Plaintiffs did not ask Judge Buchwald to find Defendants in contempt for violating the 2012 Injunction.  Instead, they filed a copyright infringement action against FilmOn X in the U.S. District Court for the Central District of California.  *See Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp.

2d 1138 (C.D. Cal. 2012).  The California district court (Wu, J.) disagreed with *Aereo I* and *Cablevision* and preliminarily enjoined FilmOn X's unauthorized streaming of copyrighted content, but only in the Ninth Circuit.  *Id.* at 1151.

Shortly after Judge Wu enjoined Defendants, the Second Circuit affirmed Judge Nathan's decision in *Aereo I*.  *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013) (*Aereo II*).  Facing a jurisdictional split and still hoping to obtain a nationwide injunction against FilmOn X's service, Plaintiffs filed the instant copyright action against Defendants.  In 2013, this Court preliminarily enjoined FilmOn X, as well as its affiliates and officers, from streaming unauthorized material throughout the United States, with the exception of the geographic boundaries of the U.S. Court of Appeals for the Second Circuit.  2013 D.C. Prelim. Inj. [Dkt. 34] at 2.

On June 25, 2014, the Supreme Court issued its decision in *Aereo III*, reversing the Second Circuit's decision, resolving the split, and validating this Court's reasoning. 134 S. Ct. at 2511.[5]  The Supreme Court specifically noted that Aereo's retransmission activities were substantially similar to those of the cable systems that Congress subjected to Transmit Clause liability in the Copyright Act of 1976.  *Id.* at 2506-07.  Therefore, *Aereo III* made clear that an Internet-based retransmission service, such as the one in the instant case, performs publicly within the meaning of the Transmit Clause.[6]

_____

[5] As a result of the Supreme Court's decision in *Aereo III*, the Ninth Circuit did not assess Judge Wu's grant of a preliminary injunction.  Instead, the parties agreed to dismiss Defendants' appeal without prejudice.  *See* Dismissal Order, *Fox Television Stations, Inc. v. Aereokiller, LLC*, No. 13-55156 (9th Cir. July 29, 2014).

[6] The Court notes that only Aereo's nearly-simultaneous retransmissions, and not its time-delayed retransmissions, were at issue in *Aereo III*. 134 S. Ct. at 2503.

In the wake of *Aereo III*, Defendants, like Aereo on remand, switched their theories and amended their answers to articulate a new position — namely, that they are entitled to a § 111 compulsory license to retransmit Plaintiffs' television programming. Answers to Am. Compl. [Dkts. 69 and 70]. In New York, they argued that the Supreme Court's analogy to cable systems in *Aereo III* meant that the Copyright Act authorized the streaming of copyrighted content so long as the retransmission service complied with the requirements listed in § 111. *See* Pls.' RJN, Ex. F. at 9-10 (*CBS Broad. Inc. v. FilmOn.com, Inc.*, No. 10-cv-7532, 2014 WL 3702568 (S.D.N.Y. July 24, 2014)). Relying on the Second Circuit's *ivi II* decision, Judge Buchwald rejected this new argument and found FilmOn.com, Inc. in contempt of the 2012 New York Injunction. *See id.* at 9-17. Similarly, Judge Nathan rejected Aereo's argument on remand and preliminarily enjoined it from streaming copyrighted television programming. *Am. Broad. Cos. v. Aereo, Inc.*, No. 12-cv-1540, 2014 WL 5393867, at *3 (S.D.N.Y. Oct. 23, 2014) (*Aereo IV*).

The parties filed cross-motions for summary judgment in the California action before Judge Wu as to whether Defendants are entitled to a § 111 license to retransmit Plaintiffs' broadcasts without infringing their copyrights. On July 24, 2015, Judge Wu found that FilmOn X's service qualifies as a "cable system" entitled to a § 111 compulsory license and granted summary judgment in favor of Defendants. *Fox Television Stations, Inc. v. Aereokiller*, 2015 WL 4477797 (C.D. Cal. July 24, 2015) ("2015 California decision"). Judge Wu, however, maintained the existing preliminary injunction against Defendants because of a split in authority concerning a close legal issue and because Defendants "have not yet been able to timely or consistently comply with the procedures attendant to a § 111 license." *Id.* at *1. Instead, that court authorized an immediate appeal of this issue to the Ninth Circuit pursuant to Federal Rule

of Civil Procedure 54(b) and 28 U.S.C. § 1292(b).  *Id.* at *15.  On August 3, 2015, Plaintiffs

filed a petition for permission to appeal Judge Wu's Summary Judgment Order, which the Ninth

Circuit granted on September 16, 2015.  Status Report [Dkt. 216] in Case No. 12-6921.

Consequently, the appeal before the Ninth Circuit is pending.

   In this suit, Plaintiffs note that FilmOn.com, Inc. already litigated its § 111

defense unsuccessfully in the New York action.  Pls.' Mem. in Supp. for Summ. J. [Dkt. 92-1]

(Pls.' Mem.) at 9-10.  Plaintiffs contend the doctrine of *res judicata* precludes FilmOn X and its

co-defendants from re-litigating the same issue.  *Id.*  Even if *res judicata* does not apply,

Plaintiffs ask this Court to adopt the reasoning in *ivi II* and *Aereo IV* and defer to the Copyright

Office's longstanding position that § 111 does not apply to Internet-based retransmission

services.  *Id.* at 12-20.  Defendants argue that this Court should reject the Copyright Office's

interpretation of § 111 and adopt the reasoning in Judge Wu's recent California decision.  Defs.'

Mem. in Supp. for Summ J. [Dkt. 97-1] (Defs.' Mem.) at 14-23; Defs.' Suppl. Mem. in Opp'n to

Pls.' Mot. for Summ. J. [Dkt. 119] (Defs.' Suppl. Mem.).

### B.  Broadcast Programming and FilmOn X's Service[7]

   Plaintiffs own copyrights to certain local news broadcasts and nationally-

broadcast television programs.  Local television stations broadcast the programming over the

public airwaves subject to the rules of the Federal Communications Commission (FCC).  Once

these signals are broadcast "over-the-air," cable systems, satellite services, and other

multichannel video programming distributors (MVPDs) retransmit the signals to the public and

pay specified amounts in order to do so.

---

[7] The parties agree for the most part on the facts presented here.  Unless otherwise cited, these facts can be found in the parties' statements of uncontested material facts.  *See* Pls.' SUMF [Dkt. 92-2] and Defs.' SUMF [Dkt. 97-2].

FilmOn X operated a website that combined the functions of a television and a digital video recorder (DVR).  Through this website, viewers could access original and licensed content, as well as over-the-air broadcast programming.  In August 2012, FilmOn X launched its service in Los Angeles and then expanded to various cities across the United States, including Washington, D.C.  In order to retransmit broadcast programming over the Internet, FilmOn X used a remote mini-antenna/DVR technology.  As part of the technology, FilmOn X used one master antenna located on the roof of a commercial data center.[8]  Its centers were physical facilities across the country, which contained the necessary electronic equipment to capture, store, and retransmit broadcast programming.  The master antenna transmitted signals to an antenna box and mini-antennas, in turn, captured the amplified signals.  ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Whenever a viewer wished to access a program being broadcast, the viewer would go to FilmOn X's website and select the show from a list of supposed local programming.

███████████████████████████████████████████████████████

██████████████████████████████████████████████  As a result, no single antenna was used by more than one viewer at the same time.  Once the mini-antenna received the signal, the data of the selected program was transmitted to the antenna router and

---

[8] In addition to this single master antenna system, also known as the "Lanner system," FilmOn X used a "trailer system" that consisted of small antennas on a trailer's roof. Meldal Decl. in Supp. of Defs.' Mot. for Summ. J. [Dkt. 98-2] (Meldal Decl.) ¶ 14.  Defendants implemented this system in Los Angeles, New York, Miami, and Chicago.  Summ. J. David Decl. ¶¶ 23-25. Defendants have now removed these trailer systems and transitioned to the "Lanner" system. Summ. J. David Decl. ¶ 25; Meldal Decl. ¶¶ 13-15.

then to the video encoder.  The encoder stored the data on FilmOn X's hard drive in a "unique

directory" created for the specific viewer.  The encoder converted the signals into a viewable

format and then streamed the data over the Internet to FilmOn X's website through a distribution

endpoint and hence to the viewer.  The data in the "unique directory" was only deleted after the

viewer finished watching the program or selected a different program to watch.

Through this technology, the viewer could watch live television on a digital

device through FilmOn X's nearly simultaneous retransmission of the selected program; the

viewer could also select a program to watch at a later time.[9]  In the past, FilmOn X charged for

both monthly and annual local channel packages.  Paying subscribers could watch live television

in high definition (HD) and select shows for later viewing.  FilmOn X would occasionally offer

free trials of HD television.  FilmOn X also offered viewers live standard-television for free.  In

addition, FilmOn X modified the broadcast program in various ways, such as inserting its logo

during the retransmission, omitting closed captioning, and playing a short ten to thirty-second

video advertisement prior to the program's streaming.[10]

## C.  FilmOn X's Efforts to Operate as a Cable System

FilmOn X has recently modified its service in an effort to bring it into compliance

with § 111 requirements; it has also expressed that it is ready to recommence retransmissions as

a cable system.  Summ. J. David Decl. ¶ 28; Meldal Decl. ¶¶ 19-52.  FilmOn X specifies that its

---

[9] With respect to the first option, the broadcast program was retransmitted nearly simultaneously
as it would stream only after several seconds of programming were saved in the "unique
directory."  With respect to the second option, the viewer could select the program for later
viewing and direct FilmOn X to save a copy of it in the viewer's "unique directory."

[10] The parties disagree as to whether these modifications violated § 111(c)(3)'s prohibition
against the willful alteration of a program's content or commercial advertising.  The Court finds
it unnecessary to decide this issue.

users will only be able to watch broadcast programs if they purchase local channel subscription packages, which will be limited to those television channels available in a designated market area.  Meldal Decl. ¶ 35.  FilmOn X has developed a geolocation system to deny access to broadcast programming unless the viewer's digital device is located within the original broadcast's market area at the time of the retransmission.[11]  *Id.* ¶¶ 19-52; *see also* Summ. J. David Decl. ¶ 33 ██████████████████████████████████████

█████████████████████████████████████████

████████████████  Finally, FilmOn X explains that it intends to retransmit over-the-air broadcasts with closed captioning and without its logo.  Summ J. David Decl. ¶ 36-37.

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

_____

[11] ████████████████████████████████████████

████████████████████████████████████

In addition to modifying its service, FilmOn X has attempted to comply with § 111 requirements by making past royalty payments and filing Statements of Account with the Copyright Office for each of the six-month reporting periods since July 1, 2012. In a July 2014 letter, the Copyright Office informed FilmOn X that it does not consider Internet-based retransmission systems to be § 111 cable systems. App'x of Copyright Office [Dkt. 91], Ex. 1 (July 23, 2014 Copyright Office Letter) at 1-2 (footnotes omitted). Nonetheless, the Copyright Office explained that given that "the question of eligibility of [I]nternet-based retransmission services for the Section 111 license appears to have been raised again before the courts," the Office would accept FilmOn X's documentation on a "provisional basis." *Id.*

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Armstrong v. Archuleta*, No. 13-cv-392, 2014 WL 7399282, at *7 (D.D.C. Dec. 30, 2014). In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.

When evaluating cross-motions for summary judgment, each motion is reviewed "separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law." *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (citation and internal quotation marks omitted). Neither party is deemed to "concede the factual assertions of the opposing motion." *Competitive Enter. Inst. Wash. Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006) (citation omitted)). "[T]he court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Am. Ins. Ass'n v. HUD*, No. 13-cv-00966, 2014 WL 5802283, at *5 (D.D.C. Nov. 7, 2014) (internal quotation marks and citation omitted). A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III.  ANALYSIS

### A.  The Copyright Act of 1976

Copyright law protects copyright owners from the infringement of any of their six exclusive rights under § 106. *See* 2013 D.C. Preliminary Injunction, 966 F. Supp. 2d at 43. One of these exclusive rights is the owners' right of exclusive performance. 17 U.S.C. § 106(4). Section 106(4) provides that "the owner of copyright . . . has the exclusive right . . . [,] in the case of . . . motion pictures and other audiovisual works, to perform the copyrighted work publicly." *Id.*; *see also EchoStar Satellite LLC v. FCC*, 457 F.3d 31, 33 (DC Cir. 2006) (stating that broadcasters "generally [have] 'exclusive rights' . . . to authorize the public display of [their] copyrighted content, including the retransmission of [their] broadcast signal[s]").

Under the Copyright Act of 1909, CATV retransmissions of over-the-air signals did not constitute public performances and, thus, did not infringe the owners' exclusive right of public performance. *See Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 401

(1968); *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394, 408-409 (1974).

Congress disagreed with the Supreme Court decisions in *Fortnightly* and *Teleprompter* and

enacted the Copyright Act of 1976, Pub. L. 94-553, 90 Stat. 2541, *codified as amended* at 17

U.S.C. § 101 *et seq.*, to bring the activities of cable systems within the Act's scope. *Aereo III*,

134 S. Ct. at 2505 (citing H.R. Rep. No. 94–1476 at 86-87 (1976), *reprinted in* 1976

U.S.C.C.A.N. 5659, 5703 (1976 H.R. Rep.)).   In doing so, Congress responded to "significant

changes in technology [that] affected the operation of the copyright law," such as the advent of

cable television.   1976 H.R. Rep. at 1, 86-87 (stating that the Copyright Act of 1976 was enacted

because "[p]ursuant to two Supreme Court decisions . . . , under the 1909 copyright law, the

cable television industry ha[d] not been paying copyright royalties for its retransmission of over-

the-air broadcast signals").

        As part of the 1976 amendments to the Copyright Act, Congress enacted the

Transmit Clause, which defines a public performance as to:

> transmit or otherwise communicate a performance . . . of the
> [copyrighted] work . . . to the public, by means of any device or
> process, whether the members of the public capable of receiving the
> performance . . . receive it in the same place or in separate places
> and at the same time or at different times.

17 U.S.C. § 101.[12]   In other words, any unauthorized public transmission of copyrighted content

infringes the owners' exclusive right of public performance.   Consequently, the amendments

---

[12] The Copyright Act states: "To 'perform' a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible."  17 U.S.C. § 101.  Section 101 further clarifies that "[a] 'device,' 'machine,' or 'process is one now known or later developed."  *Id.*  Although the statute does not define the words "to the public," the Supreme Court has now held that a performance is made "to the public" when the entity transmits the images or sounds to a "group of people outside of a family and friends" that does not own the transmitted content.  *Aereo III*, 134 S. Ct. at 2510 (citing 17 U.S.C. § 101).  Furthermore, such transmission constitutes a public performance, "regardless of

"redefined the term performance to include such secondary transmissions [by CATV companies], creating potential copyright liability for cable systems and carriers involved in such transmissions."  *Hubbard Broad., Inc. v. S. Satellite Sys., Inc.*, 593 F. Supp. 808, 813 (D. Minn. 1984) (internal citations omitted).

Congress did not stop there.  It also enacted a compulsory licensing framework in § 111(c) to allow "cable TV systems to retransmit the copyrighted programming of distant broadcast stations in return for certain royalty payments."  *Id.*; *see also* 1976 H.R. Rep., at 88 (explaining that § 111(c) is clearly "directed at the operation of cable television systems and the terms and conditions of their liability for the retransmission of copyrighted works").

Section 111(c)(1) provides:

> [S]econdary transmissions[13] to the public by a cable system of a performance or display of a work embodied in a primary transmission made by the Federal Communications Commission . . . shall be subject to statutory licensing upon compliance with the requirements of subsection (d) where the carriage of the signals comprising the secondary transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission.

§ 111(c)(1).[14]  It follows from the clear text that cable systems may "retransmit to their customers any primary transmissions made by a broadcast station licensed by the [FCC]" so long

---

the number of discrete communications" made and of whether the group of people is "situated together, spatially or temporally."  *Id.* at 2509-10.

[13] The statute defines a "secondary transmission" as "the further transmitting of a primary transmission simultaneously with the primary transmission."  17 U.S.C. § 111(f)(2).

[14] Subsection (d) provides, *inter alia*, that: (1) cable systems "shall, on a semiannual basis, deposit with the Register of Copyrights" a statement of account covering the previous six months and a royalty fee payable to the copyright owners; (2) the Register of Copyrights shall deduct any "reasonable costs incurred by the Copyright Office" and "deposit the balance in the Treasury of the United States," so that the funds could later be distributed "with interest by the Librarian

as: (1) the retransmission is permissible under FCC rules, regulations, and authorizations; and (2) the cable systems "pay a fee, to be distributed to the copyright owners as surrogate for the royalties for which they might have negotiated under a pure market scheme." *See Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599 (D.C. Cir. 1988) (*MPAA*). Finally, the statute defines a "cable system" as:

> a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service. For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one system.

§ 111(f)(3). This definition gives rise to the parties' cross-motions for summary judgment concerning Defendants' § 111(c) affirmative defense and counterclaim.

### B.   *Aereo III* Decision

*Aereo III* considered a system that is virtually identical to that of FilmOn X.  134 S. Ct. 2498.  Aereo, Inc., a competitor of FilmOn X, relied on identical mini-antenna/DVR technology to retransmit over-the-air broadcast signals over the Internet to individual subscribers. *Id.* at 2503.  In analyzing Aereo's system and retransmission activities, the Supreme Court found that Aereo was not just an "equipment supplier" and, thus, reversed a Second Circuit ruling that Aereo did not perform publicly within the meaning of the Transmit Clause.

---

of Congress upon authorization by the Copyright Royalty Judges." 17 U.S.C. § 111(d).  This subsection also provides how the royalty fees shall be calculated and distributed.  *Id.*

*Id.* at 2507, 2511.  As part of its reasoning, the Court drew an analogy between Aereo and the

CATV companies targeted by the 1976 amendments to the Copyright Act.  *Id.* at 2507.  The

Court reasoned that, since the 1976 amendments made it patently clear that cable companies

could be liable for copyright infringement, it necessarily followed that Aereo, "a system that is

for all practical purposes a traditional cable system," performed publicly for purposes of the

Copyright Act.  *Id.*

      The Supreme Court highlighted Aereo's "overwhelming likeness" to CATV

companies as it compared the "turn of the knob" of old television sets to the "click on a website"

of modern internet-based retransmission services.  *Id.*  The Court also stated that any

technological differences between CATV systems and Aereo were "invisible to subscriber and

broadcaster alike."  *Id.*  As such, the Court held that, insofar as there are differences in their

respective technologies, "those differences are not adequate to place Aereo's activities outside

the scope of the Act."  *Id.* at 2511.

### C.  Section 111(c) Affirmative Defense and Counterclaim

      Defendants seek a declaratory ruling that FilmOn X's unauthorized Internet-based

retransmissions do not infringe Plaintiffs' copyrights because FilmOn X is a "cable system" that

qualifies for a § 111(c) compulsory license.  Defs.' Mot. for Summ. J. [Dkt. 97].  Consequently,

the question here is whether FilmOn X is a cable system in light of the analogies in *Aereo III* and

the text of § 111(c).

### 1.  *Res Judicata*

      Plaintiffs first argue that that the doctrine of *res judicata* precludes Defendants

from re-litigating their defense and counterclaim.  Pls.' Mem. at 16-17.  Specifically, Plaintiffs

contend that Defendants had a "full and fair opportunity to litigate" precisely this issue —

whether they are entitled to a § 111 compulsory license.  *Id.* (citing *Taylor v. Sturgell*, 553 U.S.

880, 892-93 (2008)).  Plaintiffs point out that FilmOn.com, Inc. litigated this defense unsuccessfully in the New York action where Judge Buchwald rejected it twice.  *Id.*  The first rejection came with the entry of the 2012 Stipulated Consent Judgment and Permanent Injunction binding FilmOn.com, Inc. and its affiliates.  The second rejection came in the wake of *Aereo III* when Judge Buchwald found FilmOn.com, Inc. in contempt of the 2012 Injunction. Plaintiffs contend that FilmOn X is barred from litigating the same defense in the present action.

The argument is misplaced.  Under the doctrine of *res judicata*, an earlier suit would preclude subsequent actions only if there is an "(1) an identity of the cause of action in both suits; (2) identity of the parties in both suits; and (3) a final judgment on the merits by a court of competent jurisdiction." *Velikonja v. Ashcroft*, 355 F. Supp. 2d 197, 200 (D.D.C. 2005) (citing *Does I through III v. District of Columbia,* 238 F.Supp.2d 212, 217 (D.D.C.2002)). Moreover, a previous suit does not bar a subsequent suit that does not involve the same "transaction" or "share the same nucleus of facts." *Davis v. Geithner*, 919 F. Supp. 2d 8, 16 (D.D.C. 2013); *see also Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) ("In determining whether the *res judicata* doctrine applies, the fact that the first and second suits involved the same parties, similar legal issues, similar facts, or essentially the same type of wrongful conduct is not dispositive.") (internal citations omitted).

The instant case does not involve the same transaction or share the same nucleus of facts as the New York action because Defendants launched FilmOn X's service after the 2012 Injunction was entered.  The technology and service challenged in the New York action did not involve the mini-antenna/DVR technology at stake here.  *See* David Decl. ¶¶ 6-9.  It also did not involve time-delayed retransmissions of the copyrighted content.  *See id.*  In fact, FilmOn X's service was specifically designed to avoid copyright liability under then applicable Second

Circuit precedent. *See Maharaj*, 128 F.3d at 97 ("Thus, as a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not come into play.").

       The Court also notes that Plaintiffs opted to bring actions in California and D.C. to challenge FilmOn X's service, as opposed to again enforcing the 2012 Injunction in New York. Consequently, it cannot be said that the earlier action, which did not involve the same technology and facts, precludes Defendants from arguing now that FilmOn X is a cable system entitled to a statutory license. Furthermore, Plaintiffs' *res judicata* argument contradicts their view that § 111 should not be interpreted in a technology-agnostic manner. If technological differences matter for purposes of determining what is a cable system under § 111, it necessarily follows that Judge Buchwald's rejection of FilmOn.com, Inc's § 111 defense does not bar Defendants from raising the same defense with respect to FilmOn X's technology. Finally, Defendants' position that *Aereo III* undermines and calls into question Judge Buchwald's decision in the New York action is another reason why Plaintiffs' *res judicata* argument should be rejected. *See State Farm Mut. Auto Ins. Co. v. Duel*, 324 U.S. 154, 162 (1945) ("[R]es judicata is no defense where between the time of the first judgment and the second there has been an intervening decision or change in the law creating an altered situation."). For these reasons, the Court finds that Defendants' § 111 argument is not barred and proceeds to the merits.

### 2. *Aereo III* and the § 111 Defense

       The parties agree that the issue addressed in *Aereo III* was whether Aereo's Internet-based retransmissions constituted public performances for purposes of the Transmit Clause, but not whether Aereo was a cable company for purposes of § 111(c). Nonetheless,

Defendants contend that the Supreme Court's reasoning in *Aereo III* is instructive and relevant to deciding whether FilmOn X's service is a cable system under the Copyright Act.  Defendants further suggest that *Aereo III* embraces a technology-agnostic interpretation of the 1976 amendments and the Copyright Act as a whole.  To support this proposition, Defendants rely on the fact that the Supreme Court highlighted the "overwhelming likeness" between Aereo's service and that of CATV systems and dismissed technological differences on the basis that they were "invisible to subscriber and broadcaster alike."  *See Aereo III*, 134 S. Ct. at 2507. Defendants argue that the Court's reasoning implies that no technological difference between FilmOn X and cable companies matters for purposes of the § 111 licensing scheme.  In other words, if an Internet-based retransmission service is "substantially similar to" and "for all practical purposes a traditional cable system[,]" then it must be that FilmOn X's service qualifies as a cable system under § 111.  *See* 2015 California decision, 2015 WL 4477797 at *8 (stating that the Supreme Court's analogy, while not controlling the result, is "about as close a statement directly in Defendants' favor as could be made").  This Court respectfully disagrees.

As Defendants recognize, the Supreme Court analyzed Aereo's activities only for purposes of the Transmit Clause. Therefore, any analogy to cable companies should be interpreted in that particular context. More than that, however, Defendants over-read *Aereo III*. The Court does not agree that the Supreme Court adopted a technology-agnostic interpretation of the Transmit Clause, let alone the Copyright Act as a whole.  It specifically stated:

> In other cases involving different kinds of service or technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act.  But the many similarities between Aereo and cable companies, considered in light of Congress' basic purposes in amending the Copyright Act, convince us that this difference is not critical here.

> We conclude that Aereo is not just an equipment supplier and that
> Aereo "perform[s]."

*Aereo III*, 134 S. Ct. at 2507. In other words, technological differences could very well matter as to whether a particular provider "performs" within the meaning of the Transmit Clause. The Supreme Court merely said that the differences between Aereo and cable companies were not sufficient to immunize Aereo's practices from copyright liability. *See id.* Such a holding does not direct the courts to embrace a technology-agnostic interpretation of the Transmit Clause or, even less, the Copyright Act in all circumstances. The fact that "an entity performs copyrighted works in a way similar to cable systems" cannot be construed as an order that such entity "must then be deemed a cable system for all purposes of the Copyright Act." *Aereo IV*, 2014 WL 5393867, at *3. Therefore, while the technological differences between Aereo and cable companies were legally immaterial for purposes of Transmit Clause liability, the question remains whether these differences are relevant for purposes of § 111.

Further, even if the Supreme Court intended to adopt a technology-agnostic approach for the Transmit Clause in *Aereo III*, such an approach should not be extended to the § 111 licensing scheme. The Court's underlying reasoning when it disregarded the technological differences between Aereo and cable companies was that those differences were "invisible to subscriber and broadcaster alike." *Aereo III*, 134 S. Ct. at 2507. Its statement only makes sense in the context of the Transmit Clause.[15] *Aereo III* specifically noted that "Congress enacted new

---

[15] Like the Supreme Court in *Aereo III*, this Court previously emphasized how similar FilmOn X was to cable television companies, particularly with respect to their "relationship with broadcasters such as Plaintiffs." D.C. Prelim. Inj., 966 F. Supp. 2d at 48. This comparison, however, was specifically made for purposes of the Transmit Clause. In fact, this Court stated that "nothing about the 1976 Act or its legislative history suggests that Congress intended a commercial entity that rebroadcasts copyrighted material for consumption by the public, such as FilmOn X, to avoid liability for infringement of the copyright holders' exclusive right to public

language that erased the Court's line [in *Fortnightly* and *Teleprompter*] between broadcaster and viewer, *in respect to 'perform*[*ing*]*' a work*." *Id.* at 2505 (emphasis added).  Consequently, since the broadcaster-viewer divide was erased "in respect to 'perform[ing]' a work," technological differences could be disregarded when interpreting the Transmit Clause, but not necessarily when analyzing a different provision of the Copyright Act.  *Id.*

Unlike the definition of a cable system in § 111(f)(3), the text of the Transmit Clause supports such a broad reading.  *Compare* 17 U.S.C. § 101 (referring in broad terms to transmissions or communications made "by means of *any* device or process" regardless of whether the public receives them "in the same place or in separate places and at the same time or at different times") (emphasis added) *with  Id.* § 111(f)(3) (requiring that a cable system be a physical "facility" capable of receiving broadcast signals and retransmitting them to subscribers through specific means, such as "wires, cables, microwave, or other communications channels").  Accordingly, this Court rejects Defendants' argument that *Aereo III* stands for the proposition that courts should embrace a technology-agnostic interpretation of the Copyright Act in all respects.  In fact, *Aereo III* itself rejects Defendants' view.

Finally, Defendants direct this Court's attention to the Justices' discussion at oral argument.  Defs.' Mem. at 17-18.  Specifically, Defendants rely on Justice Sotomayor's questioning whether the Court could avoid a ruling on the Transmit Clause by finding that Aereo was a cable company entitled to a compulsory license.  *Id.*  Defendants also rely on Justice

---

performance."  *Id.* (citation omitted).  It even made clear that the comparison did not necessarily mean that FilmOn X should be granted a compulsory license under § 111(c).  *Id.* ("Whether FilmOn X should be subject to a similar licensing regime is not before the Court.").

Breyer's alleged "concern" that excluding Aereo from the compulsory licensing system would limit the public's access to copyrighted works. *Id.* According to Defendants, these sporadic comments at oral argument are instructive as to whether Internet-based retransmission services, such as FilmOn X, are entitled to a § 111 license. There are three problems with Defendants' argument. First, Aereo never argued before the Supreme Court that it was a cable system entitled to a statutory license. *See, e.g.*, Brief for Respondent, *Aereo III*, 2014 WL 1245459, at *34 n.17 (U.S. Mar. 26, 2014) (No. 13-461). Therefore, the issue was never properly raised before the Court, let alone briefed or argued. Second, it is well-established that "the Justices' questions and commentary at oral argument have no legal effect." *Aereo IV*, 2014 WL 5393867, at *4. Third, even if relevant or instructive, the Justices' comments undermine Defendants' position because they show that the Justices were fully aware of a potential § 111 defense and yet chose not to mention it in the Court's opinion. *See id.* ("This awareness at oral argument coupled with silence in the opinion could just as easily imply that the Court did not conclude that the defense was applicable on the facts here.").

### 3.   Definition of a Cable System under § 111(f)(3)

While *Aereo III* did not endorse a technology-agnostic interpretation of § 111, this Court must still determine whether the provision's plain statutory text could support such an interpretation. Specifically, the question before this Court is whether FilmOn X satisfies the statutory definition of a "cable system" under § 111(f)(3). In answering this question, the Court must give effect to the definition's meaning "as written." *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992). In interpreting a statute, the general rule is that a court "must first determine whether the statutory text is plain and unambiguous." *See Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (citations omitted). "[W]hen deciding whether the language is plain, we

must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 135 S. Ct. 2480, 2488 (2015) (internal citations omitted); *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (citation omitted).  In fact, "often-times the 'meaning —or ambiguity— of certain words or phrases may only become evident when placed in context.'"  *Id.* at 2483 (internal citations omitted).  Furthermore, where the statutory language is ambiguous, courts "may examine the statute's legislative history in order to 'shed new light on congressional intent, notwithstanding statutory language that appears superficially clear.'"  *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003) (quoting *National Rifle Ass'n v. Reno*, 216 F.3d 122, 127 (D.C. Cir. 2000)).  Finally, to the extent that there is any doubt as to Congress's intent, the Court may defer to the interpretation by the Copyright Office —the federal agency responsible for overseeing § 111's compulsory licensing scheme. *See MPAA*, 836 F.2d at 608.

> The definition of a cable system can be divided into five elements:
>
> (1) a facility, (2) located in any State, Territory, Trust Territory, or Possession, that (3) in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and (4) makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels (5) to subscribing members of the public who pay for such service.

§ 111(f)(3) (numbers not in original).[16]  Defendants offer various reasons as to why FilmOn X fits squarely within the plain definition of a "cable system."  First, they argue that the definition

---

[16] In addition to this definition, § 111(f)(3) provides: "For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one

is completely indifferent as to the mode of retransmission technology used.  Second, Defendants contend that the definition's reference to "other communications channels" shows that Congress intended the Copyright Act to be construed broadly.  According to Defendants, § 111(f)(3) relies on broad and technology-agnostic language to cover new technologies, such as Internet-based retransmission services.  Finally, Defendants assert that FilmOn X satisfies each definitional element because it: (1) has physical facilities in various states; (2) receives over-the-air broadcast signals from FCC-licensed stations; (3) makes secondary transmissions over the Internet, which involves delivering the video content through coaxial cables, fiber-optic cables, microwave links, and other communication channels; and (4) provides the service to subscribing members of the public who pay for it.  *Id.* at 16.

There are problems, however, with Defendants' argument.  Defendants conveniently separate § 111(f)(3)'s definitional elements to avoid the plain language of the provision.  According to the definition, cable systems are physical facilities that both receive and retransmit broadcast signals to subscribers.  The text makes clear that the physical facility must do two things: (1) "receive[] signals transmitted or programs broadcast by one or more television broadcast stations licensed by the [FCC], *and* (2) make[] secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing

---

system."  17 U.S.C. § 111(f)(3).  The parties disagree as to whether this sentence is actually part of the "definition" of "cable system."  The Court finds that this sentence merely provides how commonly-owned cable systems should be treated for purposes of royalty computation and does not impose additional requirements onto the definition of "cable system."  *See* 2015 California decision, 2015 WL 4477797 at *12 (explaining "that the purpose of the second sentence was to ensure that larger cable systems, required to make larger per-subscriber compulsory royalty payments, would not be able to artificially lower their royalty obligation by treating themselves as multiple, smaller systems") (citation omitted).  This does not mean that this sentence should be ignored when deciding what qualifies as a cable system. *See infra* Part 4 of Analysis Section.

members of the public who pay for such service."  17 U.S.C. § 111(f)(3) (emphasis added).

FilmOn X, however, is not this type of "facility."

   While FilmOn X does have physical facilities with dime-sized antennas that

capture broadcast signals, it ultimately relies on the Internet to deliver video content to the

subscriber.  *See, e.g.*, Summ. J. David Decl. ¶¶ 22-26; Meldal Decl. ¶¶ 16-18.  Unlike FilmOnX,

cable companies have a control center known as "headend," from which they both receive the

signals and directly retransmit them by coaxial cable, wires, or microwave links to their

subscribers.  *See ivi II*, 691 F.3d at 280 (citation omitted); see also 1976 H.R. Rep., at 88 ("A

typical [cable] system consists of a central antenna which receives and amplifies television

signals and a network of cable through which the signals are transmitted to the receiving sets of

the individual subscribers.").  Internet-based retransmission services, however, have physical

facilities that receive the broadcast signals and retransmit them to Internet service providers, as

opposed to sending them directly to the subscribers' digital device.  *See* Defs.' SUMF ¶¶ 26-27

(citing Summ. J. David Decl. ¶¶ 26; Meldal Decl. ¶¶ 16-18) ("[R]ather than directly send the

data to the subscriber, a server saves the data in a subscriber-specific folder on FilmOn X's hard

drive" and, then, "once several seconds of programming have been saved, FilmOn X's server

begins to stream the saved copy of the show to the subscriber over the Internet.").

   FilmOn X is able to complete the transmission over the Internet because

"hundreds of thousands of separate operators of computers and computer networks

independently decided to use common data transfer protocols to exchange communications and

information with other computers . . . ."  *ACLU v. Reno*, 929 F. Supp. 824, 830 (E.D. Pa. 1996)

(*Reno I*), *aff'd, Reno v. ACLU*, 521 U.S. 844 (1997) (*Reno II*).  It follows that the subscriber's

device receives the retransmission, not from the "facility," but from interconnected computers through cyberspace.

The Internet is not a physical "facility[] located in any State."  17 U.S.C. § 111(f)(3).  It is not even a "physical or tangible entity . . . ."  *Reno I*, 929 F. Supp. at 830. Instead, the Internet is a "global network of millions of interconnected computers" that provides for the distribution of content worldwide.  *ivi II*, 691 F.3d at 280 (quoting *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 403 (2d Cir. 2005)) (other citations omitted).  The fact that the Internet exists in cyberspace and has no geographical location demonstrates how different FilmOnX is from a cable company that is able to capture a broadcast signal and retransmit it directly.  *See id.*  (quoting *Reno I*, 929 F. Supp. at 832) ("There is no centralized storage location, control point, or communications channel for the Internet . . . .").  Since § 111(f)(3) requires that a physical "facility" must receive the broadcast signals *and* make the secondary transmissions to paying subscribers, any system that fails to encompass the distribution medium and does not retransmit the signals directly to the subscriber does not qualify as a "cable system."  For this reason, the Internet-based retransmission system relied upon by FilmOn X is not entitled to a § 111(c) compulsory license.

In addition to the plain language of § 111(f)(3), the Court finds support for its reading of the cable system definition in the treatment of satellite carriers.  In 1988, a district court held that a satellite broadcaster was not a "cable system" for purposes of § 111.  *See Pacific & Southern Co. v. Satellite Broadcast Networks, Inc.*, 694 F. Supp. 1565, 1574 (N.D. Ga. 1988) (*SBN I*).  Instead of amending the definition of a cable system, Congress enacted the Satellite Home Viewer Act in 1988, which created a six-year statutory license for satellite

television providers retransmitting out-of-market or "distant" signals.  17 U.S.C. § 119.[17]  The

1998 Act, however, was not meant to affect satellite broadcasters' potential § 111 defense in the

*SBN I* litigation.  As a result, the Copyright Office quickly intervened and promulgated

regulations denying satellite carriers the right to a § 111(c) compulsory license.  *See* 56 Fed. Reg.

31,580 (1991); 57 Fed. Reg. 3283.  According to these regulations, § 111 directly targets

"localized retransmission services" and does not cover satellite carriers.  57 Fed. Reg. 3284,

3292.

> Thereafter, in *Satellite Broad. & Commc'ns Ass'n of Am. v. Oman*, the Eleventh

Circuit held that the regulations reasonably interpreted the Copyright Act and constituted "valid

exercises of the Copyright Office's statutory authority to interpret the provisions of the

compulsory licensing scheme."  17 F.3d 344, 345 (11th Cir. 1994).  In reaching this conclusion,

*Oman* rejected the satellite carriers' argument that the Copyright Office's interpretation "rest[ed]

on the obviously erroneous premise that the satellite itself is the 'facility'" and "ignor[ed] the

substantial ground facilities of satellite carriers —all of which are 'located in any State of the

United States.'"  Brief for Appellees, *SBCA v. Oman*, 1993 WL 13127030, at *26 (11th Cir.

Sept. 24, 1993) (No. 93-8395).  Similarly, Internet-based retransmitters lack ground facilities that

both receive broadcast signals and retransmit them directly to the public. They rely on the

Internet — an "international system" with "no centralized control" — to retransmit the signals to

the subscriber.  *Reno I*, 929 F. Supp. at 831, 838.  In both instances, the distribution medium that

reaches the paying subscriber is not part of the "facility" claiming to be a "cable system."  Thus,

---

[17] In 1998, Congress adopted another compulsory licensing scheme for satellite providers after
they developed the technology necessary to retransmit local broadcast signals. *See* 17 U.S.C.
§ 122.

neither satellite broadcasters nor FilmOn X could be described as localized retransmission services entitled to a § 111(c) compulsory license.

The Court recognizes that the physical layer through which the Internet can deliver video content may include cables, wires, and microwaves. *See* Meldal Decl. ¶¶ 9, 17-18. Nonetheless, it is also true that the Internet does not deliver video content exclusively through coaxial cables, fiber-optic cables, and microwave links. The Internet also relies on multiple other types of distribution media, such as satellite, cellular networks, and Wi-Fi. Cable systems in 1976 transmitted broadcast signals exclusively through wires and cables and served on average only 2-3 communities. *See* 1976 H.R. Rep., at 88. Precisely because these 1976 cable companies used wires and cables, they controlled the entire transmission path leading directly to the subscribers. The same cannot be said of Internet-based retransmission services.

FilmOn X's service uses a myriad of distribution media that ultimately deliver content via a global network of interconnected computers over which it has no control. The content that eventually reaches the paying subscriber "could travel any of a number of routes to its destination." *Reno I*, 929 F. Supp. at 831-32. For example:

> [A] message sent from a computer in Washington, D.C. to a computer in Palo Alto, California, might first be sent to a computer in Philadelphia, and then be forwarded to a computer in Pittsburgh, and then to Chicago, Denver and Salt Lake City, before finally reaching Palo Alto. If the message could not travel along that path (because of a military attack, simple technical malfunction, or other reason), the message would automatically (without human intervention or even knowledge) be re-routed, perhaps, from Washington D.C. to Richmond, and then to Atlanta, New Orleans, Dallas, Albuquerque, Los Angeles, and finally to Palo Alto.

*Id.* at 832. As the Internet continues to grow and expand, it becomes more evident that "it would not be technically feasible for a single entity to control all of the information conveyed on the Internet." *Id.* In fact, when the subscriber goes to FilmOn X's website and directs FilmOn X to

stream the television programming, the subscriber is essentially retrieving information stored in remote computers. *Reno II*, 521 U.S. at 852 (describing the World Wide Web as "vast number of documents stored in different computers all over the world that users can search for and retrieve"). This information "do[es] not necessarily travel entirely along the same path." *Reno I*, 929 F. Supp. at 832. Instead, the information is "subdivided into smaller 'packets' that are then sent independently to the destination," through different routes and paths, "and are then automatically reassembled by the receiving computer." *Id.* The information is retransmitted and re-routed around the world in a matter of seconds before it reaches its destination. It follows that the global reach of Internet-based retransmitters is quite different from the cable companies' localized retransmission of over-the-air signals. *Reno I*, 929 F. Supp. at 837 ("The power of the [World Wide] Web stems from the ability of a link to point to any document, regardless of its status or physical location.").

Moreover, satellite providers, like Internet-based services, deliver video content through many types of communication channels, such as cables, wires, and microwaves. *See* Suppl. Jones Decl. ¶ 6. Since satellite providers are not cable systems, it is unlikely that Congress intended for any entity that happens to employ wires and cables as a mere part of its transmission path to qualify as a "cable system." Defendants do not provide a cogent explanation as to why FilmOn X should be treated differently. In any event, to the extent that the plain text of § 111(f)(3) could be deemed ambiguous in its definition, the Court looks to the Copyright Office's interpretation and decides the degree to which it may be entitled to deference. *See infra* Part 4 of Analysis Section.

Defendants also argue that Congress intended § 111 to encompass evolving technologies. Defs.' Mem. at 15. To support this proposition, Defendants rely on the fact that a

facility's secondary retransmissions can be made by "wires, cables, microwave, or *other communications channels* . . . ." *Id.* (quoting § 111(f)(3)) (emphasis added).  According to Defendants, the Internet falls under this last broad category.  The argument ignores an important canon of statutory interpretation.  *Ejusdem generis* ("of the same kind or class") teaches that "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008).  In this case, Congress listed specific items — "wires, cables, [or] microwave" — and followed them with the general words "other communications channels."  Under the ancient canon, the Court must determine whether the Internet is similar or of the same kind as "wires, cables, [or] microwave." *See Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 221 (D.C. Cir. 2007) ("[W]here the general words follow specific words, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.") (citation and internal quotation marks omitted).

A communications channel is "the medium used to transmit the signal from the transmitting to the receiving point."  Claude Shannon, "Communication In the Presence of Noise," 86 *Proceedings of the IEEE* 1 (1998).  Wires, cables, and microwaves are examples of such media with "specific" and "defining characteristics," such as "bandwidth, noise, and throughput." *See* Suppl. Jones Decl. ¶¶ 4-5.  The Internet does not share these characteristics.  Instead, the Internet is "a global network of interconnected computers" that has "no centralized storage location, control point, or communications channel." *ivi II*, 691 F.3d at 280 (citations omitted); *see also* Suppl. Jones Decl. ¶ 4.  The Court concludes that a system that operates through nebulous international connections in cyberspace does not constitute a "channel" similar to "wires, cables [or] microwave."

Indeed, the plain language of § 111(f)(3) does not support Defendants' broad interpretation, which becomes even more far-fetched when the words are read "in their context and with a view to their place in the overall statutory scheme." *King*, 135 S. Ct. at 2488. If it were true that Congress intended the definition of a cable system to embrace any and all new technologies, Congress would not have amended the Act in 1994 to specify "microwave" as an example of a "communications channel." *ivi II*, 691 F.3d at 282. It also would not have enacted separate licensing schemes for satellite providers retransmitting distant signals, *see* 17 U.S.C. § 119, and local broadcast signals, *see id.* § 122. Congress did not consider the Internet in 1976 when § 111 was enacted and has not amended the definition since to include anything resembling a distribution medium with a global footprint.

Beyond the text and overall statutory scheme, the legislative history of the Copyright Act indicates that the "approach of the bill [containing the 1976 amendments] is to set forth the copyright owner's exclusive rights in *broad terms in section 106*, and then to provide various *limitations, qualifications, or exemptions* in the 12 sections that follow." 1976 H.R. Rep., at 61 (emphasis added). Section 111 contains "limitations" that must be construed narrowly to preserve the copyright owner's broad § 106 exclusive rights. *See Tasini v. N.Y. Times Co.*, 206 F.3d 161, 168 (2d Cir. 2000) (stating that where the Copyright Act "sets forth exceptions to a general rule, we generally construe the exceptions 'narrowly in order to preserve the primary operation of the [provision]'") (citation omitted). Defendants' argument overlooks the congressional intent as evidenced in the text of the Copyright Act and its legislative history. *Aereo III* advised: "[T]o the extent commercial actors or other interested entities may be concerned with the relationship between the development and use of [new] technologies and the Copyright Act, *they are of course free to seek action from Congress*." 134 S. Ct. at 2511 (citing

32

Digital Millennium Copyright Act, 17 U.S.C. § 512) (indicating that not all new communications media will be automatically entitled to treatment as a cable system) (emphasis added). Defendants are free to seek action from Congress and this Court will not twist and bend the statute's definition of a cable system to accommodate FilmOn X's service.

Finally, another canon of statutory interpretation counsels against construing the text broadly to include Internet-based retransmission services.  The *Charming Betsy* canon provides that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  *Murray v. Schooner Charming Besty*, 6 U.S. (2 Cranch) 64, 118 (1804).  In other words, statutes should not be construed, if possible, to place the United States in violation of its international obligations.  In this case, the United States has "ratified several free trade agreements which contain the obligation that 'neither Party may permit the retransmission of television signals (whether terrestrial, cable, or satellite) on the Internet without authorization of the right holder or right holders, if any, of the content of the signal and of the signal . . . .'"  U.S. Copyright Office, *Satellite Home Viewer Extension and Reauthorization Act Section 109 Report* 188 (2008) [Dkt. 91-4] ("SHVERA Report").  Requiring that FilmOn X be granted compulsory license could violate this international obligation.  *See ivi I*, 765 F. Supp. 2d at 611, 613.  Since another possible construction remains — and it is consistent with the Court's interpretation of what Congress actually intended as evidenced by the statute's text and legislative history — the Court finds that FilmOn X is not a cable system.

In conclusion, the plain language of § 111(f)(3) contradicts Defendants' position that Internet-based retransmitters are entitled to a compulsory license.  The Court's interpretation becomes even more forceful when the text is read as part of the overall statutory scheme.  The best Defendants could assert is that § 111(f)(3) is ambiguous, particularly with respect to: (1)

whether the entity must own or control its transmission path from headend to paying subscriber to qualify as a cable system; and (2) whether the entity must retransmit broadcast signals exclusively by wires, cables, microwaves, or other communications channels.  Although the analysis above resolves those claims, to the extent that the statutory text may be still deemed ambiguous, this Court will consider the Copyright Office's interpretation of § 111 and determine whether it is entitled to deference.

### 4.  The Copyright Office's Interpretation of § 111

The Copyright Office is the federal agency responsible for managing and overseeing § 111's compulsory licensing scheme.  *See MPAA*, 836 F.2d at 608; *see also ivi II*, 691 F.3d at 283.  While the FCC is also involved in implementing congressional policy on cable systems, the Copyright Office has historically been the entity "charge[d] . . . with the oversight of the cable compulsory license" and it is responsible for determining the eligibility of service providers for § 111 purposes.  *Motion Picture Ass'n of Am., Inc. v. Oman*, 750 F. Supp. 3, 6 (D.D.C. 1990).[18]  Given the Copyright Office's unique expertise in this highly technical area of the law, it has the authority to issue binding interpretations of the Copyright Act.  *See MPAA*, 836 F.2d at 599.  In light of this authority, courts defer to such interpretations when appropriate.

---

[18]  The FCC has never issued any regulation or expressed any policy view that contradicts the Copyright Office's longstanding interpretation.  Defendants urge this Court to stay this case pending an FCC decision on its notice of proposed rulemaking (NPRM) concerning the classification of over-the-top providers as MVPDs.  Defs.' Mem. at 27-29.  This pending NPRM, however, will only address their classification for purposes of the federal telecommunications regulatory regime.  Even if the Copyright Office recognized the pendency of the FCC proceeding in its July 23, 2014 letter to FilmOn X, there is no certainty as to when the FCC will issue a decision and, more importantly, as to whether the Copyright Office will in fact change its interpretation of § 111(f)(3) as a result of a future FCC decision.  *See* Defs.' Req. for Jud. Notice [Dkt. 99-1] (Defs.' RJN), Ex. C (NPRM) at 23 (recognizing that the Copyright Office may not reconsider its position on Internet-based retransmission services even if the proposed rule is adopted).  As a result, the Court denies Defendants' request to stay the case.

*See id.*; *see also United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) ("[A]gencies charged with applying a statute . . . certainly may influence courts facing questions the agencies have already answered.").

For over fifteen  years, the Copyright Office has taken the position that Internet-based retransmission services are not cable systems and do not fall within § 111.  *See ivi II*, 691 F.3d at 283.  The fact that the Copyright Office accepted FilmOn X's § 111 filings on a provisional basis does not change this fact.  Quite to the contrary, in response to FilmOn X's filings, the Copyright Office clearly wrote:

> We understand FilmOn to be an internet-based service that retransmits broadcast television programming.  In the view of the Copyright Office, such a service falls outside the scope of the Section 111 license . . . As explained in [*ivi II*], Section 111 is meant to encompass localized retransmission services that are regulated as cable systems by the FCC. [691 F.3d] at 284 (quoting 57 Fed. Reg. 3284, 3292 (Jan. 29, 1992)).  We do not see anything in the Supreme Court's recent decision in [*Aereo III*] that would alter this conclusion . . . For the reasons discussed above, the Office does not believe FilmOn qualifies for the Section 111 statutory license, and will not process FilmOn's filings at this time.  In recognition that the question of eligibility . . . appears to have been raised again before the courts, however, the Office will not refuse FilmOn's filings but will instead accept them on a provisional basis.

 July 23, 2014 Copyright Office Letter at 1-2 (footnotes omitted).

Before analyzing the Copyright Office's interpretation, the Court must first determine the type and amount of deference owed to the agency.  Plaintiffs argue that the Court should apply *Chevron* deference, and thus adopt the Copyright Office's interpretation so long as it is reasonable.  Pls.' Mem. at 12-17 (relying on *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).  In support, Plaintiffs cite the Second Circuit's decision in *ivi II* and the D.C. Circuit's decision in *MPAA*.  There are two problems with Plaintiffs' argument.  First, *ivi II* did not discuss why it found the Copyright Office's interpretation entitled

to *Chevron* deference as opposed to a lesser type of deference.  *See ivi II*, 691 at 279.  The

omission is significant because Judge Buchwald in *ivi I* had found *Chevron* inapplicable and,

instead, applied lesser deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  *See ivi I*,

765 F. Supp. at 605 n.11.  While *ivi II* is relevant and convincing as to other matters, it does not

contribute to analyzing the deference that is owed to the Copyright Office here.  Second, the

D.C. Circuit cited *Chevron* in *MPAA*, when it deferred to a formal Copyright Office regulation

that interpreted § 111(d)(1)(B).  836 F.2d at 608.  Of course, however, there is no formal

regulation governing Internet-based retransmission services that might apply here.[19]

   The Copyright Office's position that Internet-based services are not cable systems

under § 111(f)(3) is not based on a formal regulation but on a series of statements, policy

documents, and congressional testimonies over the years.  While it is true that the absence of a

final regulation does not automatically preclude *Chevron* deference, it is also true that "the

overwhelming number of cases applying *Chevron* deference have reviewed the fruits of notice-

and-comment rulemaking or formal adjudication."  *Mead*, 533 U.S. at 219.  The Court will not

apply *Chevron* deference in the absence of formal rulemaking here because the Copyright Office

issued regulations after notice-and-comment in other situations, such as those concerning

satellite carriers. *See* 57 Fed. Reg.  3284, 3292; *see also ivi I*, 765 F. Supp. at 605 n.11.

---

[19] The Copyright Office has issued formal regulations interpreting § 111(f)(3).  The regulations
establish that § 111 is "clearly directed at localized transmission services." *See, e.g.*, 57 Fed.
Reg. at 3290. Nonetheless, the notice-and-comment process and the ensuing regulations only
considered the eligibility of satellite carriers, multipoint distribution service, and multichannel
multipoint distribution service to operate under the § 111 compulsory license.  *Id.* at 3284-85.
Therefore, the regulations did not specifically address the question of whether an Internet-based
retransmission service qualifies as a cable system.

Nonetheless, deference to the agency's interpretation may still be warranted under *Skidmore*.[20]  *Id.* (citing *Mead*, 533 U.S. at 226-27).  *Skidmore* deference "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Mead*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 139-40) (internal quotation marks omitted).  In other words, a Court should look "to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Id.*

The Copyright Office has consistently opined that Internet-based retransmission services do not qualify for a § 111 compulsory license.  The Copyright Office first noted the vast differences between "industries eligible for compulsory licensing" and Internet-based retransmission services as long ago as 1997.  App'x of Copyright Office [Dkt. 91], Ex. 5, (U.S. Copyright Office, *A Review of the Copyright Licensing Regimes Covering Retransmissions of Broadcast Signals* 97 (1997)).  Given these differences, the Office concluded that Internet-based retransmitters were not entitled to a compulsory license.  Three years later, the Register of Copyrights reaffirmed this position before Congress.  *Id.*, Ex. 2 (Statement of Marybeth Peters, Register of Copyrights Before the House Subcommittee on Courts and Intellectual Property,

---

[20] Defendants argue that the Copyright Office's failure to issue a formal regulation to govern Internet-based retransmission services means that it does not intend its policy views to carry the force of law.  *See* Defs.' Reply [Dkt. 126] at 15.  Defendants contend that this Court should not give any deference to the Office's interpretation.  Further, Defendants ignore that it was not until recently, especially in the wake of *Aereo III*, that Internet-based retransmission services began to claim that they are cable systems.  Notably, Aereo and FilmOn X originally conceded that they were not entitled to a § 111(c) compulsory license.  Also, since the Copyright Office first articulated its position in 1997, Congress and the courts had always embraced the Office's interpretation without much debate or controversy.  The Office itself made clear that *Aereo III* did not alter its conclusion.  July 23, 2014 Copyright Office Letter at 1.  It was not until recently, when Judge Wu departed from this longstanding view, that the Office's interpretation was rejected for the first time.  *See* 2015 California decision, 2015 WL 4477797.

106th Congress, 2d Sess., at 9 (June 15, 2000)) (2000 Hearings).  The Register told Congress

that since § 111 "could not reasonably be interpreted to include Internet retransmissions . . . [,] if

there is to be a compulsory license covering such retransmissions, it will have to come from

newly enacted legislation and not existing law."  *Id.*  The Copyright Office has been consistent in

denying a § 111 license to Internet-based retransmission services.  *See id.*, Ex. 6 (Letter dated

Nov. 10, 1999 from Marybeth Peters to Sen. Orrin. G. Hatch, *reprinted in* 145 Cong. Rec. 30980

(Nov. 19, 1999)); *accord*, *id.*, Ex. 10, 2000 Hearings at 88 (Statement of Peggy Miles, Chairman

of the International Webcasting Association).

   In 2008, the Copyright Office issued a report in response to a congressional

directive seeking the Office's views on a variety of compulsory licensing matters, including the

expansion of "current licensing schemes . . . to include the delivery of broadcast programming

over the Internet."  *ivi I*, 765 F. Supp. 2d at 611; *see also* Satellite Home Viewer Extension and

Reauthorization Act (SHVERA), Pub. L. No. 108-447, 118 Stat. 2809, 3407-08 (2004).  In its

2008 Report, the Office remained committed to its prior interpretation:

> The Office continues to oppose an Internet statutory license that
> would permit any website on the Internet to retransmit television
> programming without the consent of the copyright owner.  Such a
> measure, if enacted, would effectively wrest control away from
> program producers who make significant investments in content and
> who power the creative engine in the U.S. economy.

SHVERA Report at 188.  In response to concerns about the lack of competition and the lack of

public access to broadcast programming, the Office reported that "there is no proof that the

Internet video market is failing to thrive and is in need of government assistance through a

licensing system."  *Id.*  To the contrary, the Office explained that "the lack of a statutory license

provides an incentive for parties to find new ways to bring broadcast programming to the

marketplace and that market, by all accounts, continues to grow."  *Id.*

Congress has been fully aware of the Copyright Office's longstanding interpretation. *See, e.g.*, 2000 Hearings, Ex. 6 at 359, *reprinted in* 145 Cong. Rec. 30980-82 (Nov. 19, 1999) (statements of Sens. Hatch and Leahy) (acknowledging that "under current law, Internet and similar online communication services are not and never have been, eligible to claim the cable or satellite compulsory licenses created by Section 111 and 119"). Despite this awareness, Congress has neither amended the text of § 111 nor enacted a separate compulsory-licensing scheme to include Internet-based retransmission services. However, Congress has repeatedly amended the statute in other respects. For example, it amended the cable system definition to include the term "microwave" and enacted the licensing scheme for satellite providers. *See ivi II*, 691 F.3d at 281-82. As recently as 2014, four years after *ivi I* and two years after *ivi II*, Congress amended the Copyright Act without rejecting or altering the Copyright Office's interpretation. *See* SHVERA, Pub. L. No. 113-200 (2014).

Inaction in the face of a consistent legal interpretation can signal Congress's agreement. If Congress had intended to have Internet-based retransmission services qualify for a § 111 license, it would have already acted to reject the Copyright Office's interpretation. That has not been the case. Under these circumstances, "it is well established that once an agency's statutory construction has been fully brought to the attention of the public and Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *Bolden v. Blue Cross & Blue Shield Assoc.*, 848 F.2d 201, 208-09 (D.C. Cir. 1988).

In addition, the Copyright Office's interpretation of § 111(f)(3) is independently persuasive because it is grounded in the statute's text and legislative history. The Office has clearly stated that § 111 was intended for "an inherently localized transmission media of limited

availability." 62 Fed. Reg. 18705, 18707 (Apr. 17, 1997) (citing 56 Fed. Reg. 31595 (July 11, 1991)). The Office made this clear when it denied satellite carriers their right to a § 111 license. *See* 57 Fed. Reg. 3284, 3292 ("Examination of the overall operation of section 111 proves that the compulsory license applies only to localized retransmission services regulated as cable systems by the FCC."). FilmOn X does not, and cannot, dispute that Internet-based retransmitters are not "inherently localized transmission media." 62 Fed. Reg. 18705, 18707. Since the Eleventh Circuit found this interpretation of § 111(f)(3) to be reasonable with respect to satellite carriers, the Court finds that the same interpretation is at the very least persuasive with respect to Internet-based retransmitters. *See Oman*, 17 F.3d at 346. Consequently, this Court defers, under *Skidmore*, to the Office's interpretation of § 111.

With respect to the text, the Copyright Office reached its determination based on the requirement in § 111(f)(3) that a "facility[] located in any State," and refers to "contiguous communities" and "headend." As the Office points out, these terms do not have any application to a nationwide, let alone global, service. *See ivi II*, 691 F.3d at 284. Although the words "communities" and "headend" relate to the royalty computation provision in subsection (d)(1), they bear some significance as to the actual definition of a cable system. Systems like FilmOn X and satellite carriers do not retransmit signals from a "headend" to the public. Rather, the medium used to complete the secondary transmission to the public "are not located in any state, let alone the same state" where the signals are received. 57 Fed. Reg. 3290. FilmOn X's service has the capacity to reach subscribers well beyond local "communities" and is, in fact, potentially worldwide. When confronted with systems that are not inherently localized transmission media of limited availability, such as satellite carriers, Congress has amended the statute to create a new

compulsory-licensing scheme.  *See* 17 U.S.C. §§ 119 and 122.  The congressional response has

been consistent with the Copyright Office's interpretation.

        Moreover, the Office's position is also persuasive because "at the time Congress

created the cable compulsory license, the FCC regulated the cable industry as a highly localized

medium of limited availability."  62 Fed. Reg. 18705, 18707 (April 17, 1997) (citing 56 Fed.

Reg. 31595).  This suggests that "Congress, cognizant of the FCC's regulations and the market

realities, fashioned a compulsory license with a local rather than a national scope."  *Id.*  This

interpretation of Congress's intent is consistent with the text, purpose, and legislative history of

the statute.  *See* 1976 H.R. Rep., at 86-88 (explaining that traditional cable systems in 1976

served on average two to three communities as part of their efforts to provide broad public access

to broadcast programming in remote or distant mountainous communities).  As evidenced by the

treatment of satellite carriers, Congress has indirectly reaffirmed the Office's position.

        "In enacting each [compulsory] license, Congress has traditionally considered the

unique historical, technological, and regulatory circumstances that affect each industry."  H.R.

Rep. No. 108-660 at 8-9 (2004) (2004 H.R. Rep.).  The vast differences between "the local

character of cable systems and the national business model of [Direct Broadcast Satellite] and

[Internet-based retransmission services] have resulted in differential public service, carriage, and

taxation obligations that ought to be objectively reviewed before Congress enacts sweeping

changes."  *Id.*  When Congress enacted § 111 in 1976, Congress certainly did not consider the

"unique historical, technological, and regulatory circumstances" surrounding an "international

network of interconnected computers."  *Reno II*, 521 U.S. at 849.  Since then, Congress has not

amended the text of § 111(f)(3) in any way that could suggest that it has considered the

circumstances affecting this "unique and wholly new medium of worldwide communication."

*Id.* at 850 (citation omitted).  It would be improper for this Court to predict congressional decisions and order that Internet-based retransmission services are entitled to a compulsory license.  2004 H.R. Rep. at 8-9; *see also* 57 Fed. Reg. 3292, n. 5 (since "the 1976 Act did not consider the public policy implications of extending a compulsory license to these non-cable services, the Copyright Office should not assert authority to interpret the Copyright [A]ct in this way").[21]

In conclusion, the Copyright Office's persuasive interpretation resolves any potential ambiguities in the text of § 111(f)(3).  This Court hereby defers to this interpretation and, for this reason as well, holds that Defendants are not cable systems entitled to a § 111(c) compulsory license.

### D.  Infringement of Public Performance Rights

Since FilmOn X is not entitled to a § 111(c) compulsory license, the Court must determine whether Plaintiffs' public performance rights were actually infringed.  Defendants argue that Plaintiffs' Motion as to this copyright infringement claim is procedurally improper

---

[21] Defendants argue that the Copyright Office has afforded a § 111 compulsory license to similar retransmission services.  Defendants offer the examples of AT&T U-verse and Verizon FiOS, which use Internet protocol technology (IPTV) to deliver video content to subscribers.  Defs.' Mem. at 23.  Yet, IPTV technology is not the same as the Internet.  In fact "IPTV video is typically delivered through a closed, 'end-to-end system' in which the distributor controls the wires and routers right up until the subscriber's home." *ivi I*, 765 F. Supp. at 611-12 n.24.; Suppl. Jones Decl. ¶ 3-4.  The Copyright Office has distinguished the practice of streaming content over the Internet from the use of Internet Protocol for purposes of § 111 eligibility.  SHVERA Report at 181-89, 194-200.  AT&T U-verse and Verizon FiOS do not stream video programming over the Internet as FilmOn X does.  *See, e.g.*, Defs.' RJN, Ex. D, (*What is IPTV?*, AT&T (2009)).  To the contrary, AT&T U-verse and Verizon FiOS deliver content to local communities through closed and managed networks that were built for this precise purpose.  *Id.* Moreover, since FilmOn X has the capacity to deliver video programming at a national level and even internationally, there is a real and unique concern for piracy that is not present in these other systems.  *ivi I*, 765 F. Supp. at 614 n.28.  Therefore, the Court finds Defendants' examples to be inapposite.  It is up to Congress to evaluate the public policy implications of Internet-based retransmissions and determine whether to amend the Copyright Act.

and should be denied.  Defs.' Opp'n [Dkt. 100] at at 28-30.  According to Defendants, the case at

this stage should be limited to the § 111 issue pursuant to this Court's Scheduling Order.  *Id.*

(citing Sched. Order [Dkt. 75]).  Furthermore, Defendants contend that the Court's adjudication

of the copyright infringement claim would be premature and unfair to the extent that the parties

have not conducted any discovery into: (1) whether time-delayed transmissions constitute public

performances within the meaning of the Transmit Clause; and (2) whether and to what extent any

co-defendant other than FilmOn X infringed Plaintiffs' exclusive right of public performance.

*See id.*[22]

Defendants correctly assert that this Court's Scheduling Order limited discovery

and summary judgment briefing to Defendants' § 111 defense and counterclaim.  *See* Sched.

Order, [Dkt. 75]; *see also* March 30, 2015 Minute Order re Dkt. 80.  While Federal Rule of Civil

Procedure 16(b) provides that a scheduling order "shall not be modified except upon a showing

of good cause and by leave of the district judge," the underlying purpose of the Rule "is to

promote the ability of the Court to manage cases, to develop a sound plan to govern the

particular case from start to finish' and 'to set[] and keep[] firm pretrial and trial dates.'"  *Olgyay*

*v. Soc'y for Envtl. Graphic Design, Inc.*, 169 F.R.D. 219, 220 (D.D.C. 1996) (internal quotation

marks and citation omitted).  This case was filed more than two years ago and the Court had

already entered a Preliminary Injunction against Defendants.  There are no pretrial or trial dates

set that could be affected if this Court were to consider Plaintiffs' public performance claim.

---

[22] Plaintiffs concede that discovery might be needed concerning the co-defendants' roles and
involvement in FilmOn X's transmissions.  *See* Pls.' Reply [Dkt. 114] at 24. ("While the
evidence shows that all of defendants are liable for infringement, . . . that adjudication can await
for another day when Plaintiffs have been able to take discovery confirming the interlocking
nature of the companies and Mr. David's control over them.").  This Court will deny without
prejudice Plaintiffs' motion for summary judgment of copyright infringement with respect to Mr.
David, FilmOn.tv Networks, Inc., FilmOn.tv, Inc., and FilmOn.com Inc.

Also, *Aereo III* has already made clear that FilmOn X's nearly-simultaneous retransmissions constitute public performances.  *See* 134 S. Ct. at 2503.  Defendants do not dispute this.

Moreover, Defendants do not proffer any examples of discovery necessary to argue why such retransmissions are not public performances within the meaning of the Transmit Clause.  Therefore, since the parties have extensively argued about FilmOn X's retransmission services, it has become clear that it presents a purely legal question that can be resolved now based on undisputed evidence in the record.  Plaintiffs' Motion is ripe for adjudication.

### 1. Nearly-Simultaneous Retransmissions

To establish a copyright infringement claim, Plaintiffs must establish that they own valid copyrights over the broadcast programming and that any of their exclusive rights under § 106 was violated.  2013 D.C. Preliminary Injunction, 966 F. Supp. 2d at 43 (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)).  Defendants do not dispute that Plaintiffs, which produce and license television programs on over-the-air broadcast stations, own copyrights in either the audiovisual works or scripts of such television programs.  *See* Pls.' SUMF ¶¶ 11-26 (explaining that some of the copyrighted programming includes: *New Girl* (FOX), *America's Funniest Home Videos* (ABC), *CSI: Crime Scene Investigation* (CBS), and *The Office* (NBC)).

Moreover, it is also undisputed that FilmOn X's nearly-simultaneous retransmissions of over-the-air content are public performances for purposes of the Transmit Clause.  *See Aereo III*, 134 S. Ct. at 2503, 2511 (concluding that Aereo's performed publicly within the meaning of the Transmit Clause when it transmitted copyrighted television programs near-simultaneously with the original broadcast).  It is also clear that Plaintiffs never authorized these retransmissions.  Consequently, the Court holds that FilmOn X's nearly-simultaneous

retransmissions directly infringed Plaintiffs' exclusive right of public performance under

§ 106(4).  *See id.*

### 2.  Time-Delayed Retransmissions

FilmOn X's time-delayed service allows individual subscribers to record over-

the-air television programming and watch the selected content at a later time.  *See* Summ. J.

David Decl. ¶ 26; Meldal Decl. ¶¶ 16-18.  Defendants compare the service's storage and time-

shifting function to that of cloud-based storage providers, "in which the user dictates what

material will be stored on the network, when copies will be made, and when the network will

transmit that data."  Defs.' Opp'n at 31.  According to Defendants, since the individual user is

the one who accesses the stored content and then directs the provider to transmit it, this process

is nothing more than "private transmission" outside the scope of the Copyright Act.  *Id.*  This

Court disagrees.

While it is true that the Supreme Court in *Aereo III* did not consider Aereo's time-

delayed retransmission service, its reasoning confirms this Court's conclusion that the Transmit

Clause encompasses FilmOn X's DVR-like functionality.  *See* 134 S. Ct. 2503; *see also* 2013

D.C. Prelim. Inj., 966 F. Supp. 2d at 46. This Court already ruled:

> By making available Plaintiffs' copyrighted performances to any
> member of the public who accesses the FilmOn X service,
> FilmOn X performs the copyrighted work publicly as defined by the
> Transmit Clause: Film On X "transmit[s] . . . a performance . . . of
> the work . . . to the public, by means of any device or process."  *See*
> 17 U.S.C. § 101.  "A 'device,' 'machine,' or 'process' is one now
> known [*i.e.*, in 1976] *or later developed*;" "[t]o 'transmit' a
> performance or display is to communicate it by any *device or
> process.*"  *Id.* (emphases added).  These two definitions are facially
> broad and encompass FilmOn X's convoluted process for relaying
> television signals.  *The Transmit Clause, which applies whether
> "members of the public capable of receiving the performance or
> display receive it in the same place or in separate places and at the*

> *same time or at different times," also plainly captures FilmOn X's*
> *DVR-like capabilities.*

2013 D.C. Prelim. Inj., 966 F. Supp. 2d at 46 (emphasis added). The Supreme Court validated

this Court's interpretation of the Transmit Clause when it reasoned that in a "performance" to the

public, "'the public' need not be situated together, spatially or temporally." *Aereo III*, 134 S. Ct.

at 2510. In other words, the "subscribers may receive the same programs *at different times and*

*locations*." *Id.* (emphasis added).

       FilmOn X essentially argues that its timely-delayed retransmissions are "private

transmissions" because they are made to individual subscribers, rather than to the public. Defs.'

Opp'n. at 31. Also, Defendants contend that FilmOn X could not be liable because direct

infringement requires volitional conduct. *Id.* at 31-34. According to Defendants, the fact that

the subscriber directs FilmOn X to store the over-the-air content means that FilmOn X's conduct

is not intentional. *Id.* In other words, like a cloud storage service, FilmOn X merely provides

equipment to store the over-the-air content.

       Defendants, however, merely rehash Aereo's unsuccessful arguments in *Aereo III*.

The fact that the transmissions originate from individual copies and are streamed to individual

users does not render the transmission "private." Like its nearly-simultaneous transmission

service, FilmOn X's DVR-function renders multiple subscribers "capable of receiving" the same

"perceptible images and sounds" of over-the-air programs. 134 S. Ct. at 509-510; *see also* 2013

D.C. Prelim. Inj., 966 F. Supp. 2d at 46-48. FilmOn X's transmissions are made to the public

regardless of the time delay. *See Aereo III*, 134 S. Ct. at 2510 (holding that a transmission is

performed publicly, regardless of whether the public is not situated together "spatially or

*temporally*") (emphasis added).

Furthermore, Defendants' reliance on FilmOn X's alleged passive behavior is misplaced.  The Supreme Court rejected the proposition that an entity such as FilmOn X is merely an equipment supplier that operates based on the subscriber's instruction and direction.  *See id.* at 2507 ("We conclude that Aereo is not just an equipment supplier and that Aereo 'perform[s].'").  An unauthorized secondary transmission constitutes a performance regardless of the time delay.  In other words, just because the subscriber has to click a button to initiate the streaming does not mean that FilmOn X does not perform within the meaning of the Transmit Clause.  *See* 2013 D.C. Prelim. Inj., 966 F. Supp. 2d at 46-47.  Finally, the Supreme Court did not find it necessary to address the "volitional conduct" requirement in *Aereo III* to hold that both Aereo and its subscribers perform within the meaning of the Transmit Clause.  134 S. Ct. at 2506-07.

Since *Aereo III*'s reasoning applies with equal force in this context, it is no surprise that Defendants choose to rely almost exclusively on Justice Scalia's dissenting opinion in *Aereo III* and the cases cited therein.  Given the broad language of the Transmit Clause, *Aereo III*'s reasoning should be extended to time-delayed retransmissions.  For purposes of what constitutes a public performance, this type of service is much more similar to its nearly-simultaneous counterpart, than to a cloud storage service.  Unlike a cloud storage service, FilmOn X did not allow servers to store lawfully acquired content and play it back on command.  Rather, it captured broadcast signals and saved individual copies of the over-the-air content, so that it could later "stream the saved copy of the show to the subscriber over the Internet."  Summ. J. David Decl. ¶ 26(d).   This difference is important because "an entity that transmits a performance to individuals in their capacities as owners or possessors does not perform to 'the public,' whereas an entity like [FilmOn X] that transmits to large numbers of paying subscribers

who lack any prior relationship to the works does so perform." *Aereo III*, 134 S. Ct. at 2510.[23] Consequently, the Court rejects Defendants' repackaging of Aereo's unsuccessful arguments and extends *Aereo III*'s reasoning to FilmOn X's time-delayed transmissions.  FilmOn X's time-delayed retransmissions also directly infringed Plaintiffs' exclusive right of public performance under § 106(4).

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion for Summary Judgment, including Defendants' request to stay, Dkt. 97.  The Court will also grant in part and deny in part Plaintiffs' Motion for Partial Summary Judgment, Dkt. 81.  Partial Judgment will be entered in favor of Plaintiffs as follows: (1) FilmOn X, LLC is liable for infringing Plaintiffs' exclusive right of public performance under section 106(4) of the Copyright Act, 17 U.S.C. § 106(4); and (2) Defendants' counterclaim for declaratory relief that they are entitled to a statutory or compulsory license to retransmit Plaintiffs' copyrighted programming under Section 111 of the Copyright Act, 17 U.S.C. § 111, is dismissed.  Finally, Plaintiffs' copyright infringement claim against FilmOn.TV Networks, Inc., FilmOn.TV, Inc., FilmOn.com, Inc., and Alkiviades David will be denied without prejudice.  A memorializing Order accompanies this Opinion.


Date: November 12, 2015

                                        _____/s/_____
                                        ROSEMARY M. COLLYER
                                        United States District Judge

---

[23] This statement by the Supreme Court also demonstrates that *Aereo III* did not adopt a technology-agnostic interpretation of the Copyright Act.  Technological differences matter in determining whether the subscriber has any prior relationship to the copyrighted programming.